Exhibit No. 3

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION


| | |
|---|---|
| DAVID BOVERI, | ) |
| Plaintiff, | ) Case No. |
| vs. | ) 19 CV 50226 |
| CONSENSYS, Inc., | ) |
| Defendant. | ) |


The remote videotaped deposition of
DAVID J. BOVERI, called for examination, taken
pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before DINA G. MANCILLAS, a Certified Shorthand
Reporter within and for the State of Illinois,
CSR No. 84-3400 of said state, on May 14, 2021,
at 9:00 a.m. CST.

David Boveri
May 14, 2021

```
 1      REMOTE APPEARANCES:

 2

 3          DAVID J. BOVERI, Pro Se,

 4          (3230 Sycamore Road, Suite 168,

 5          DeKalb, Illinois  60115,

 6          847-461-9235), by:

 7          MR. DAVID J. BOVERI,

 8              appeared pro se via videoconference

 9              on behalf of himself;

10

11          DAVIS WRIGHT TREMAINE LLP,

12          (1251 Avenue of the Americas, 21st Floor,

13          New York, New York  10020-1104,

14          212-489-8230), by:

15          MR. SCOTT M. COOPER,

16          scottcooper@dwt.com,

17              appeared via videoconference on

18              behalf of the Defendant.

19

20

21

22

23

24

25
```

David Boveri
May 14, 2021

1      ALSO PRESENT REMOTELY:

2

3          Mr. Devon Green, Video Technician and

4              Legal Videographer, US Legal

5              Support, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     REPORTED BY:

23         DINA G. MANCILLAS, CSR, RPR, CRR, CLR

24         CSR No. 84-3400

25     APPEARING REMOTELY FROM DUPAGE COUNTY, ILLINOIS

David Boveri
May 14, 2021

1    accurate?

2         A.    No.  That is a typo.  It is 1 of

3    2019.

4              I did not know any of the

5    individuals in that company at that date.  I

6    have -- yeah.  Sorry.

7         Q.    How did you first learn about

8    ConsenSys?

9         A.    I first learned about ConsenSys

10   through Kel Kanhirun.

11        Q.    And what's the nature of your --

12   let -- let me rephrase that.

13             In 2018, what was the nature of your

14   relationship with Kel Kanir- -- -hirun?

15        A.    A friend of mine from college.

16        Q.    And how did you first learn about

17   internship or employment opportunities with

18   ConsenSys?

19        A.    Kel told me about them.

20        Q.    Was there a period of time when --

21   when Kel was paying your rent?

22        A.    That is correct.

23        Q.    And for how long was he paying your

24   rent?

25        A.    He gave me a one-time sum to pay my

David Boveri
May 14, 2021

1    rent.

2         Q.    And that paid your rent for how

3    long?

4         A.    Approximately six months.

5         Q.    And how much money was that?

6         A.    I believe it was approximately

7    $4,000.

8         Q.    And why would he give you that money

9    to pay your rent?

10        A.    Because I was disabled and homeless

11   and disowned by my family.

12        Q.    Why did your family disown you?

13        A.    My parents disowned me because I

14   told my aunt that my brother was going to

15   become engaged to his now fiancee.

16        Q.    Was there a period of time when

17   Mr. Kanhirun was providing you with money to

18   cover cost of living expenses other than your

19   rent?

20        A.    No.

21        Q.    I'm going to again share my screen.

22   This will be Exhibit No. 6.

23             MR. COOPER:  Dina, for your

24        reference, this is actually Tab No. 7, Tab

25        No. 7 that I sent you this morning, but

David Boveri
May 14, 2021

1        Exhibit 6 for purposes of this deposition.

2    BY MR. COOPER:

3        Q.    Mr. Boveri, do you recognize this

4    document?

5        A.    Yes.

6        Q.    And what is it?

7        A.    It is a text message between me and

8    Kevin Kanhirun, also known as Kel.

9        Q.    And specifically, I want to direct

10   your attention to the part in the middle of the

11   screen where it looks like Kel is telling you,

12   "I sent you some money last week.  Maybe you

13   can use it to get your own Wi-Fi."

14            Is -- is it your recollection that

15   Kel in this text message is referencing the --

16   the $4,000 payment that you just spoke about?

17       A.    No, he's not.

18       Q.    So is this a separate payment?

19       A.    Correct.

20       Q.    Why was he making a separate payment

21   to you?

22       A.    I believe at that time, I was doing

23   consulting for him on Trello or project

24   management in general.

25       Q.    And did this consulting ever appear

David Boveri
May 14, 2021

1    on your resumé?

2        A.    No.

3        Q.    Why not?

4        A.    I often do not include other things

5    on my resumé that I have done.  For example, I

6    used to consult and tutor foreign language

7    students on their English.

8              MR. COOPER:  I'm going to move to

9         strike as nonresponsive.

10   BY MR. COOPER:

11       Q.    So the -- the question, Mr. Boveri,

12   is, why didn't you include that consulting work

13   that you say you performed for Mr. Kanhirun, I

14   guess, in April 2018 on your resumé at that

15   time?

16       A.    It was minimal, and there were space

17   limitations to the resumé in the formatting I

18   used on the website that generated, and it is

19   also not a curriculum vitae.

20              So you do not include every little

21   thing you do on it, unlike in academia, where

22   on a CV, you would include every minor thing

23   you did.

24       Q.    Other than the payment referenced

25   here in this text message thread and the $4,000

David Boveri
May 14, 2021

1    payment that you referenced earlier, were --

2    did Kel Kanhirun send you any other payments

3    in, let's say, the first half of 2018?

4         A.    If you're specifying that specific

5    payment, yes, but there -- to my memory, there

6    were two or three similar payments, but I do

7    not recall the amount or the number, for

8    similar work completed.

9         Q.    Did you ever blackmail Mr. Kanhirun?

10        A.    No, I have not.

11        Q.    Did you ever attempt to blackmail

12   him?

13        A.    No, I have not.

14        Q.    Did you ever pay him back for the

15   $4,000 that he gave you to pay your rent?

16        A.    No.  I have offered, and he has

17   indicated he does not want the money back.

18        Q.    What was Mr. Kanhirun getting out of

19   this arrangement?

20        A.    Are you asking why did he do it?

21   Can you clarify?

22        Q.    Sure.

23        A.    We -- he did it because I was -- he

24   met me in October or November of 2017 for

25   lunch.  We had not dis- -- we did not see each

David Boveri
May 14, 2021

1        other in a while.

2                He discovered I was homeless.  He

3        discovered that nobody in my family was helping

4        me.  And he did not want to see his friend

5        homeless, and he wanted me to get back on my

6        feet.

7             Q.   So is it accurate to say that he

8        wanted you to realize some -- some amount of

9        financial stability?

10            A.   Correct.

11            Q.   I'm going to again share my screen

12       in a moment.  This will be Exhibit 7.

13                MR. COOPER:  Dina, this is Tab No. 8

14            that I sent you this morning.

15       BY MR. COOPER:

16            Q.   Take a look at this, Mr. Boveri.

17       It's Bates No. BOVERI 332.

18                Do you recognize this document?

19            A.   Yes, I do.

20            Q.   Specifically I want to focus in, for

21       the purposes of the next question or two, on --

22       on the portion of the document -- excuse me --

23       under the heading "On Saturday."

24                Is it accurate to say that this is

25       an email from Kel Kanhirun to you?

David Boveri
May 14, 2021

 1          A.    Yes.

 2          Q.    He write -- and that it's dated

 3     March 18 -- or, excuse me -- March 16 of 2018?

 4          A.    Correct.

 5          Q.    It looks like Mr. Kanhirun writes to

 6     you, "I'll propose a short-term and long-term

 7     financial solution to you."  And that's a -- a

 8     direct quote.

 9               What was he talking about in terms

10     of financial solutions?

11          A.    I don't recall.

12          Q.    Do you recall what his ultimately

13     proposal was?

14          A.    In the context of that quote?  Is

15     that what you mean?

16          Q.    From -- well, let's put it this way.

17               In -- in March of 2018, did

18     Mr. Kanhirun propose any financial solution to

19     you?

20          A.    I understand you're using the quote

21     "financial solution."  If we constitute that to

22     mean any way of me achieving income, the answer

23     would be yes, but I don't know specifically

24     what those short- and long-term financial

25     solutions refer to.

David Boveri
May 14, 2021

1      Q.    As far as I can tell -- I mean, it

2   looks like the term is being used in the

3   context of him paying you money.

4           Does that seem consistent with --

5   with what we've been talking about today?

6      A.    It seems consistent that perhaps the

7   short-term would be, but not the long-term.

8      Q.    So kind of circling back here just

9   so we can kind of put a bow on this, do you

10  have any recollection sitting here today as to

11  what Mr. Kanhirun was referring to when he

12  wrote in this document, "I'll propose a

13  short-term and long-term financial solution to

14  you"?

15     A.    I can speculate, but I do not recall

16  what he was specifically referring to.

17     Q.    And what would -- what would your

18  speculation be as to the short-term?

19     A.    Doing consulting work for him on --

20  on project management and Trello so that he

21  could pay me a nominal fees to do my work -- I

22  mean, to -- to -- yeah, to do the work I

23  completed for him.

24     Q.    And what would you speculate that

25  the long-term financial solution referred to?

David Boveri
May 14, 2021

1      A.    Apply for a job at ConsenSys, but I

2   don't know off the top -- I don't recall if

3   that's specifically what this conversation is

4   referring to.

5      Q.    Other than your -- your academic

6   experience at Northern Illinois University,

7   prior to your internship with ConsenSys, did

8   you ever have a full-time job before?

9      A.    No.

10     Q.    Mr. Boveri, is it accurate to say

11  that Mr. Kanhirun helped you to secure a job

12  with ConsenSys?

13     A.    That is accurate, yes.

14     Q.    Did he help you to -- to build

15  your -- your LinkedIn profile?

16     A.    He did, yes.

17     Q.    Did he help you with your resumé?

18     A.    I -- are you referring to the resumé

19  you showed me earlier in this call?

20     Q.    Well, I -- I can -- I can rephrase

21  the question.

22          Did Mr. Kanhirun help you in

23  connection with any resumé that you submitted

24  to ConsenSys for the purpose of obtaining

25  employment or an internship from ConsenSys?

David Boveri
May 14, 2021

```
1        A.    I don't recall.  If I did submit a
2    resumé, then, yes.  If I did not, then, no.
3              I don't recall whether I submitted a
4    resumé.  I do know that he told me that the
5    LinkedIn profile was the most important aspect
6    of the application.
7        Q.    Did he instruct you on how to dress
8    for your anticipated interview with ConsenSys?
9        A.    We discussed it.  He did not
10   instruct me to do anything.
11       Q.    So I'm going to again show you what
12   I believe was -- was just marked as Exhibit 7.
13   I'll share my screen.  Same thing we've just
14   been looking at and referring to and
15   discussing.
16             So if you look at the bottom,
17   Mr. Boveri, you'll see that Mr. Kanhirun
18   directs you or -- or advises you, if you prefer
19   that word, for purposes of -- of an interview,
20   to be "clean shaven" and, using his words, to
21   "wear gay colors for your interview."
22             Do you agree that this advice came
23   from Mr. Kanhirun?
24       A.    Are you indicating that the email
25   says it came from him or that -- what are you
```

David Boveri
May 14, 2021

1    asking?

2         Q.    Did Miss Kan- -- did Mr. Kanhirun

3    tell you to wear gay colors for your interview?

4         A.    I don't recall, but I did say that

5    in the email that you are showing me.

6         Q.    So you're saying it's -- what is

7    contained in this email -- I'll give you the

8    date and time stamp -- dated Wednesday,

9    March 14, 2018, time stamp 6:21 p.m., says it's

10   from Kel Kanhirun, the part about dressing and

11   shaving, was it you who wrote that?

12        A.    Okay.  Well, you've scrolled down on

13   the screen and showing a different part of the

14   email.  The part you were showing was a quote

15   from me rephrasing something, apparently.  And

16   the part you're showing now is a quote that

17   then references the quote.

18              And I do see the -- at the bottom

19   screen, it says on Wednesday, March 14th, 2018,

20   at 6:21 p.m., that Kel Kanhirun wrote, and at

21   the bottom, it does say, "Clean shaven," and,

22   "Wear gay colors for your interview."

23        Q.    Thank you.  Did you ever work for an

24   entity called Anonymonkey?

25        A.    Yes.

David Boveri
May 14, 2021

```
 1          Q.    And what did you do there?

 2          A.    At that company, I did work on using

 3    Facebook and other social media platforms.  I

 4    also consulted on strategy and product

 5    development for a start-up called Anonymonkey

 6    based out of Chicago which was founded at the

 7    University of Chicago.

 8                And one of the people working this

 9    was -- I'm assuming this is where you're

10    heading.  So forgive me if it's not, but, yes,

11    Kel Kanhirun did work there as well.

12          Q.    And do you see -- we're still

13    looking at the same document -- toward the

14    bottom of the page where Mr. Kanhirun advises

15    you to -- I'm going to quote here -- "Add

16    Anonymonkey as your experience.  Say whatever

17    you want.  Observe my profile to make the

18    timeline congruent."

19                Do you see that part?

20          A.    I do see it.  Correct.

21          Q.    Why is it that you had to be advised

22    by Mr. Kanhirun to add that entry to your list

23    of experience?

24          A.    I don't recall, but I can speculate.

25    Would you like me to speculate?
```

David Boveri
May 14, 2021

1       Q.    No.  I have another question.

2       A.    Okay.

3       Q.    He advises you there in that same

4   entry to -- to -- or, the same line, rather,

5   to, quote, "Say whatever you want."

6           Do you know why he would advise you

7   to say whatever you want in that bottom entry?

8       A.    Yes.  Because when you work at a

9   start-up, you have multiple roles, and I did

10  have multiple roles.  And I was not compensated

11  for my time there because I was hoping to

12  achieve equity.

13          So "whatever you want" would be --

14  my interpretation at the time was whatever is

15  accurate.

16      Q.    Or whatever works best?

17      A.    Are you asking me -- can you clarify

18  that as a question?

19      Q.    Sure.  If -- if Mr. Kanhirun was

20  advising you to say whatever you want, how did

21  you interpret that?

22      A.    I'm not sure why I would put

23  something on my resumé that did not look best.

24  So the question doesn't make sense to me.

25          How would I interpret it otherwise?

David Boveri
May 14, 2021

1    process.

2              And I don't believe it was ever sent

3    to anybody.

4         Q.   I'm going to scroll down in -- in

5    this document, Mr. Boveri.  And I want to -- I

6    want you to focus on a portion of the paragraph

7    that starts with "at any rate."

8              Do you see that paragraph?

9         A.   Yes.

10        Q.   I'm looking at the se- -- excuse

11   me -- the third sentence in that paragraph.

12             Quote, "It took months to prepare

13   for the interview in April and a crazy amount

14   of work to prep for the job, but I made it,"

15   end quote.

16             Did it take you months to prepare

17   for an interview for an internship?

18        A.   Yes.

19        Q.   Why did it take you months to

20   prepare for a ConsenSys interview?

21        A.   Because I have a disability.  And at

22   that time, it was untreated.  And I had brain

23   fog and had been recently homeless and could

24   barely -- in the time that one would have to

25   normally spend perhaps -- I don't know -- one

David Boveri
May 14, 2021

1    or two weeks brushing up on the industry such

2    as blockchain, I did not have the cognitive

3    resources to do it quickly.

4        Q.    I'm looking at the very next

5    sentence.  You write, "I'm just an intern for

6    now, but holy shit, dude.  I'm rolling in

7    Benjies."

8            Skipping ahead a little bit within

9    that same paragraph, you write, "This fucking

10   intern pulls in over six racks a month to sit

11   on his couch."

12           You also -- excuse me.  With regard

13   to -- with regard to your sentence about being

14   "just an intern for now," my question is, when

15   you wrote this in June of 2018, did you have

16   aspirations of receiving a full-time permanent

17   position with ConsenSys?

18       A.    As indicated in -- I believe it was

19   Exhibit 1 -- I don't have access to those notes

20   now.  They're across the room -- I had

21   aspirations and believed that I had been

22   offered and rescinded a full-time position by

23   that point at ConsenSys.

24       Q.    If you -- still in the exact same

25   paragraph.

David Boveri
May 14, 2021

1    masturbating during ConsenSys meetings?

2           A.    Zero.

3           Q.    How much did you spend masturbating

4    during time you were supposed to be performing

5    work as -- for ConsenSys?

6           A.    Zero.

7           Q.    Then why did you write this?

8           A.    Because the individual to whom this

9    therapeutic exercise was addressed talked that

10   way and was very crude and disrespectful.

11              And he'd like to make those kind of

12   jokes.

13          Q.    Well, apparently you talked this

14   way, too, and you liked to make these kind of

15   jokes, no?

16          A.    Insofar as I write them to -- on a

17   personal therapeutic exercise on my phone, I

18   did, yes.

19              I would never -- yeah.  I don't -- I

20   don't remember the context of why I wrote those

21   things, but I do remember the person, and that

22   was the kind of humor he had.

23          Q.    Did you ever apply for any position

24   with ConsenSys that was not an internship?

25          A.    Can you define "apply"?

David Boveri
May 14, 2021

```
 1          Q.     Did you submit an application for

 2     any position with ConsenSys that was not in an

 3     internship?

 4          A.     No.

 5          Q.     Did you have the opportunity to

 6     apply for a position with ConsenSys that was a

 7     full-time, noninternship position?

 8          A.     Yes.

 9          Q.     I am going to again share my screen.

10                 MR. COOPER:  I believe this will be

11          Exhibit 9.  Dina, this -- this Exhibit 9 is

12          what I sent you this morning as Tab 11.

13     BY MR. COOPER:

14          Q.     This document bears the Bates

15     number BOVERI 335.  I'll scroll through it so

16     that you can check it out, Mr. Boveri.

17                 Do you recognize this document?

18          A.     Yes.

19          Q.     I want to direct your attention to

20     the bottom portion of the -- the document and

21     the message that we spoke about a couple

22     minutes ago, Bates-stamped March 14, 2018, time

23     stamped 6:21 p.m., from Kel Kanhirun to you

24     where he writes, "There are two programs here,

25     the summer program and the new grad program.
```

David Boveri
May 14, 2021

1    Pick the one that suits you."

2            Did -- did you spend time

3    considering which program was best for you?

4        A.    Yes.

5        Q.    Scrolling up in the document toward

6    the top, on the 19th of March 2018, you write

7    to -- to Kel Kanhirun, "Okay.  I finally looked

8    over the jobs and internships.  The new grads

9    program seems to be for full-time employees (it

10   mentions healthcare).  So I'll be applying for

11   the 2018 ConsenSys summer internship."

12           Well, why did you prefer to apply

13   for the internship instead of the ConsenSys new

14   grads program?

15       A.    That's a difficult question because

16   the -- by the time you applied, the new grads

17   program did not exist.  The link disappeared.

18           So I don't recall what I was saying

19   in this instance, but I do know that the link

20   disappeared, and I later discovered through

21   Elizabeth Gottlieb, who was in charge of the

22   internship program, that it disappeared because

23   the person in charge of it was fired from

24   ConsenSys, I believe, for some sort of

25   malfeasance or inappropriate conduct.

David Boveri
May 14, 2021

1                    And so they eliminated that program.

2      So I don't recall why, at that moment, I didn't

3      apply to it, but by the time I went to apply,

4      it did not exist.

5           Q.    Except here, on March 19th of 2018,

6      you have apparently made the decision to apply

7      for an internship instead of a full-time

8      position.

9                    So my question is, what went into

10     your decision-making process at that time?

11          A.    I don't recall because my mem- -- my

12     memory is that -- I don't remember this -- why

13     I said that at this point, but I do remember

14     when I filled out the email -- filled out the

15     actual application, the link did not exist.

16                   So I can't, you know -- I do

17     remember at the time wondering to double-check

18     things, and it wasn't there.

19          Q.    The link to what did not exist?

20          A.    The full-time grad program.  There's

21     no record of it.  It was deleted off the

22     website, and it never happened at ConsenSys.

23          Q.    And -- and just to clarify, when you

24     say that at the time you sat down to fill out

25     the application, would that time have been at

David Boveri
May 14, 2021

1    some point after March 19th, 2018?

2         A.    I don't recall.  I don't have

3    records of the day I filled out the

4    application.

5         Q.    Well, you if we look at the time and

6    date stamp, you sent this email at 10:43 p.m.

7    on March 19th.

8              Is it safe to say that -- is it safe

9    to say that you applied for a ConsenSys

10   internship only after you sent this email to

11   Kel?

12        A.    Yes.

13             MR. COOPER:  So now might be a good

14        time for, let's say, a -- a ten-minute

15        break.  It is 10:36 your time, Central

16        Time, Mr. Boveri.

17             Does that sound appropriate to

18        you to -- to reconvene at 10:46?

19             THE WITNESS:  Yes.

20             THE VIDEOGRAPHER:  Great.  We're

21        going off the record at 15:36 UTC.

22             (A recess was had from 15:36 UTC

23        until 15:49 UTC.)

24             THE VIDEOGRAPHER:  This marks the

25        beginning of Media 2.

David Boveri
May 14, 2021

1    BY MR. COOPER:

2         Q.    I -- I can represent to you that

3    this was produced by you during the course of

4    discovery.

5         A.    Okay.  Honestly, I do not recognize

6    this document, but I can attest that is my

7    email and that I provided it to you.  My

8    assumption is that it is an automated message

9    that I received and provided through an

10   auto- -- searching for keywords through the

11   discovery process.

12        Q.    And when you said an automated

13   message is that you received, is it accurate to

14   say that this appears to be a -- a message that

15   you received subsequent to applying for a

16   summer internship position with ConsenSys?

17        A.    Yes.  It does appear to be that,

18   yes.

19        Q.    I'm going to move on to the next

20   exhibit, which will be Exhibit No. 11.

21             MR. COOPER:  Dina, for your

22        purposes, this was Tab 13.

23   BY MR. COOPER:

24        Q.    Another one-pager.

25             Mr. Boveri, do you recognize this

David Boveri
May 14, 2021

1    document?

2          A.    Yes.

3          Q.    And what is this document?

4          A.    It is a document confirming the

5    scheduling of my interview for a position with

6    ConsenSys with Lianna Newman.

7          Q.    Did -- and -- and specifically,

8    because I realize yesterday that there are

9    two -- two messages within this document, one

10   from Ms. Newman and one from you, and

11   Ms. Newman's comes first.

12               If we focus in on Ms. Newman's

13   message dated April 2nd, 2018, at 11:56 a.m.,

14   she writes that, "You have been selected

15   for" -- excuse me -- "selected to interview for

16   the summer internship at ConsenSys in DC Labs."

17               Is -- is that correct?

18         A.    That is correct.

19         Q.    Did you ever receive an invitation

20   from ConsenSys to interview for a full-time

21   permanent position?

22         A.    No, I did not.

23         Q.    And moving right along, I'm going to

24   introduce the next exhibit, which I believe

25   should be Exhibit 12.

David Boveri
May 14, 2021

1            Is that an accurate summary of -- of
2    this portion of the conversation?
3        A.    The conversation or the text message
4    you were showing me?
5        Q.    I'll clarify.  Is that an accurate
6    summary of the portion of the -- the text
7    message that I've just shown you?
8        A.    I'm not sure that you summarized,
9    but, yes, the words you read aloud did appear
10   on the text message.
11       Q.    And to be clear, did you ever apply
12   for an independent contractor position?
13       A.    No, I did not.
14       Q.    And were you pleased by the
15   prospects according to Kel of -- of being
16   engaged on a project-by-project basis?
17       A.    No.
18       Q.    Then why did you respond, quote,
19   "Oh, wow.  Cool"?
20       A.    I was responding specifically to the
21   independent contractor position, which I
22   understood to mean full-time.
23       Q.    Why would you understand that to
24   mean full-time?
25       A.    Because of my knowledge of what I've

David Boveri
May 14, 2021

 1    explanation?

 2         A.    The explanation would be that he

 3    discussed -- well, I think -- may I answer

 4    about before the red zone?

 5         Q.    No.  You can answer the question.

 6         A.    Okay.  My understanding is that two

 7    members of the hiring committee, including

 8    Kevin Kanhirun and Lianna Newman, had a

 9    discussion about why I did not qualify to be a

10    remote intern that was in person.

11              And then my memory is that Lianna

12    Newman indicated that I was more than qualified

13    to be a software developer at ConsenSys and

14    that I could be hired full-time.

15              And my memory then is that I ex- --

16    I disclosed my disability and gave one member

17    of the hiring comminity -- hiring committee,

18    Kevin Kanhirun, to disclose the disability to

19    Lianna Newman.

20         Q.    You just mentioned -- just backing

21    up a step -- that Lianna indicated that you

22    were, to use your phrase, "more than qualified"

23    for a full-time -- a certain full-time

24    position.

25              Did she say that to you?

David Boveri
May 14, 2021

 1        A.    No.  It was communicated to Kevin

 2   Kanhirun.

 3        Q.    So you were not a party to that

 4   conversation?

 5        A.    That specific one?  No.

 6        Q.    At the bottom of this -- this page,

 7   Kel writes, "She asked why I didn't consider

 8   you for full-time."

 9             My first question is, when he says

10   "she," do you believe that Kel was referring to

11   Lianna Newman?

12        A.    I believe that he is misgendering

13   Lianna Newman, but, yes.

14        Q.    Okay.  And what is the answer?  Why

15   didn't Kel consider you for a full-time

16   position?

17        A.    I disclosed my disability to Kevin

18   Kanhirun, Kel, and communicated the status of

19   my treatment, and I -- we discussed my -- to

20   what extent my disability may or may not impact

21   my ability to do the job full-time, but -- and

22   so it is my understanding that the contractor

23   position mentioned in passing above was a

24   reaction to, why don't you hire him full-time?"

25             And it was my understanding that the

David Boveri
May 14, 2021

 1      contractor position was then an in-between of

 2      full-time and intern.  A sort of compromise, it

 3      was my understanding that a member of the

 4      hiring committee, Lianna Newman, made after

 5      being told about my disability.

 6              And like I indicated, these rec- --

 7      these are iMessage records.  They may -- they

 8      were synced to a laptop that may be slightly

 9      out of order, but regardless of the order of

10      that, my understanding was that comment there,

11      "Why didn't full-ti- -- why you didn't

12      considered for full-time," was the predecessor

13      to the offer of being a contractor, not the

14      other way around.

15          Q.   Did you ever receive an offer to

16      work as an independent contractor for

17      ConsenSys?

18          A.   Can you decline -- can you define

19      what an "offer" constitutes?

20          Q.   Did you receive an offer to work as

21      an independent contractor for ConsenSys?

22          A.   It's not clear to me what you mean

23      by "offer."

24          Q.   You have a Ph.D., Mr. Boveri.

25      You're 34, 35 years old.  You don't know the

David Boveri
May 14, 2021

1    meaning of "offer"?

2         A.    Are you asking me if I was --

3         Q.    How did you get this far in life

4    without knowing the meaning of the word

5    "offer"?

6              In fact, it appears all throughout

7    your complaint and, I might add, throughout

8    your -- your written discovery responses.

9         A.    It's not clear to me, in this

10   moment, whether you're referring to a verbal

11   offer or a written offer.

12        Q.    Did ConsenSys, at any point in time,

13   offer you a position as an independent

14   contractor.

15             You really seem to be struggling

16   with this one.

17        A.    Well, because I'm -- I'm not -- like

18   I said, you haven't clarified whether you meant

19   written offer or verbal offer.  So it's --

20        Q.    Any offer, Mr. Boveri.  Any offer at

21   all to work for ConsenSys as an independent

22   contractor.

23        A.    From my perspective, this

24   conversation on the screen, as well as verbal

25   conversations surrounding it, constitute an

David Boveri
May 14, 2021

```
1    offer.
2         Q.    Did you ever receive anything in
3    writing offering you a position from ConsenSys
4    as a -- an independent contractor?
5         A.    No, I did not.
6         Q.    And when you talk about verbal
7    conversations regarding this supposed
8    independent contractor position, who did you
9    have those verbal conversations with?
10        A.    Kevin Kanhirun.
11        Q.    And during those conversations, did
12   he offer you, on behalf of ConsenSys, an
13   independent contractor position?
14        A.    It is my understanding that Lianna
15   Newman offered a [sic] independent contractor
16   position through Kevin Kanhirun as part of the
17   discussions of my capabilities to do the job
18   and that, per disclosure, it was rescinded.
19             MR. COOPER:  Hey, Dina, can you read
20        back the question, please?
21             THE COURT REPORTER:  Sure.
22             (Said record was read by the
23             reporter.)
24   BY THE WITNESS:
25        A.    It is my understanding that I was
```

David Boveri
May 14, 2021

```
1    offered the position and that it was rescinded

2    through interactive discussions of my

3    disability which were disclosed to two members

4    of the hiring committee.

5    BY MR. COOPER:

6         Q.    Were you a party to any

7    communication in which you were supposedly

8    offered a position as an independent

9    contractor?

10        A.    No.

11        Q.    Were you a party to any

12   communication, Mr. Buver- -- Boveri in which

13   ConsenSys withdrew an offer of an independent

14   contractor position?

15        A.    Yes.

16        Q.    With whom?

17        A.    Kevin Kanhirun.

18        Q.    And what did he tell you?

19        A.    That they would not be offering me a

20   position because of the disclosures present on

21   this and the previous exhibit on the screen

22   that you've shown me of my disability.

23        Q.    He told you they wouldn't be

24   offering you a position.

25             So then doesn't it follow that they
```

David Boveri
May 14, 2021

1    never offered you a position in the first

2    place?

3         A.    No, not -- not from my perspective,

4    no.

5         Q.    Well, maybe you can explain your

6    perspective because speaking for myself, it

7    seems like you're twisting yourself in knots to

8    create an event that didn't actually occur.

9         A.    It is my understanding that I

10   disclosed a -- my disability to one member of

11   the hiring committee who then disclosed it to

12   another who engaged in an interactive

13   discussion about my capabilities without me.

14             And I -- at the time, I had been

15   recently homeless and disowned, and I thought

16   that this interactive discussion of my

17   disability without me present, including offers

18   of either full-time or contractor-based

19   positions, I believed that those were in my

20   best interests because I was very frightened of

21   becoming homeless again.

22             And I thought that it would be oh --

23   I was just grateful that they were not denying

24   me any sort of position outright because of my

25   disability.

David Boveri
May 14, 2021

1    Q.    Did Lianna Newman have the authority
2    to hire people?
3        A.    It was my understanding that as a
4    member of the hiring committee at ConsenSys DC,
5    which, at the time, was called DC Labs, but did
6    not exist by the time I was hired, but did
7    exist when I was being interviewed, it is my
8    understanding that the hiring committee had
9    deputized her to a strong vote and, therefore,
10   most of the decision-making process in who to
11   hire as an intern for their DC office, but not
12   if the -- the internship was for the company as
13   a whole out of Brooklyn, their Brooklyn office.
14       Q.    How did you come by that
15   understanding that she had been deputized to
16   make certain decisions?
17       A.    Kevin Kan- -- Kanhirun told me.
18       Q.    Did she have unilateral authority to
19   extend offers of employment or -- or internship
20   or independent contractor?
21       A.    I was not privy to those
22   conversations, but it is my understanding that
23   the committee was following her recommendations
24   specifically because of group consensus wherein
25   a -- everybody has to agree, and she would have

David Boveri
May 14, 2021

 1   voted no.

 2            And as such, they implicitly decided

 3   her vote of ye- -- her vote of yes would be

 4   speaking on behalf of the whole committee.

 5        Q.    Is it accurate to say that you were

 6   never privy to any of those meetings or votes?

 7        A.    Yes.  I did not work at ConsenSys,

 8   and I was not privy to those meetings, and nor

 9   did I meet any other member at the time before

10   hiring of the committee besides Lianna Newman

11   and Kevin Kanhirun.

12        Q.    Okay.  I'm going to introduce what

13   will be Exhibit No. 16.

14            MR. COOPER:  Dina this is Tab

15        No. 18.

16   BY MR. COOPER:

17        Q.    Another one-page document.  Again,

18   it appears to be a text thread between you and

19   Mr. Kanhirun.  It bears the Bates number

20   BOVERI 253.

21            Do you recognize this document,

22   Mr. Boveri?

23        A.    Yes, I do.

24        Q.    I want to direct your attention

25   toward the bottom of the page.

David Boveri
May 14, 2021

1           Mr. Kanhirun writes, "I think I'm
2     going to recommend you as a data scientist,
3     intern/contractor.  I believe this 'signal'" --
4     "signal" used in quotes -- "will achieve our
5     strategic goals."
6           You'll see that just above that,
7     Mr. Boveri, there's a date stamp of April 7th,
8     2018.  As of that date, what were your and
9     Mr. Kanhirun's strategic goals?
10        A.    I'd like to point out the reference
11    to a "cat ninja" as well above, that our
12    strategic goals were for me to be hired at
13    ConsenSys, to work with him and his team, so
14    that we could do the job we were hired to do
15    and engage in several programs at ConsenSys
16    which allowed people to create internal
17    start-ups such as the project we did create,
18    Hey, Pie!.
19          An internal goal would be to be
20    hired full-time.  Or, strategic goal.  My
21    apologies.  That's what -- my understanding.
22        Q.    And yet -- and yet, less than one
23    month earlier, you declined an opportunity to
24    apply for a full-time position, is that
25    correct?

David Boveri
May 14, 2021

1    discussed whether I should be characterized as

2    a cat ninja or something like that.

3              So to me, these -- he's --

4    [indiscernible] -- the discussion of the role,

5    but in this context, the question was I was

6    asking was about the title of the role being

7    offered, and there -- and he's responding to

8    separate the role from the title.

9              So we are discussing the title.  It

10   is my understanding that he answered that.

11        Q.   I will move on to a new exhibit.

12   This will be Exhibit 18.

13              MR. COOPER:  Dina, this is Tab

14        No. 20.

15   BY MR. COOPER:

16        Q.   It's a one-pager.  It bears the

17   Bates number BOVERI 263.

18              Mr. Boveri, I want to direct your

19   attention to the top of the page.  It looks

20   like Kel Kanhirun tells you, quote, "I may be

21   able to get you a full-time gig as a product

22   manager."

23              Did you ever apply for a job as a

24   product manager?

25        A.   No.

David Boveri
May 14, 2021

1    Q.    Did you interview for a job as a

2    product manager?

3    A.    No.

4    Q.    In total, how many interviews did

5    you have with ConsenSys?

6    A.    I believe it was one.  There may

7    have been a second interview with Lianna

8    Newman, but I don't recall, but the two

9    interviews were as described for the

10   internship.

11   Q.    The -- and -- let me -- let me ask

12   this.

13        Is it accurate to say that any

14   interview or interviews you had with ConsenSys

15   were with Lianna Newman?

16   A.    Correct.

17   Q.    Okay.  Were you ever offered a job

18   as a product manager?

19   A.    It was my understanding that I was

20   engaged in an interactive discussion about my

21   ability to be a product manager full-time with

22   Kevin Kanhirun as part of a larger interactive

23   discussion that he was having with other

24   members of the hiring committee, including

25   Lianna Newman, in regards to my ability to do

David Boveri
May 14, 2021

1    the job, given my disability.

2         Q.    I'm going to ask the question again.

3    It's really a straightforward, yes-or-no

4    question.

5              Were you ever offered a job as a

6    product manager?

7         A.    Nothing at ConsenSys was ever

8    straightforward.  So --

9         Q.    Neither are your answers.

10        A.    Yes, because I don't -- working in a

11   decentralized company is unlike anything else I

12   can describe.

13             So to be offered something by people

14   who are allowed to make decisions is not the

15   same as it would be at another company where

16   there would be a documented set of HR

17   procedures for offering jobs.

18             And there was no such at ConsenSys,

19   not until after --

20        Q.    I'll ask it again.  Were you ever

21   offered -- were you ever offered a job as a

22   project -- excuse me -- as a product manager?

23        A.    It was my understanding that the

24   committee discussed whether I could do that job

25   as a product manager, given my disability.

David Boveri
May 14, 2021

1     Q.    Were you ever offered a job as a

2   product manager?

3     A.    From my perspective, if a member of

4   a hiring committee indicates that you can be a

5   product manager --

6           MR. COOPER:  Move to strike the

7           answer as nonresponsive.

8   BY MR. COOPER:

9     Q.    Clearly, you cannot or will not

10  answer that question.  So I can rephrase if

11  ever so slightly.

12          Did you ever receive an offer for a

13  position with ConsenSys as a product manager?

14    A.    A written offer or a verbal offer?

15    Q.    Any offer.

16    A.    I did not receive a written offer,

17  but I was offered a position as a product

18  manager as can be seen in this -- as evidenced

19  here in this conversation.

20          I believe there is a -- was a verbal

21  conversation before the internship process --

22  application process began where I was directly

23  offered to be a product manager on a project

24  with the World Bank, and I disclosed my

25  disability at that point.

David Boveri
May 14, 2021

```
 1              I don't believe it is mentioned

 2      directly in the complaint because the time

 3      frame exceeded the statute of limitations by

 4      the EEOC by a couple weeks, but it was my

 5      understanding that -- I can't remember Alex's

 6      name.  Alex Kostura, I believe, that this was

 7      discussing -- no, not discussing.

 8              It is my understanding that on

 9      the -- on a project with the World Bank, that

10      Kevin Kanhirun and Alex Kostura determined that

11      they did not have enough resources to organize

12      the prod-- the -- the products --

13              MR. COOPER:  Move to strike the

14         answer as nonresponsive.

15      BY MR. COOPER:

16         Q.    Mr. Boveri --

17         A.    The answer is yes.

18         Q.    -- the question is real simple --

19         A.    Yes.

20         Q.    -- real simple.

21         A.    Yes.  Yes, insofar as it is -- it

22      happened months before this.  I was offered a

23      job at a product manager.

24         Q.    How many months before this?

25         A.    I don't recall off the top of my
```

David Boveri
May 14, 2021

 1    head, but several -- within the same calendar

 2    year, in the spring.

 3         Q.    So -- so, January 2018?

 4         A.    I believe it was February or March,

 5    but it could have been January.  I don't know.

 6    I don't recall.  I did not put it in the

 7    complaint directly, but it happened.

 8         Q.    And -- and who -- who conveyed the

 9    offer of a product manager position to you at

10    that time?

11         A.    Kevin Kanhirun.

12         Q.    And he told you, "Here is an offer

13    for employment as a product manager with

14    ConsenSys"?

15         A.    Are you asking if he said those

16    specific words?

17         Q.    I'm asking if he actually offered

18    you a position.

19         A.    Yes.

20         Q.    And what did you say in response?

21         A.    I said the same thing I said in --

22    in -- in response to the later offer, as we've

23    been reviewing, that I have a disability, and

24    we discussed whether I would be able to

25    complete the responsibilities, given the --

David Boveri
May 14, 2021

 1    that my dis- -- my illness was untreated at the

 2    time.

 3         Q.    Is there any -- are -- excuse me.

 4              Are you aware of any evidence

 5    whatsoever that would support your claim that

 6    ConsenSys offered you a position as a product

 7    manager?

 8         A.    I do not have access.  ConsenSys has

 9    not provided any documents internally of the

10    hiring committee.  So I'm not aware of whether

11    that evidence could exist.

12              My -- and it is outside the time

13    frame of the complaint.  So I did not search

14    for it, nor is it alleged as an act of

15    discrimination, but as I'm under oath, you

16    asked -- the direct answer to the question is

17    yes, I had been earlier offered a position, but

18    not during this interactive process or in --

19    during the time period alleged during the

20    complaint I filed.

21              So it is my understanding that

22    the -- the references here are not the same

23    offer, no.  I don't believe that -- and if --

24    it was not my understanding that these were the

25    same offer, that it was a separate offer and

David Boveri
May 14, 2021

1     that that initial offer, though it did not

2     happen, is not directly mentioned here as an

3     act of discrimination, whether or not --

4          Q.    Did you ever -- did you ever attempt

5     to accept an offer of full-time employment with

6     ConsenSys?

7          A.    I attempted to engage in an

8     interactive discussion about my disability in

9     the --

10         Q.    That's a yes-or-no question.  It's a

11    yes-or-no question, Mr. Boveri.

12         A.    I don't believe it is because I

13    believe that when you respond to an offer, you

14    have to discuss -- whether they accept or deny,

15    you have to discuss the terms.

16         Q.    Did you ever -- did you ever attempt

17    to accept an offer of full-time employment as a

18    product manager with ConsenSys?

19         A.    No, because the offers were

20    rescinded upon disclosure of my disability.

21         Q.    Did you ever attempt --

22         A.    I answered the question.

23         Q.    -- to accept an offer of an

24    independent contractor position with ConsenSys?

25         A.    No, because the offer was rescinded

David Boveri
May 14, 2021

```
 1    upon disclosure of my disability.
 2         Q.    Here's what's interesting.
 3              Per this -- this tale that you're
 4    now for the first time, at some point earlier
 5    in 2018, according to you now, Kel Kanhirun had
 6    offered you a product manager position.
 7              And rather than accept it, according
 8    to what you just testified to, you said, "Oh,
 9    by the way, I have all these disabilities.
10    Let's discuss."
11              And then if we fast-forward to this
12    other part of this tale that you're telling,
13    something similar happens where, according to
14    you, Kel gets -- is involved in some
15    conversation with Lianna Newman about perhaps
16    hiring you on a project-by-project basis as a
17    contractor.
18              And according to your testimony,
19    that -- that opportunity disappeared after you
20    again disclosed your disabilities, which, of
21    course, per your own testimony, Kel was already
22    aware of?
23         A.    Is this a question about whether I
24    told a tale?
25         Q.    I'd like for you to explain
```

David Boveri
May 14, 2021

1    do you agree, Mr. Boveri, that during the

2    course of discovery in this lawsuit, you

3    produced in excess of 6,000 pages of documents?

4         A.    Correct.

5         Q.    Have you produced even one -- one

6    page of documentation supporting your claim

7    that you ever received an offer of full-time

8    employment -- full-time permanent employment,

9    that is -- with ConsenSys?

10        A.    It is my belief that these documents

11   here show evidence of the interactive

12   discussions that took place of the job offers

13   that were rescinded after I disclosed my

14   disability.

15        Q.    Have you provided any documentation,

16   during the course of discovery, Mr. Boveri,

17   that support your claim that you ever received

18   an offer for a -- an independent contractor

19   position with ConsenSys?

20        A.    I believe that the documents I

21   provided provide evidence for the verbal

22   discussions that took place where I was offered

23   those things, but the offer was rescinded

24   because of my disability.

25             Now, the problem here in this

David Boveri
May 14, 2021

1      situation is that a lot of the offers were

2      given and perhaps rescinded either -- without

3      my presence, but this is done by the hiring

4      committee through discussions with me.  And the

5      person rescinding the offers would have been

6      Lianna Newman.

7                    And I would have been communicating

8      directly with Kevin Kanhirun about those

9      offers, and there may have -- some of the

10     offers may have been -- I authorized a member

11     of the hiring committee, Kevin Kanhirun, to

12     disclose my disability to other members of the

13     hiring committee; namely, Lianna Newman.

14                   So in the presence of that,

15     there's -- from my perspective, there's two

16     things that either happened.  Either -- I mean,

17     I believe I was offered a job that was

18     rescinded, or I was engaged in an interactive

19     discussion about my disability before a job was

20     ever offered as alleged in my complaint.

21                   The -- the possibility of both is

22     alleged in my complaint and cited.

23          Q.   Mr. Boveri, have you produced any

24     documentation that you believe supports your

25     claim that any -- that at any point in time,

David Boveri
May 14, 2021

1    ConsenSys withdrew or rescinded an offer of

2    employment or independent contractor status to

3    you?

4         A.    Yes.  The ones we just reviewed.

5    Is -- I believe that I -- it shows evidence of

6    job offers and an interactive process of

7    whether I could complete the job due to my

8    disability and then a rescindal -- rescinding

9    of that offer because the only alternative, I

10   believe, is that I was never offered a job, and

11   an interactive process was engaged before I

12   offered a job as cited in my complaint.

13        So I believe I've supported that.

14        Q.    Mr. Boveri, I think toward the

15   beginning of our -- our deposition today, you

16   testified that prior to your -- your internship

17   with -- with ConsenSys, you had never worked a

18   full-time job before, is that correct?

19        A.    That's correct.

20        Q.    Have you worked a full-time job

21   since the termination of your employment with

22   ConsenSys?

23        A.    What -- what do you define as a

24   full-time job?

25        Q.    Have you worked -- have you been

David Boveri
May 14, 2021

1    employed in a full-time permanent capacity for

2    at least 35 hours a week on an ongoing basis?

3         A.    I have been self-employed for 35

4    hours a week or more on an ongoing basis, yes.

5         Q.    Have you been employed by any entity

6    other than yourself on a

7    35-hour-a-week-or-more, ongoing basis?

8         A.    If we consider the LLC I own in

9    conjunction with others to be myself, then, no.

10        Q.    Have you ever received an offer of

11   full-time employment from any entity other than

12   ConsenSys?

13        A.    No.

14        Q.    Is it possible you just are not

15   familiar with what an offer of full-time

16   employment looks like?

17        A.    That is very possible, which is why

18   the alternative is listed in the complaint,

19   that perhaps I misconstrued it in a late -- in

20   a legal -- this interactive process was engaged

21   with.  It's very possible.

22        Q.    Okay.  I'm going to introduce a new

23   exhibit.  This will be Exhibit No. 19.

24             MR. COOPER:  And, Dina, for your

25        benefit, this was tab -- or, is Tab No. 21.

David Boveri
May 14, 2021

```
1     BY MR. COOPER:
2          Q.    This is another one-page document,
3     Mr. Boveri.  It bears the Bates number
4     BOVERI 439.
5               Do you recognize this document?
6          A.    Yes, I do.
7          Q.    Who is Elizabeth Gottlieb?
8          A.    According to the email, she is
9     the -- was the internship coordinator and
10    coordinator of campus recruitment at ConsenSys
11    when I was hired.
12         Q.    And did Ms. Gottlieb extend an offer
13    of an internship to you?
14         A.    Yes, she did.
15         Q.    Moving on to another exhibit.  This
16    will be Exhibit No. 20.
17              MR. COOPER:  Dina, this is Tab 22
18         that I sent you earlier.
19    BY MR. COOPER:
20         Q.    Another one-page document.  It bears
21    the Bates number BOVERI 453.
22              Mr. Boveri, do you recognize this
23    document?
24         A.    Yes, I do.
25         Q.    Is this a note that you created?
```

David Boveri
May 14, 2021

 1          A.    I believe so.  As was established

 2     earlier in my email, it automatically backed up

 3     notes.

 4                And so the Gmail assigns a subject

 5     line and a date based on the first line of the

 6     note, but, yes, it is a note.

 7          Q.    Does this note reflect the terms of

 8     an internship offer that Elizabeth Gottlieb

 9     conveyed to you?

10          A.    Yes.

11          Q.    Did you ever make any similar notes

12     or create any records reflecting the terms of

13     any offer of full-time permanent work with

14     ConsenSys?

15          A.    Not to my knowledge.  In the course

16     of my discovery, I provided many documents for

17     which we have reviewed that referenced it, but

18     I have not discovered any that I did write

19     about that in -- in such a way as -- in such a

20     way as this, except accepting the -- the one

21     referenced earlier written to Zachary Laveris.

22                Those are the kind of notes that I

23     discovered where I referenced things in

24     passing, but I don't -- I don't -- I'm not

25     aware of any notes I took specifically besides

David Boveri
May 14, 2021

1    the documents already reviewed.

2         Q.    And would that same response --

3    well, let me -- let me rephrase.

4              Similar question.  Did you ever make

5    any notes similar to this Exhibit No. 20 or --

6    or create any records reflecting the terms of

7    an offer for an independent contractor position

8    with ConsenSys?

9         A.    I had not discovered any.  I

10   don't know what -- whether I did.  I can't say

11   I had not, but I did not discover any.

12        Q.    I will move on to a new exhibit.

13   This will be Exhibit No. 21, I believe.

14              MR. COOPER:  Dina, for your

15        reference, this is Tab No. 23.

16   BY MR. COOPER:

17        Q.    Mr. Boveri, do you recognize this

18   document?

19        A.    Yes.

20        Q.    What is this document?

21        A.    I believe it is a welcoming email I

22   received from ConsenSys to start the summer

23   internship program.

24        Q.    I want to direct your attention for

25   now specifically to the third bullet point

David Boveri
May 14, 2021

 1     intern?

 2          A.    Yes, it does.  And I would like to

 3     note that it -- it says that I'm offered to

 4     work with DC Labs which did not exist at the

 5     point of my hiring, which I believe I provided

 6     support for in the document production, that

 7     they didn't know who I worked for by the time

 8     that I was laid off because me and I believe it

 9     was four to six other people were hired to a

10     department that didn't exist at ConsenSys as --

11     because DC labs -- I never received a paycheck

12     from them, nor did it exist when I -- it may

13     have existed on May 24th, but it did not exist

14     on June 6th, as --

15          Q.    Other -- other than this exhibit,

16     did you ever receive any other letter from

17     ConsenSys offering you any form of employment

18     or work?

19          A.    No.

20          Q.    And I want to direct your attention

21     to the second paragraph.

22               It says, "The temporary position we

23     are offering to you as an intern as classified

24     is nonexempt.  As such, you will be paid an

25     hourly rate of $40 and will be eligible for

David Boveri
May 14, 2021

```
 1          A.    No, I do not.

 2          Q.    And did you read this email in full

 3     at the time you received it?

 4          A.    Yes.

 5          Q.    Okay.  Mr. Boveri, were -- during

 6     the course of your, your internship with

 7     ConsenSys, were you familiar with a version of

 8     the employee handbook that was in effect in

 9     2018?

10          A.    Yes, I was.

11          Q.    I am again going to share my screen

12     and introduce a new exhibit.

13               MR. COOPER:  This one will be

14          Exhibit 24, which is Tab 26 from what I

15          sent you, Dina, this morning.

16     BY MR. COOPER:

17          Q.    Mr. Boveri, do you recognize this

18     document?

19          A.    Yes.  It is the employee handout

20     from ConsenSys.

21          Q.    And I'm going to direct you to a

22     specific section as soon as I get there.

23               So you'll see on Page 10 of this

24     employee handbook, which bears the Bates

25     number, for purposes of this litigation,
```

David Boveri
May 14, 2021

1    DEF_18, that there exists a policy called

2    "Americans with Disabilities Act."

3              Do you see that?

4         A.    I do see that.  Correct.

5         Q.    During your employment with

6    ConsenSys, were you familiar with this policy?

7         A.    After my employment began, yes, I

8    was.

9         Q.    If you look at the third paragraph

10   of this policy, it says, quote, "If you're

11   currently disabled during your employment and

12   are in need of a reasonable accommodation, you

13   should contact your HR business partner to

14   assist you with evaluating reasonable

15   accommodations that may enable you to perform

16   the essential functions of your job."

17             Did you have a disability during

18   your employment with ConsenSys?

19        A.    Yes, I did.

20        Q.    I don't want to limit it to -- to

21   one disability.

22             Can you list every disability that

23   you had during your employment with ConsenSys?

24        A.    I'm sorry.  You said you don't or do

25   want to limit it to one?

David Boveri
May 14, 2021

1        Q.    I -- I do not want to limit your

2    response.

3        A.    Okay.

4        Q.    So can we get, you know, the full

5    rundown of disabilities that you had during

6    that six-or-so-month time frame?

7        A.    The largest one, the most impactful

8    one being narcolepsy.  I had several other

9    medical disabilities, including -- post- --

10    postural orthostatic tachycardia syndrome, POTS

11    as that is called.

12            I also had chronic sinus infections

13    caused by an ectopic -- ectopic molar in my

14    sinuses that was decreasing my -- my energy

15    levels and ability to function which I then

16    received surgery for in November of 2018, I

17    believe.  November or October of 2018.

18            And I have -- yeah.  I have a total

19    of six sleep disorders, including narcolepsy.

20    So, narcolepsy, insomnia, central nervous

21    system sleep apnea, partial obstructive sleep

22    apnea, periodic limb movement disorder.

23            And then the diagnosis, I was,

24    during my employment of ConsenSys, given a

25    multiple-day EEG to determine the cause of

David Boveri
May 14, 2021

1   these titles were dynamic.  They were

2   different.  They were this -- I could tell you

3   right now, I mean, these people, they're

4   tight -- people invented their own titles at

5   this company, and that is a fact.

6            And there may have been practices,

7   but decentralized, by definition, is a circle

8   of people working together without a direct

9   lead.

10           And it was my understanding that --

11  oh, sorry.  The people lead would be someone

12  voted by the circle.  So Danielle Frizziola

13  would be the lead of people.

14           And does people overlap with HR?  At

15  the time, I assumed yes.  So -- but there's no

16  reference to these circles or organizational

17  structures in any employee handbook in any way,

18  nor a business partner.

19           So, to me, I -- it's not clear who a

20  business par- -- or, an HR business partner

21  would be because I should be looking for an

22  H- -- a people lead partner.

23       Q.    And what was --

24       A.    It's nonsense.

25       Q.    -- was Lianna Newman's title?

David Boveri
May 14, 2021

```
1          A.    Titles at -- I don't know what her

2     title was because -- sorry -- what Lianna's

3     title was because in a decentralized

4     organization she was working, Lianna was

5     working with the people team to do the

6     screening and hiring and in the final

7     application -- sorry -- the final job

8     application -- job offer and interview was done

9     by a member of the people team, which would be

10    Elizabeth.

11          And I don't believe her -- if you

12    can go back, but I don't believe her title

13    mentions people at all.

14          So why would I -- why would I infer

15    that "people" means HR if the person from HR

16    who I assumed would be Elizabeth doesn't have

17    "HR" or "people" in their title?  I mean, you

18    can check what her title was, but it's not

19    consistent with the term "HR."

20          Can you bring up that document from

21    Elizabeth Gottlieb or her --

22          Q.    No --

23          A.    -- what her title is?

24          Q.    Did you believe that the Americans

25    with Disabilities Act policy did not apply to
```

David Boveri
May 14, 2021

 1    you?

 2         A.    I would like to see the other

 3    document before I respond.

 4         Q.    I'll bring up the -- the Americans

 5    with Disabilities Act policy.

 6         A.    I'd like you to bring up the exhibit

 7    you showed previously with the title --

 8         Q.    I don't -- I don't really care

 9    what -- what you would like.  I'm running the

10    show.  You're answering the questions.

11         A.    I'm -- I believe we're still on the

12    question where you asked -- you were asking

13    about HR and HR partners, and we haven't -- we

14    haven't even determined that there is an HR

15    partner at ConsenSys.

16              I've seen no evidence of it, and

17    so -- so you're asking about my understanding.

18    My understanding of it --

19              [Simultaneous speaking.]

20    BY MR. COOPER:

21         Q.    -- the last question?

22         A.    My understanding of it is, there is

23    no --

24         Q.    You're nonresponsive and you're

25    babbling.

David Boveri
May 14, 2021

```
 1              MR. COOPER:  Dina, can you please
 2        repeat the last question that I asked?
 3                (Said record was read by the
 4                reporter.)
 5        BY THE WITNESS:
 6             A.    At what time frame?
 7        BY MR. COOPER:
 8             Q.    At any point during your employment
 9        with ConsenSys.
10             A.    No, I did not believe that.
11             Q.    So you believe that the policy did
12        apply to you?
13             A.    Towards the end of my employment,
14        yes.
15             Q.    At any point during the course of
16        your employment with ConsenSys, did you contact
17        a member of ConsenSys HR for any reason at all?
18             A.    Yes.  If we're assuming HR can
19        constitute someone from the people or intern
20        team, sure.
21             Q.    Specifically, who did you contact?
22             A.    Elizabeth Gottlieb.
23             Q.    And about when in time did you
24        contact her?
25             A.    Did -- I'm sorry.  Can you clarify?
```

David Boveri
May 14, 2021

1        Did you ask about a specific question or just

2        general contact?

3            Q.    I asked about if, at any point in

4        time during the course of your employment with

5        ConsenSys, you contacted a member of ConsenSys

6        HR for any reason at all.

7            A.    Okay.  Yes.  I mean, I -- I talked

8        to her many times.  She was an internship

9        coordinator.

10           I didn't realize she was part of HR

11       until much later, but, yeah, we had contacts

12       through internship events, and we also had

13       contact discussing how HR worked and whether it

14       worked and what it was because as of around

15       October or November, I didn't know what HR was,

16       how it worked or who was in it, nor that she

17       was in it.

18           So I was trying to figure it out to

19       determine what my rights were regarding my

20       upcoming surgery.

21           Q.    And what sort of discussion did you

22       have with Ms. Gottlieb about your upcoming

23       surgery, as you put it?

24           A.    I specifically said that I was

25       having discussions in order to determine my

David Boveri
May 14, 2021

1    rights about my surgery.  I don't recall

2    whether I mentioned the surgery directly, but I

3    was trying to figure out how HR worked.

4              And that's when I learned about the

5    grad program and how it disappeared.  I learned

6    about multiple things that were noncompliant

7    that HR was doing, including a stalker she had

8    that was almost hired.

9              So I was trying to understand how HR

10   worked because I was trying to determine who I

11   would even talk to as whatever a business, HR

12   business partner could be.

13        Q.    And what -- about what point in time

14   did you have these conversations with

15   Ms. Gottlieb?

16        A.    I would surmise around September or

17   October.  And --

18        Q.    Did you ever --

19        A.    And to clarify, it was my

20   understanding that a decentralized company,

21   that Lianna Newman was acting on behalf of HR,

22   especially since she disclosed to me that she

23   had worked HR at a previous job of hers, though

24   she was hired as a programmer at ConsenSys.

25              So it was my understanding that

David Boveri
May 14, 2021

1    if -- if we're not -- this nebulous term "HR,"

2    it's hard to define, but it was my

3    understanding that she was working on behalf of

4    it.

5           If you indicate it's only people on

6    the people circle in those emails, the only

7    time I talked to anybody about medical issues

8    of the people you showed in the emails would be

9    around September, October, besides Lianna

10   Newman.

11        Q.    Aside from Ms. Gottlieb who you've

12   already identified, did you ever have occasion

13   to have communication with any member of HR or

14   the people team or Team Cadre?

15        A.    I don't know what Team Cadre was,

16   but I'm sure I did over many times.

17   Oftentimes, it was not clear who we were

18   talking to when a problem had to be solved such

19   as getting a paycheck issued or whatever.

20           It was never -- it was not often

21   clear what department people worked for at

22   ConsenSys.

23        Q.    So who in HR were the people team,

24   however you want to refer to it, did you speak

25   to other than Ms. Gottlieb?

David Boveri
May 14, 2021

1          A.    I, at some point, probably talked to

2     Crystal Cruz and any other of the internship

3     coordinators.  I don't remember her name right

4     now, but Sarah.  She's listed in the complaint.

5               I don't know if she is, but, I mean,

6     I talked to many people over time in many

7     capacities because that's how the company was.

8          Q.    And why -- what problems did you --

9     did you approach them with?

10         A.    At ConsenSys, simple things like,

11    you know, "Oh, you accidentally" -- for

12    example, I was accidentally paid twice for the

13    same work.  And I had to, you know -- when you

14    try to solve a problem like that, it's not

15    clear who solves it.

16              So you have to go through a round of

17    emails to find someone who approves the

18    paycheck or the budgets, and it's -- it's kind

19    of like whack-a-mole.

20              So you -- you don't always know, and

21    very often at ConsenSys, the person who would

22    be making the decision or fixing a problem such

23    as a paycheck, hiring a third-party contractor

24    to do work, all these things -- the person

25    signing off of it was often not, in any

David Boveri
May 14, 2021

1    not work.

2                  And it was my understanding at the

3    time that since the company was

4    decentralized and my team at Hey, Pie! was my

5    report, that my discussion and disclosure to

6    them constituted equivalent to HR.

7                  That was my understanding because

8    of -- right or wrong, the nebulous nature of HR

9    at ConsenSys where people teams and business

10   partners are terms that were being thrown

11   around, but never on the same page.  So --

12        Q.    So do I have this correct, in terms

13   of the timing, that the meeting where you said

14   you took the notes, that was one of the final

15   days of your employment with -- with ConsenSys?

16        A.    Correct, but the -- yes.  There was

17   also previous disclosures leading up to that,

18   including in my work calendar at ConsenSys

19   which is public to the entire company.

20        Q.    Did you ever request an

21   accommodation for a disability?

22        A.    Yes.

23        Q.    Specifically what accommodation did

24   you request?

25        A.    I requested the ability to have a

David Boveri
May 14, 2021

```
1     flexible schedule so that I could take naps as

2     medically required, when needed.  I also

3     requested certain days when I was feeling very

4     sick due to my -- my -- my narcolepsy, POTS,

5     and my sinus issues, that I get a half-day or

6     day off or push back a deadline.

7                 And I also requested that I be

8     allowed to go on leave during the surgery and

9     my recovery period.

10         Q.   Let's-- let's take it one-by-one.

11                First item -- or, excuse me.  The

12    first accommodation that you said you requested

13    was a flexible schedule so that you can take

14    naps.

15                To whom did you make that request?

16         A.   To Kevin or Kel Kanhirun.  And in --

17    and it was -- yeah.  I think it would just be

18    to him, but everybody -- but I -- the

19    flexibility to do those things, again, I did

20    not disclose to the other people that I had

21    narcolepsy, but everybody was aware that

22    sometimes I needed to reschedule things or --

23    because we were -- full-time employees did that

24    kind of stuff, and I was treated by my team

25    explicitly like a full-time employee in that
```

David Boveri
May 14, 2021

 1    regard.

 2         Q.    And so if it's your testimony that

 3    you approached Kel Kanhirun with a request for

 4    an accommodation in the form of a -- what you

 5    characterize as a flexible schedule so that you

 6    could take tap naps, what was Kel's response?

 7         A.    Yes.

 8         Q.    So he -- he purported to grant your

 9    request?

10         A.    Correct.

11         Q.    Did you, at any point in time,

12    submit to ConsenSys any support of -- excuse

13    me -- any -- any sort of documentation that

14    supported your need for that requested

15    accommodation?

16         A.    No.  I was told to keep it hidden

17    and quiet.

18         Q.    And who told you that?

19         A.    Kevin Kanhirun.  After discussions

20    with Lianna Newman, he told me that.

21         Q.    And just -- just to be clear, was

22    Lianna Newman part of the conversation with you

23    in which you claim to have been told to keep

24    your request for accommodation hidden?

25         A.    With me, no, but I was told that

David Boveri
May 14, 2021

1    they would both hide my disability and to do

2    the same from the rest of the people team of

3    whom they were working on behalf of.

4         Q.    And Kel, in the context of receiving

5    your request for accommodation, told you that

6    he was working on behalf of the people team?

7         A.    It was my understanding at ConsenSys

8    that Lianna Newman, Kel, Alex Kostura, and

9    other members of the hiring committee, were

10   working on behalf of the people team, yes.

11   They hired me.  Yes.

12        Q.    Even during the course of your

13   employment?

14        A.    The -- admit -- when I was told to

15   keep it quiet was before I was employed.

16             So it was my understanding that one

17   of my direct reports, after I was hired, told

18   me that that would be fine because he and the

19   rest of my team considered me full-time

20   and told me, instructed me to just claim 40

21   hours, pretend I was full-time, and take the

22   unlimited paid time off and benefits of a

23   full-time employee who would have any reason to

24   reschedule or be flexible, including a yoga

25   class someone did once.

David Boveri
May 14, 2021

1          So, yes, that's -- that was my

2    understanding at the time.

3          Q.    And, again, that was -- that was --

4    is it your testimony that that was Kel Kanhirun

5    who told you to do that?

6          A.    To do what specifically?

7          Q.    To help yourself to paid time off.

8          A.    It was multiple people who said

9    that, but it was Kel specifically who said that

10   in relation to my disability of narcolepsy, but

11   by the time I had my surgery, I was told by

12   Alex Kostura, Chip Jansen, and then members of

13   a -- I can't recall the names -- other members

14   of the project teams I was on to take leave of

15   my paid time off as well as, I could be getting

16   it wrong -- her name wrong, but the head of

17   research at the time who I mentioned earlier --

18   it could be Carol Wu, but I could be misstating

19   it.

20          She knew I was on paid leave and

21   asked me to interview someone for her

22   department to hire for a project while I was on

23   leave.

24          So they -- many people at the

25   company, those and many others knew that I was

David Boveri
May 14, 2021

1    Q.    Specifically by Kel Kanhirun?

2    A.    Uh-huh.  And I was -- yeah, I was

3    not to mention my narcolepsy and other major

4    health issues.

5         My sinus issues, as -- as I

6    testified to previously, though they were

7    causing great impairment at the time, I didn't

8    know it during those discussions, but upon, you

9    know, diagnosis and my treatment for that, like

10   I said, I can't recall whether I disclosed it

11   directly to HR, but I did not ask for

12   permission because it was my understanding that

13   when you get paid time off for a surgery, that

14   you have to ask your team, your spoke.

15        And my spoke, all the teams I was

16   on, whatever spoke is, is not defined, but the

17   circles and spokes we were on, they all -- I

18   all disclosed the medical leave I needed to

19   take due to one of my disabilities.  Yes.

20   Q.    Did you ever provide any -- any

21   documentation to -- to anyone at ConsenSys in

22   support of your need for any requested

23   accommodation for disabilities?

24   A.    No.  It was never requested from me.

25   Q.    Did you ever request an

David Boveri
May 14, 2021

1    accommodation of a disability that was not

2    granted?

3         A.    I engaged in an interactive

4    discussion about my disability before I was

5    hired, and the accommodations I received after

6    being hired were never discussed with me, nor

7    offered to me in relation to whether I could

8    work a full-time job.

9              The accommodations I was offered

10   after being hired were the ones that could have

11   been offered upon the initial interactive

12   discussions, and they were not.

13             So they were never denied, but my

14   position and my eligibility permission

15   provisions was denied based on my requests for

16   disability, but after employment, no, no.  Just

17   the amount of my salary and the status and role

18   of my position was denied because of my

19   requests.

20        Q.    Well, specifically, what -- what

21   request was denied?

22        A.    It is my understanding that any

23   disclosure of disability relating to your

24   ability to complete a job is a request for

25   compensation.

David Boveri
May 14, 2021

1    Q.    And, again, the only person to whom

2    you disclosed was to Kel Kanhirun, correct?

3    A.    I also authorized Kel Kanhirun to

4    disclose it to Lianna Newman who, as the -- as

5    I -- the document we reviewed showed that

6    Lianna Newman did receive that disclosure and

7    discussed with Kel Kanhirun my disability.

8    Q.    During the period of your

9    employment -- actually, strike that.

10             Did you ever inform anyone from

11   human resources or the people team that you had

12   taken a leave of absence?

13   A.    I was not required to.

14   Q.    Can you answer the question?

15   A.    No, because I told my team and I put

16   it on my schedule, and that was what I was told

17   by all of my reports, that was the procedure

18   required.

19             And I think you're talking

20   specifically about my leave of absence for the

21   surgery.  So that's what I'm referring to.

22   Q.    Did you ever inform human resources

23   that you missed any work time?

24   A.    No, because I wasn't told by the

25   people who -- one could construe it as my

David Boveri
May 14, 2021

1     bosses or my direct reports, that all you had
2     to do was put it on your calendar.
3                 And I was told that as long as your
4     team approved it, that was sufficient and it
5     was my understanding that I would only need to
6     disclose it to human resources if I was going
7     to apply directly for an FMLA leave, which I
8     did not.
9                 It was -- it was my understanding
10    that at ConsenSys, a week of sick leave was
11    needed to be disclosed and approved by your
12    team, a spoke lead, whatever these terms meant.
13    And I did that to every single person who had
14    any sort of authority, and it was approved.
15                And I was not instructed by any of
16    my direct reports as an intern to do any
17    further disclosure.  So whether they disclosed
18    it to somebody else at HR, I do not know, and I
19    have no knowledge of how the approval process
20    worked on their end.
21                MR. COOPER:  Okay.  At this point,
22          I'm going to suggest that we break for
23          lunch, Mr. Boveri, because -- it's 12:36
24          your time now.
25                Do you want to reconvene at,

David Boveri
May 14, 2021

1       Q.      Okay.  Do you recall someone by the

2    name of Danielle Frizziola presenting and/or

3    speaking at that those meetings?

4       A.      The name sounds familiar, but I

5    don't recall whether she did or did not.

6       Q.      Do you know if anyone at

7    ConsenSys -- let me rephrase.

8             Do you allege that anyone at

9    ConsenSys discriminated against you on the

10   basis of any disability?

11      A.      Yes.

12      Q.      Specifically who?

13      A.      As mentioned before and in the

14   complaint that Kel Kanhirun and Lianna Newman

15   engaged in discrimination against me because of

16   my disability during the hiring process.

17      Q.      How did Kel Kanhirun discriminate

18   against you?

19      A.      As a member of the hiring committee,

20   he engaged in discussions of my disability with

21   another member of the hiring team, and nobody

22   created any documentation of those discussions

23   or documented or if -- if -- again, as said

24   before, if it happened as -- if he -- if

25   those -- if I was offered a job during those --

David Boveri
May 14, 2021

1    the timeline described in the complaint, then

2    he withdrew it because of my disability.

3              If I was not offered a job and it

4    was a misconstrual on my part, then he and

5    Lianna both engaged in pre-offer,

6    pre-employment discussions of my disability

7    without a job offer because that was weeks

8    before any offer came through, if that's the

9    timeline or the interpretation one stands

10   behind.

11        Q.    Anyone else other than Lianna or Kel

12   that you allege discriminated against you?

13        A.    No, but I do -- I'm not aware of

14   what other conversations may have taken place

15   for hiring, but I'm not -- I don't know either

16   way what conversations were had without,

17   because there's no record of my disclosure

18   inside of ConsenSys when the hiring committee

19   was acting on behalf of the people team.

20        Q.    I want to talk for a moment about

21   the end of your employment with ConsenSys.

22              Did your employment with

23   ConsenSys -- or, excuse me -- your internship

24   with ConsenSys end as part of a layoff in

25   December of 2018?

David Boveri
May 14, 2021

1          A.    Correct.

2          Q.    Even -- even without that layoff,

3    did your internship have an end date?

4          A.    Yes, it did.

5          Q.    Do you recall what that end date

6    would have been?

7          A.    Within one or two weeks of the

8    layoff afterwards, yes.

9          Q.    I'm going to share my screen again

10   and introduce what I believe is Exhibit 25.

11              MR. COOPER:  But, Dina if that's

12         incorrect, please let me know.  Dina, this

13         is Tab 27.

14   BY MR. COOPER:

15         Q.    So I'll let you -- give you a

16   moment, Mr. Boveri, to take a look.  This

17   document is a two-pager.  It bears the Bates

18   numbers DEF_7 through 8.

19              Mr. Boveri, do you recognize this

20   document?

21         A.    I do, but I'm not sure how this is

22   different than the document showed earlier.  So

23   I don't recognize it as a separate document,

24   but it may be.

25              I don't -- because there's a very

David Boveri
May 14, 2021

1    me -- including you in its December 2018

2    reduction in force?

3         A.   Are you asking me whether the

4    reduction in force was unlawful or if my

5    inclusion was unlawful?

6         Q.   The -- the latter.

7         A.   Okay.  I am not alleging that my

8    inclusion in that layoff specifically as a

9    person was unlawful insofar as any, anybody's

10   layoff was or was not unlawful.

11        Q.   So is it accurate to say that you do

12   not allege -- well, let me -- let me make this

13   open-ended.

14             Do you allege, Mr. Boveri, that

15   ConsenSys violated any laws in terminating your

16   employment?

17        A.   No, but it's unclear to me whether

18   they violated a New York State 1 Act, but under

19   the contract I was provided, I would not have

20   been covered by that Act.

21             So if that was or was not illegal, I

22   was not personally unlawfully fired under that

23   Act because of the terms of the contract you

24   just showed.

25        Q.   Did you have something close to a

David Boveri
May 14, 2021

1      Kel's time such that his fiancee might be

2      bothered?

3          A.   I can't testify insofar as I

4      don't -- I don't recall thinking that, but I do

5      recall later thinking that even such, the work

6      we did at ConsenSys with me was extensive, and

7      I did worry that it was perhaps unfair to his

8      wife that he had -- in addition to his

9      responsibilities in Singapore and other

10     projects, the Hey, Pie! project was -- you

11     know, was cutting into his work/life balance.

12              So that, I do recall being concerned

13     about, but this, insofar as it's a thought

14     experiment, I don't recall this specific

15     concern.

16         Q.   Okay.  Mr. Boveri, during or before

17     your employment with ConsenSys, did you ever

18     complain to human resources or the people team

19     about discrimination?

20         A.   I was instructed not to.  So, no.

21         Q.   And would it be accurate to say that

22     it's your testimony that the person who

23     instructed you not to is Kel Kanhirun?

24         A.   It was my -- it would be accurate to

25     say that it was my understanding that -- that

David Boveri
May 14, 2021

1    Lianna Newman and Kel Kanhirun both instructed

2    me to do so, but the person who said that was

3    Kel, yes.

4         Q.    And did anyone else give you that

5    instruction?

6         A.    No, because I was told not to

7    disclose this to anybody else.

8         Q.    So I'll ask the question again.  I

9    understand what you just said, but I'll ask it

10   again.

11              During the period of your employment

12   with ConsenSys, did you ever complain to human

13   resources or the people team about

14   discrimination?

15        A.    Specifically about discrimination?

16   Is that what you're asking?

17        Q.    Uh-huh.  Yes.

18        A.    No, I did not complain about

19   discrimination to anyone at ConsenSys,

20   including the people team because I was

21   instructed not to discuss my disability in any

22   way with anybody.

23        Q.    Did you, at any point during or

24   before your employment with ConsenSys, complain

25   to anyone at ConsenSys about a perceived

David Boveri
May 14, 2021

1    failure to accommodate any of your

2    disabilities?

3         A.    No, and nor do I believe I alleged

4    so, but I do -- I do allege that I was

5    pressured -- I felt pressured to work hard to

6    earn a full-time position because -- that was

7    withheld from me.

8              I felt a lot of pressure to work

9    through any disability or sickness, but, no, I

10   did not -- I believe the question was, did I

11   complain.  No.

12        Q.    Did you ever complain to anyone

13   at -- at ConsenSys that you were denied a leave

14   of absence that you requested?

15        A.    No, nor do I allege I was denied it,

16   but I allege that I was pressured into not

17   using it.

18        Q.    Aside from the -- the one instance

19   that you spoke about earlier when you said that

20   you were -- you were overpaid for a particular

21   pay period, did you ever notify either human

22   resources or the people team or any supervisor

23   that your ConsenSys paychecks were incorrect at

24   any point in time?

25        A.    I did not have a supervisor, nor

David Boveri
May 14, 2021

1    Numeral II.1.

2         A.    I -- I believe that would be 11.

3         Q.    I don't know.  Is it 11 or Roman II?

4    It's tough to tell, but --

5         A.    Yes, it is.

6         Q.    -- whatever it is, it's the first

7    one directly beneath where it says in the

8    subheading, "Count I - Violation of Title I of

9    the ADA."  [Sic]

10             Do you see where I'm talking about?

11        A.    Yes, I do.

12        Q.    Okay.  So I want to break this

13   paragraph down into a couple separate

14   allegations.  You allege that you were, quote,

15   "sufficiently qualified for a full-time

16   position."

17             What -- what full-time position?

18        A.    Either a product manager or a

19   software developer.

20        Q.    And how do you know you were

21   qualified for those positions?

22        A.    I was told by several employees both

23   before, during, and after my employment at

24   ConsenSys that I was not -- or, excluded from

25   the qualifications of a full-time, a full-time

David Boveri
May 14, 2021

 1    employment at ConsenSys.

 2         Q.    You also allege that you were,

 3    quote, "willfully and intentionally treated

 4    differently than an unqualified candidate who

 5    did not have a disability."

 6         A.    Correct.

 7         Q.    Who was this -- who was this alleged

 8    unqualified candidate?

 9         A.    The name is currently escaping me,

10    but I believe it is discussed in either the

11    complaint or the answer to my interrogatories.

12         Q.    And how do you know that this person

13    did not have a disability?

14         A.    That would have been a guess on my

15    part, but I do know that they received a

16    full-time job offer at the same time I was

17    offered it, and I could surmise the only

18    difference between the two of us was that he

19    did not have a disability.

20         Q.    Do you know whether or not this

21    individual whose name you can't recall applied

22    for a full-time permanent position?

23         A.    I -- I -- I -- I do not know the

24    terms of his application submission.  I don't

25    know.  I do know the process of him getting

David Boveri
May 14, 2021

1    hired after submitting.

2         Q.    And how are you familiar with that

3    process?

4         A.    He told me what happened, and he

5    told me that after being hired, they indicated

6    that he was not qualified for the position.  So

7    they offered him a provisional employment

8    period where -- wherein he could work as a --

9    he was going to be provisionally hired as a

10   salaried employee, as a software developer, but

11   that in the time period approximating the same

12   length as the internship, they would decide

13   whether he qualified or -- whether they

14   would -- I don't know the term -- kind of like

15   a trial period, but he was offered the

16   opportunity to prove himself after it was

17   discovered he was -- should not have been

18   offered the job due to his qualifications and

19   that he would have to learn the qualifications

20   on the job.

21              That's my memory of that.

22        Q.    If you look at the paragraph here

23   that -- I'm sorry -- the Roman Numeral II.3 or

24   11.3, it begins with the word, "The facts

25   described contradict."

David Boveri
May 14, 2021

1           You allege that ConsenSys engaged

2      in, quote, "negligent documentation practices."

3      Specifically in what ways did ConsenSys violate

4      the law by engaging in supposed negligent

5      documentation practices?

6           A.    I disclosed my disability to members

7      of the hiring committee, and they did not

8      record that this conversation happened and file

9      it with other members of HR, or it could be

10     called the people team.

11           And as -- to my knowledge, there's

12     no record of it internally at ConsenSys.

13     That's -- that seems negligent to me that a

14     disability was disclosed and -- to people who

15     were authorized to receive the disclosure and

16     that they did not write it down and, instead,

17     told me not to tell any- -- anyone else about

18     it.

19           I want to clarify that at the top of

20     the screen above 11.5, the Line C reiterates

21     what I just said:  "Defendant did not document

22     or maintain records of Mr. Boveri's

23     disclosure."

24           So it is in that way that I testify

25     now it was negligent.  I believe that

David Boveri
May 14, 2021

1      constitutes negligence.

2            Q.    Who do you allege engaged in -- in

3      what you refer to as preemployment inquiry

4      about your supposed disabilities?

5            A.    Lianna Newman and Kel Kanhirun.

6            Q.    Anyone else?

7            A.    I do not know to what extent they

8      discussed my disability with other people, but

9      I do not allege it.

10           Q.    And did you witness that discussion?

11           A.    No, but I was told the result of the

12     discussion.

13                 And as I showed you -- as we

14     reviewed earlier in this conversation, it was

15     affirmed to me that the conversation took

16     place.  On multiple instances, I was told of

17     this and subsequent conversations on the same

18     topic with Lianna Newman who interviewed me,

19     who recommended me to Elizabeth Gottlieb and

20     the other members of the people team who also

21     indicated during her interview -- I'm sorry --

22     I misgendered Ms. Newman, but Lianna indicated

23     during the interview that Lianna had worked

24     previously, not at ConsenSys, as in HR at her

25     previous job.

David Boveri
May 14, 2021

```
 1                    And as such, I'm alleging that

 2       discussions between Mr. Kanhirun and Lianna

 3       Newman, who was acting on behalf of people,

 4       and -- did not document the disclosures, the

 5       two of them together, prior to my employment at

 6       ConsenSys.

 7            Q.    Specifically what -- which

 8       disability or disabilities did you disclose to

 9       Kel Kanhirun in advance of your employment with

10       ConsenSys?

11            A.    Narcolepsy.

12            Q.    Any others?

13            A.    I don't recall.  At that point, my

14       diagnoses were confusing to me, but I -- and my

15       doctors, but I believe the primary disability

16       would be narcolepsy and the problems caused by

17       that.

18            Q.    I will direct your attention to,

19       this is Paragraph 12.5.

20                    My question -- I guess my first

21       question is, with regard to how you

22       characterize this internship, you characterize

23       it as a "remote developer internship position."

24                    Are you -- are you certain that it

25       was a developer position?
```

David Boveri
May 14, 2021

1    days or weeks expressed shock that I wasn't

2    already a full-time employee.  They thought I

3    was and that I had -- if they -- if they did

4    know I started as an intern, they were not

5    aware that I was not -- they'd assumed I had

6    been offered full-time the job.

7            So in the course of those

8    discussions, if we consider inquiry to just be

9    disclosing that I would like to work there

10   full-time, it happened on many occasions.

11        Q.    So after the point at which you --

12   you started your internship with ConsenSys,

13   which I believe was around the 5th of June of

14   2018, did you ever submit an application for a

15   full-time permanent position with ConsenSys?

16        A.    I did not submit an application, no.

17        Q.    Did you ever submit anything in

18   writing -- during that same time period

19   following, say, June 5, 2018, did you ever

20   submit anything in writing to anyone at

21   ConsenSys expressing your interest in an open

22   and available full-time permanent employment

23   position with ConsenSys?

24        A.    I don't have access to all the

25   possible documents.  Most of my conversations

David Boveri
May 14, 2021

1      in several years, but we decided it would be a

2      good fit and that the next step to proceed

3      would be to create a proposal to demonstrate

4      how this external consultant was ideal for the

5      position so that a job could be offered, but,

6      again, we never finished -- finished the

7      process.

8                    I recall it was on or about the day

9      of -- an article that was published in Forbes

10     Magazine indicating the disorganization at

11     ConsenSys which, as mentioned in multiple

12     responses in my complaint, and I -- I recall

13     calling this individual that I interviewed and

14     said, "You know, I don't think this -- I think

15     in two days, all of us will be out of a job.

16     Read this article."

17                   And then the entire department that

18     I was interviewing for disappeared in the -- in

19     the course of layoffs.

20         Q.    Do you allege that during the period

21     of time that you were out of -- out of work in

22     late November, early December 2018, to have and

23     recover from your surgery, that anyone at

24     ConsenSys pressured you to work while you were

25     still recuperating?

David Boveri
May 14, 2021

1          A.    I believe I indicate -- and I do

2     testify that I felt pressured by the

3     discrimination of -- from my hiring.

4               I believe to that due to the date

5     that my internship was meant to expire that you

6     indicated earlier in one of the exhibits, I

7     believe that if I did not do everything I could

8     up to and including that date, that I would not

9     be hired back in any way.

10              And part of the work I did while on

11    leave to interview this other consultant for

12    the research department was an example of the

13    length I was trying to go to demonstrate my

14    value to the company because I didn't know that

15    the large-scale layoffs were happening.  I was

16    just trying to demonstrate my overall value to

17    the company.

18              I believe that taking time -- the

19    approved time off that I was given, I believe

20    that by taking that time off, that I would lose

21    value in the sight of my peers who hired me and

22    were authorized to do so in a decentralized

23    organization.

24         Q.    Did you turn down the opportunity

25    to -- to re-up or renew your internship for the

David Boveri
May 14, 2021

```
1    workweek?
2           A.     I don't believe so.
3           Q.     As for Crystal Cruz, does she have
4    any knowledge in connection with your claims
5    for discrimination?
6           A.     She was one of the people that
7    implicitly I was told not to disclose my
8    disability to.  So, no.
9           Q.     As for Ms. Cruz, does she have any
10   knowledge or information in connection with
11   your claims that you worked at least 40 hours
12   in a workweek?
13          A.     That I worked at least 40?  Yes.
14          Q.     Excuse me.  Let me rephrase.
15                 Does she -- does Ms. Cruz have any
16   knowledge in connection with your claims that
17   you worked more than 40 hours in a workweek?
18          A.     No.
19          Q.     As for Kanwal Jehan, first of all,
20   who is that?
21          A.     Kanwal Jehan worked at ConsenSys
22   Labs.  And after his -- after Thomas Rush
23   conceptualized the project I referenced earlier
24   and they determined there wasn't a budget for
25   anyone to do it, Kanwal Jehan and myself, on
```

David Boveri
May 14, 2021

1    to do so because I, of the uncertainty of my

2    employment due to discrimination, but most

3    people I spoke to pressured me to stop working

4    and take my approved leave of absence because I

5    needed to rest.

6         Q.    Do you believe that you were being

7    discriminated against when ConsenSys renewed

8    your internship or re-upped your internship

9    effective August 2018?

10        A.    I do not allege that that was an act

11   of discrimination specifically.  No.

12              Specifically, I allege it was the

13   initial hiring process that was discriminatory.

14              MR. COOPER:  So I'm going to take

15         a -- a three-minute break to make sure that

16         I don't have anything else.

17              In the event that I don't have

18         anything else to ask, we'll be done, but

19         let me just look through my notes to make

20         sure.  We'll go back on -- plan to go back

21         on the record at 4:50 Central time.

22              THE WITNESS:  Okay.

23              THE VIDEOGRAPHER:  Going off the

24         record at 21:47 UTC.

25

David Boveri
May 14, 2021

```
 1              (A recess was had from 21:47 UTC

 2              until 21:50 UTC.)

 3              THE VIDEOGRAPHER:  We are back on

 4     the record at 21:50 UTC.

 5     BY MR. COOPER:

 6          Q.   So, Mr. Boveri, we were just talking

 7     about the late November, early December 2018

 8     time period when you had taken time off from

 9     your job at ConsenSys to have surgery and --

10     and recover from that surgery.

11              Were you paid for the time that you

12     took off to have your surgery and recover from

13     your surgery?

14          A.   Yes, I believe so.

15          Q.   And during those weeks when you

16     were -- were taking off to first have the

17     surgery and then recover from the surgery, did

18     you report to ConsenSys that you had worked 40

19     hours?

20          A.   Yes, I did.

21          Q.   Okay.  And did you, in fact, work

22     for 40 hours in those weeks?

23          A.   No, I did not.

24              MR. COOPER:  That's -- that's it for

25          my questioning.
```

David Boveri
May 14, 2021

```
 1                    CERTIFICATE

 2                        OF

 3              SHORTHAND REPORTER

 4

 5              I, DINA G. MANCILLAS, a

 6    Certified Shorthand Reporter of the State of

 7    Illinois, CSR License No. 084-003400, do hereby

 8    certify:

 9              That previous to the commencement of

10    the examination of the aforesaid witness, the

11    witness was duly sworn and/or duly affirmed by

12    me to testify the whole truth concerning

13    matters herein;

14              That the foregoing

15    deposition transcript was stenographically

16    reported remotely by me and was thereafter

17    reduced to typewriting under my personal

18    direction and constitutes a true and accurate

19    record of the testimony given and the

20    proceedings had at the aforesaid deposition;

21              That the said deposition was

22    taken before me at the time and place

23    specified;

24              That I am not a relative or

25    employee or attorney or counsel for any of the
```

David Boveri
May 14, 2021

1    parties herein, nor a relative or employee of

2    such attorney or counsel for any of the parties

3    hereto, nor am I interested directly or

4    indirectly in the outcome of this action.

5                    IN WITNESS WHEREOF, I do

6    hereunto set my hand at Chicago, Illinois, this

7    24th of May, 2021.

8

9

10

11

12

13    _____

14    DINA G. MANCILLAS, CSR, RPR, CRR, CLR

15    CSR LICENSE NO. 084-003400

16

17

18

19

20

21

22

23

24

25