# Exhibit No. 1

2004 WL 1144044
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Davy CADY, Plaintiff,

v.

MISS PAIGE, LTD., an Illinois
corporation, Defendant.

No. 02 C 4867.
|
April 30, 2004.

**Attorneys and Law Firms**

Davy Cady, Chicago, IL, pro se.

Cynthia C. Mooney, James Joseph Powers, IV, Seyfarth
Shaw, Chicago, IL, for Defendants.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

 **\*1** This matter is before the Court on the parties'
cross-motions for summary judgment. Plaintiff Davy Cady has filed
a *pro se* complaint against defendant Miss Paige Ltd. ("Miss
Paige") seeking to hold defendant liable for a violation of the
Age Discrimination in Employment Act of 1967 ("ADEA"),
29 U.S.C. § 621 *et seq.* Plaintiff contends that Miss Paige's
policy of requiring job applicants to disclose their high school
attendance and/or graduation dates violates his rights under
the ADEA. Plaintiff also has filed a motion for Rule 10(b) and
11(b) sanctions against Miss Paige. For the following reasons,
we grant defendant's motion for summary judgment and deny
plaintiff's motion for summary judgment. Plaintiff's motion
for sanctions also is denied

BACKGROUND

The following undisputed facts are taken from Miss Paige's
Local Rule 56.1 Statement of Material Facts. Miss Paige
is an employment agency that provides job placement
services to companies and organizations throughout the
Chicago metropolitan area. Beginning in the mid–1990's,
Miss Paige limited its placement services to those clients who
predominately employ individuals over 18 years of age or
who possess a high school diploma or GED equivalent. Miss
Paige limited its placement services to take advantage of a
1995 revision to Illinois law, which exempted employer paid
fee agencies from state regulation if the agencies only placed
individuals over 18 years of age or those who possess a high
school diploma or GED equivalent.

As part of is placement services, Miss Paige represents
to its employer-clients that it will verify an applicant's
educational, military and employment history in part because
the majority of Miss Paige's clients require that their job
applicants possess at least a high school diploma or GED
equivalent. To accomplish this verification, Miss Paige uses
a two-part employment application from which consists of
the application itself and a second part which is a document
entitled "Notice Regarding Background Investigation." As
part of the job application, applicants are requested to disclose
their high school attendance dates. Miss Paige requests this
information to facilitate the process of verifying an applicant's
educational background. Applicants also are expected to
completely fill out the application form before Miss Paige
will interview the applicant. Miss Paige has an established
policy that its hiring representatives are not to proceed with an
interview if an applicant fails to complete significant portions
of the application form.

In January 2001, Miss Paige was engaged by FTD to fill
customer service positions for the upcoming Valentine's Day
holiday period. Miss Paige advertised in the Chicago Tribune
and other newspapers for these temporary positions. The
advertisement instructed interested persons to contact Miss
Paige's Lisle office for additional information. Sometime in
January 2001, plaintiff David Cady contacted Miss Paige to
inquire about the advertisement. After inquiring about the
employment opportunity with FTD, plaintiff was invited to
visit the Lisle office to complete a job application for the
temporary position. On or about January 17, 2001, Cady
visited Miss Paige's Lisle office to fill out a job application
for a temporary position with FTD. When filling out Miss
Paige's standard application form, plaintiff refused to list his
high school attendance dates. A branch manager at Miss
Paige explained to plaintiff that all applicants are expected to
provide their high school attendance dates on the application
form and that Miss Paige requires this information in order to
process the application. Plaintiff also did not provide his birth
date, driver's license number or a complete work history and
did not answer certain questions pertaining to his conviction

history and legal ability to work in the United States. Based on the events of January 17, 2001, plaintiff stated that he intended to bring legal action against Miss Paige. However, these events are not part of the current lawsuit.

**\*2** In February 2001, Miss Paige published an advertisement in the Chicago Tribune for a professional services assistant position. On or about February 12, 2001, plaintiff responded to the advertisement by contacting Miss Paige's Skokie office and spoke with a personnel consultant at Miss Paige. Plaintiff explained his qualifications and inquired whether he might be qualified for the position. Plaintiff was told that he might be qualified for the position and was invited to visit Miss Paige's Skokie office to complete an application. Plaintiff then asked if he would be required to disclose his high school graduation date in order to process his application. The Miss Paige consultant informed plaintiff that he would have to disclose his high school graduation date on the application, and a Miss Paige supervisor later verified that it was company policy to require high school graduation dates from applicants. There is no evidence that Miss Paige ever knew plaintiff's age at that time. Plaintiff never applied for the professional services assistant position that was published in the February 2001 newspaper advertisement.

In April 2001, Miss Paige published an advertisement in the Chicago Tribune for an administrative office assistant position. On or about April 3, 2001, plaintiff responded to the advertisement by contacting Miss Paige's Oak Brook office and spoke with a branch manager. Plaintiff explained his qualifications and inquired whether he might be qualified for the position. Plaintiff was told that he might be qualified for the position and was invited to visit Miss Paige's Oak Brook office to complete an application. Plaintiff then asked if Miss Paige had a policy of requiring an applicant to disclose his high school graduation date in order to process the application regardless of whether the applicant could provide a graduation date from an institution of higher learning. The Miss Paige branch manager informed plaintiff that he would have to disclose his high school graduation date on the application, and a Miss Paige supervisor later verified that it was company policy to require high school graduation dates from applicants. There is no evidence that Miss Paige ever knew plaintiff's age at that time. Plaintiff never applied for the administrative office assistant position that was published in the April 2001 newspaper advertisement.

In August 2001, Miss Paige published an advertisement in the Suburban Life for an office assistant position. On or about

August 8, 2001, plaintiff responded to the advertisement by contacting Miss Paige's Oak Brook office and spoke with a staffing manager. Plaintiff explained his qualifications and inquired whether he might be qualified for the position. Plaintiff was told that he might be qualified for the position and was invited to visit Miss Paige's Oak Brook office to complete an application. Plaintiff then asked if Miss Paige had a policy of requiring an applicant to disclose his high school graduation date in order to process the application regardless of whether the applicant could provide a graduation date from an institution of higher learning. The Miss Paige staffing manager informed plaintiff that he would have to disclose his high school graduation date on the application, and a Miss Paige supervisor later verified that it was company policy to require high school graduation dates from applicants. There is no evidence that Miss Paige ever knew plaintiff's age at that time. Plaintiff never applied for the office assistant position that was published in the August 2001 newspaper advertisement.

**\*3** Later in August 2001, Miss Paige published an advertisement in the Chicago Tribune for an general office assistant position. On or about August 20, 2001, plaintiff responded to the advertisement by contacting Miss Paige's Rolling Meadow office and spoke with a permanent placement manager. Plaintiff explained his qualifications and inquired whether he might be qualified for the position. Plaintiff was told that he might be qualified for the position and was invited to visit Miss Paige's Rolling Meadow office to complete an application. Plaintiff then asked if Miss Paige had a policy of requiring an applicant to disclose his high school graduation date in order to process the application regardless of whether the applicant could provide a graduation date from an institution of higher learning. The Miss Paige permanent placement manager informed plaintiff that he would have to disclose his high school graduation date on the application, and a Miss Paige supervisor later verified that it was company policy to require high school graduation dates from applicants. There is no evidence that Miss Paige ever knew plaintiff's age at that time. Plaintiff never applied for the general office assistant position that was published in the August 2001 newspaper advertisement.

Thereafter on January 19, 2002, plaintiff filed a complaint with the Illinois Department of Human Rights ("IDHR") against Paige Personnel Services alleging that he was not hired in January 2001 because of his age. Plaintiff subsequently withdrew his complaint with the IDHR. On November 2, 2001, plaintiff filed a charge of discrimination

2004 WL 1144044

with the United States Equal Employment Opportunity Commission ("EEOC") against Paige Personnel Services alleging that he had been discriminated against based on the company's policy of requiring him to provide his high school graduation date on a job application despite his willingness to offer a graduation date associated with an advanced degree. On April 8, 2002, the EEOC dismissed plaintiff's complaint and provided him with a notice of his rights.

Plaintiff then filed this lawsuit on July 10, 2003 against Miss Paige, Ltd. and four individual defendants alleging discrimination on the basis of age in violation of the ADEA, negligent infliction of emotional distress and intentional infliction of emotional distress. In his complaint, plaintiff alleges, among other things, that he was discouraged and deterred from applying for four positions that were advertised by Miss Paige based on the company's policy of requiring job applicants to disclose their high school attendance dates and/or graduation dates in violation of the ADEA. In an Memorandum, Opinion and Order dated March 31, 2002, this Court dismissed plaintiff's claims for negligent infliction of emotional distress and intentional infliction of emotional distress in their entirety against all of the defendants and dismissed the claim for discrimination against the individual defendants.

DISCUSSION

A. Summary Judgment Standard

*4 Under Federal Rule of Civil Procedure 56, summary judgment may only be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We apply this standard with particular care in employment discrimination cases in which intent and credibility are critical. Senner v. Northcentral Technical College, 113 F.3d 750, 757 (7th Cir.1997). Nevertheless, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A party must present "more than a scintilla of evidence" to defeat summary judgment. Senner, 113 F.3d at 757.

Indeed, "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." Hadley v. County of DuPage, 715 F.2d 1238, 1243 (7th Cir.1983). Conclusory allegations alone will not defeat a motion for summary judgment. Thomas v. Christ Hosp. and Medical Center, 328 F.3d 890, 893–94 (7th Cir.2003), citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). "Speculation does not create a genuine issue of fact, instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir.1995) (emphasis added). The fact-intensive nature of employment discrimination cases does not oblige the court to "scour the record" for factual disputes to help a plaintiff avert summary judgment. Greer v. Bd. Of Ed. Of the City of Chicago, 267 F.3d 723, 727 (7th Cir.2001).

Local Rule 56.1 for the Northern District of Illinois requires that the parties support all disputed facts with specific references to the record and further emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of facts. Jupiter Aluminum Corp. v. Home Ins. Co., 225 F.3d 868, 871 (7th Cir.2000) (all relevant facts denied without supporting documentation must be accepted as true provided the facts are "properly supported by references to the record or other evidentiary materials"). The Seventh Circuit repeatedly has sustained the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the local rules and regularly upholds strict enforcement of Rule 56.1. Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1316 (7th Cir.1995) (citing cases).

In this case, Cady has failed to object properly and/or respond to nearly all of Miss Paige's asserted, and properly supported, facts. Miss Paige filed a 43 paragraph statement of undisputed facts, and plaintiff only responded to five of the 43 paragraphs. In support of his summary judgment motion and in response to Miss Paige's motion, plaintiff filed a seven paragraph and 15 subparagraph combined statement of facts. However, plaintiff failed to support his combined statement of facts with any citations to the record.

*5 Plaintiff, however, did submit a supplemental affidavit as support for some of the facts in his combined statement of facts. Rule 56(e) requires that affidavits offered in opposition to summary judgment be made on personal knowledge and set forth such facts as would be admissible at trial. "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir.1998), quoting Davis v. City of Chicago,

2004 WL 1144044

841 F.2d 186, 189 (7th Cir.1988). In many instances, that is not the case with Cady's affidavit which contains unsupported conclusory assertions. Because plaintiff has failed to comply with Local Rule 56.1, we adopt Miss Paige's statement of the facts in deciding the summary judgment motions. However, it should be noted that we have reviewed and studied all of the materials submitted by Cady, and when appropriate, we have taken into consideration the materials he has submitted to the Court.

**B. Requiring High School Attendance Dates And/Or A Graduation Date On An Employment Application Is Not A *Per Se* Violation Of The ADEA**

Although it is unclear from his complaint, plaintiff seems to argue that requiring job applicants to disclose their high school attendance dates and/or high school graduation dates is a *per se* violation of the ADEA. However, such a claim finds no support in the plain language of the ADEA nor in the regulations promulgated by the EEOC. Nowhere in the ADEA is it illegal for an employer or an employment agency like Miss Paige to require a job applicant to disclose his age on a job application, much less the dates of the applicant's high school attendance or graduation date. *See generally* 29 U.S.C. § 621, *et seq.*

The EEOC has echoed this view in the employer context: "A request on part of the employer for information such as 'Date of Birth' or 'State Age' on an employment application form is not, in itself a violation of the Act." 29 C.F.R. § 1625.5. "Because the EEOC is the primary agency charged with implementing the ADEA, its interpretation is entitled to great deference." *Kralman v. Ill. Dep't of Veterans' Affairs,* 23 F.3d 150, 155 (7th Cir.1994). By the same token, asking for an individual's age in "help wanted notices or advertisements" is not an ADEA violation. 29 C.F.R. § 1625.4(b); *see also Chudnovsky v. Prudential Sec., Inc.,* 2000 WL 1576876, at *8 (S.D.N.Y. October 23, 2000) (rejecting a *pro se* plaintiff's argument that asking for an individual's age on an employment application was proof of pretext), *aff'd,* 51 Fed. Appx. 901 (2nd Cir.2002); *Landau v. Bolger,* 1988 WL 69939, at *3 (E.D.N.Y.1988) (finding lack of evidence that a request for date of birth on an employment application was used to screen out applicants), *aff'd,* 867 F.2d 1424 (2nd Cir.1988).

In light of these principles, plaintiff cannot maintain a cause of action for a *per se* violation of the ADEA simply because Miss Paige requires job applicants to disclose their high school attendance dates and/or graduation dates on an employment application. If requesting a job applicant to provide his age on an application for employment is not a violation of the ADEA, there is even less of a basis for asserting that a policy requiring the disclosure of high school attendance dates and/or graduation date violates the ADEA. To the extent plaintiff's complaint alleges that Miss Paige's policy constitutes a *per se* violation of the ADEA, plaintiff's motion for summary judgment is denied.

**C. Plaintiff Can Not Establish A Prima Facie Case Of Age Discrimination**

**\*6** Alternatively, it appears that plaintiff is arguing that Miss Paige discriminated against him based on his age. Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1) A plaintiff alleging age discrimination under the ADEA can prove such discrimination either by providing direct evidence of an employer's discriminatory intent or by showing disparate treatment using indirect evidence and the burden-shifting method established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Schaffner v. Glencoe Park Dist.,* 256 F.3d 616, 620 (7th 2001).

Plaintiff has not produced any direct evidence of age discrimination. Thus, we proceed under the *McDonnell Douglas* framework. Under this burden-shifting method to establish a prima facie case of age discrimination in the hiring context, Cady must initially demonstrate: (1) he is age 40 or older; (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) someone substantially younger than him was selected for the job. *Zaccagnini v. Chas. Levy Circulating Co.,* 338 F.3d 672, 675 (7th Cir.2003). If the plaintiff establishes a prima facie case, then "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reasons for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir.1996). If the employer provides a legitimate, non-discriminatory reason, then the plaintiff must show by a preponderance of the evidence that the employer's stated reason for its decision is nothing more than pretext. *Id.*

It is not disputed that plaintiff is older than age 40. However, to the extent that plaintiff claims that Miss Paige has intentionally discriminated against him based on his age, he has failed to provide any evidence that he applied for and

was qualified for the positions he sought with Miss Paige. Indeed, the record demonstrates that plaintiff, in fact, did not complete or submit any applications to Miss Paige for any of the potential jobs at issue in this case. As the Seventh Circuit has recognized, such a failure prevents a plaintiff from establishing a prima facie case of age discrimination. *Ritter v. Hill N' Dale Farm, Inc.,* 231 F.3d 1039, 1045 (7th Cir.2000) (plaintiff failed to prove a prima facie because a single expression of interest for a job several years earlier did not qualify as an application for the job).

Plaintiff also has not presented any evidence that he was qualified for the positions about which he inquired. Although plaintiff asserts that he was qualified for these positions, "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir.2002). Plaintiff asserts that he was discouraged and deterred from applying for the positions in question because of Miss Paige's policy requiring job applicants to disclose their high school attendance dates and/or graduation dates on its job application form. Plaintiff relies on the futility doctrine arguing that he did not apply for the jobs at issue because of Miss Paige's alleged pervasive discriminatory practices and policies in requiring job applicants to disclose their high school attendance dates and/or graduation dates on its job application form.

**\*7** The United States Supreme Court has acknowledged that there is an exception to the requirement that a plaintiff formally apply for a position. In *International Bd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the United States Supreme Court ruled that in determining liability under Title VII, employees are not deprived of relief just because they did not formally apply for the position, especially in the context of severe and pervasive discrimination, which might deter applicants from engaging in "a futile gesture." 431 U.S. at 365–66. However, in that same opinion, the Supreme Court also noted:

> A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices.

*Id.* at 367–68.

In this case, plaintiff has not presented any evidence of discriminatory conduct by Miss Paige that would relieve him of the requirement of formally applying for the positions in question. Indeed, the undisputed facts show that plaintiff was told by a Miss Paige representatives that he may be qualified for the jobs at issue. In fact, each time he inquired about a job, plaintiff was invited to visit a Miss Paige office to fill out an application. Moreover, plaintiff admits that he does not have any evidence demonstrating that he would not have been selected for any of the jobs if he had disclosed his high school attendance or graduation dates on the application form.

Finally, plaintiff cannot demonstrate that Miss Paige rejected him for the four positions in question or that someone substantially younger was selected for the jobs. Indeed, plaintiff admits that he never applied for the jobs at issue. Thus, Miss Paige never rejected his application. Moreover, the record is void of any evidence that Miss Paige subsequently selected substantially younger individual for the jobs. In fact, the record does not contain any evidence of who Miss Paige hired for the various jobs at issue in this case. Accordingly, plaintiff cannot establish a prima facie case of age discrimination.

Even assuming *arguendo* that plaintiff could establish a prima facie case age discrimination, Miss Paige has provided a legitimate, non-discriminatory reason for its policy of requiring job applicants to include their high school attendance dates and/or graduation dates on its application form. Specifically, Miss Paige explains that it has pledged to its client-employers, most of whom require high school diplomas as an employment prerequisite, that it will verify an applicant's educational history. Miss Paige further states that having applicants disclose their high school attendance dates facilitates the verification process. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 396 (7th Cir.1998). Thus, Miss Paige has articulated a legitimate, non-discriminatory reasons for its policy of requiring job applicants to disclose their high school attendance dates and/or graduation dates on the job application.

**\*8** In order to satisfy his burden of persuasion, plaintiff now must show that the proffered reasons is pretextaul. "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.,* 257 F.3d 723, 730 (7th Cir.2001). To demonstrate pretext, a plaintiff must show that each of the defendant's articulated reasons for its employment decision either: "(1) had no basis in fact; (2) did not actually motive [the employment decision];

**Cady v. Miss Paige, Ltd., Not Reported in F.Supp.2d (2004)**

2004 WL 1144044

(3) was insufficient to motivate [the employment decision]." *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1006 (7th Cir.2002). There is nothing in the record showing that Miss Paige is lying about its proffered explanation, and plaintiff has not introduced a scintilla of evidence demonstrating that Miss Paige promulgated its policy with an intent to classify applicants based on their age or otherwise discriminate against job applicants, including plaintiff, based of age.

In sum, Cady has failed to establish a prima facie case of age discrimination and cannot demonstrate that Miss Paige's proffered reason for its policy of requiring applicants to disclose their high school attendance dates and/or graduation dates was a pretext for any discriminatory intent. Thus, we find that there are no issues of material fact, and Miss Paige is entitled to judgment as a matter of law.

D. Plaintiff's Motion for Sanctions

Finally, plaintiff also filed a motion for sanctions against Miss Paige for purported violations of Rules 10(b) and 11(b) of the Federal Rules of Civil Procedure. However, plaintiff has not provided any evidence that Miss Paige made allegations or denials without evidentiary proof. Indeed, our review of the record demonstrates that Miss Paige's factual allegations and denials are supported with citations to the record. Plaintiff's motion for sanctions also should be denied because he has not provided any admissible evidence supporting his claim that Miss Paige was attempting to harass him when it cited his *pro se* litigation experience. Thus, plaintiff's motion for sanctions is denied.

CONCLUSION

For all of the foregoing reasons, defendant Miss Paige's motion for summary judgment is granted, and plaintiff Davy Cady's motion for summary judgment is denied, terminating the case. We also deny plaintiff's motion for Rule 10(b) and 11(b) sanctions, and all other pending motions are denied as moot. This is a final and appealable order.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1144044

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 8 of 35 PageID #:668

2008 WL 2157170
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Guy R. MARTINO, Plaintiff,

v.

MCI COMMUNICATIONS SERVICES,
INC., d/b/a Verizon Business Services,
a Delaware Corporation, Defendant.

No. 07 C 2627.
|
May 21, 2008.

**Attorneys and Law Firms**

Eugene K. Hollander, Paul W. Ryan, The Law Offices of Eugene K. Hollander, Chicago, IL, for Plaintiff.

Michael J. Gray, Jonathan Matthew Linas, Jones Day, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** In his five-count Amended Complaint, Plaintiff Guy R. Martino ("Martino") alleges violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* as well as state law claims of breach of contract, promissory estoppel, unjust enrichment, and a claim under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.,* against Defendant Verizon Business Network Services, Inc. ("Verizon Business"). Before the Court is Verizon Business' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants Verizon Business' summary judgment motion as to Martino's ADEA claim. The Court declines to exercise its supplemental jurisdiction over Martino's state law claims and dismisses these claims without prejudice. *See* 28 U.S.C. § 1367(c)(3).

**BACKGROUND**

**I. Northern District of Illinois Local Rule 56.1**

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir.2000). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir.2004). Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir.2005). The parties' Local Rule 56.1 statements must contain short numbered paragraphs, including references to the affidavits, parts of the record, and other supporting materials. *See id.; see also Ammons,* 368 F.3d at 817.

The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir.2006). The requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon,* 233 F.3d at 528. A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.,* 442 F.3d 600, 608 (7th Cir.2006). Moreover, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir.2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional facts that a litigant has proposed"); *see also Raymond,* 442 F.3d at 604 ("district courts are entitled to expect strict compliance with Local Rule 56.1"). With these standards in mind, the Court turns to the relevant facts of this case.

**II. Relevant Facts**

**A. Parties**
**\*2** Verizon Business is a subsidiary of Verizon Communications, Inc., which is a worldwide

2008 WL 2157170

telecommunications company. (R. 47-1, Def.'s Rule 56.1 Stmt. Facts ¶ 2.) Verizon Business was formed following a merger between MCI Communications and Verizon Communications on January 6, 2006. (*Id.*) In late 2004, Martino, who was born on July 16, 1950, applied for an open position at MCI Network Services, Inc. (*Id.* ¶¶ 1, 4.) After receiving and accepting an offer as a Business Solutions Consultant ("BSC"), Martino began working for MCI's Enterprise Hosting and Data Services Group on February 9, 2005. (*Id.* ¶¶ 4, 5.)

**B. Martino's Employment and Job Duties**

During his employment, Martino reported to Robert Gross, who was the Regional Sales Director for the Midwest Region. (*Id.* ¶ 6.) As a BSC, Martino served as a product-knowledge or service-knowledge specialist for hosting and hosting-related products and services. (*Id.* ¶ 9.) Throughout his tenure, Martino was assigned to core sales teams because his position was considered an "overlay" position-he overlaid and assisted the core sales teams that handled the named accounts. (*Id.* ¶¶ 10, 11; R. 50-1, Pl.'s Rule 56.1 Stmt. ¶ 1.) A core sales representative-not a BSC-would "quarterback" the entire sales process, owned the client relationship, and owned all of the components that made up the sales process. (Def.'s Stmt. Facts ¶ 11.) As a sales representative in the IT Hosting Solutions Division, Martino was responsible for selling a "full suite of services," which included managed hosting, Akamai services (web application services), data center services, e-mail services, application management, IT services help desk, remote backup and restore, and mainframe outsourcing to the premier accounts in the hosting division. (*Id.* ¶ 12; Pl.'s Stmt. Facts ¶ 2.) In return for providing services during his employment, Martino received a salary, commissions, and benefits, as well as expenses. (Def.'s Stmt. Facts ¶ 7.)

**C. The BP Amoco Deal**

In mid-2005, Verizon Business formed a sales team to secure business from BP Amoco regarding a data center collocation opportunity. (*Id.* ¶ 13.) Martino was part of the team because he was the BSC in the IT Hosting Solutions Division that "overlaid" the core sales branch responsible for the BP Amoco deal. (*Id.*) David Schiffman was the core sales representative principally responsible for the BP Amoco deal. (*Id.* ¶ 15.) Steve Rumstein, the Director of IT Hosting Solutions, also played an important role in the BP Amoco deal. (*Id.* ¶ 17.) Ultimately, BP Amoco and Verizon Business signed a contract in October 2005. (*Id.* ¶ 20.)

While attempting to secure BP Amoco's business, Verizon Business had to respond to BP Amoco's request for proposal ("RFP"). (*Id.* ¶ 14.) The RFP process is a formal process where members of a sales team sit in a conference room, read through the pages of the RFP, and formulate a response. (*Id.*) One of the "major initiatives" expected of a BSC at Verizon Business is to assist the core sales team in the RFP process. (*Id.*) At his deposition, Rumstein testified that Martino did not play a significant role in landing the BP Amoco deal. (*Id.* ¶ 18, Ex. D, Rumstein Dep., at 34-35.) Rumstein specifically testified that Martino did not get involved with the cores sales team during the RFP process for the BP Amoco deal. (*Id.*, Ex. D, Rumstein Dep., at 35.) Further, Rumstein testified that he expected a BSC to take a much stronger leadership role in driving the RFP process than Martino took on the BP Amoco deal. (*Id.*, Ex. D., Rumstein Dep., at 40.)

**D. Martino's Sales and Performance Evaluation**

**\*3** Under Martino's compensation policies in 2005 and 2006, he was eligible to receive commissions on sales in accounts assigned in his territory-regardless of the amount of work he performed in securing those accounts. (*Id.* ¶ 21.) As discussed, during this time period, Martino was the hosting sales representative who overlaid the core sales branch that secured the BP Amoco business. Therefore, Martino received qualified sales credits from the BP Amoco deal. (*Id.* ¶ 22.) Specifically, Martino received credit for three qualified sales resulting from the BP Amoco deal in 2005, including $324,945 in October 2005, $1,630 in November 2005, and $2,616 in December 2005. (*Id.* ¶ 24.) Martino, however, did not reach his monthly sales quota for the majority of 2005. (*Id.* ¶ 23.) In 2006, the vast majority of Martino's qualified monthly sales were a result of the BP Amoco deal. (*Id.* ¶ 26; Ex. K, June 2006, Commissions Related Revenue Report.)

In or around February 2006, Gross evaluated Martino's job performance for 2005. (*Id.* ¶ 29.) Gross gave Martino an "improvement required" rating in the Post-Sale Activity/ Retention category on the written evaluation and commented that "I would like to see improvement in the follow-up with [Martino's] supported teams during and after turn-up environments." (*Id.*) Gross based his "improvement required" rating on Rumstein's and Schiffman's input. (*Id.*) Otherwise, Martino received "meeting expectations" in the remaining categories of his written review. (Pl.'s Stmt. Facts ¶ 6.)

**E. Changes at Verizon Business**

Following the merger of MCI and Verizon Business in January 2006, Verizon Business decided to reduce the costs associated with headcount in the specialized services division.[1] (*Id.* ¶ 34.) In June 2006, Ron McMurtrie, the Vice President of Specialized Services, informed Ed Franklin, the Vice President of IT Solutions, that a reduction-in-force ("RIF") was to take place to achieve the goal of reducing costs. (*Id.* ¶ 35.) McMurtrie instructed Franklin that he had to reduce the headcount within the IT Services Division by approximately 35 people. (*Id.*)

[1] Despite Plaintiff's argument to the contrary, the Vice President of IT Services, Ed Franklin, did not base Defendants' Rule 56.1 Statement ¶ 34 on "flights of fancy, speculation, hunches, intuitions or rumors." *See Hartman v. Pena*, 914 F.Supp. 225, 231 (N.D.Ill.1995). (*See* Def.'s Stmt. Facts, Ex. M, Franklin Decl. ¶¶ 3-6.)

Before the RIF, BSCs in the IT Hosting Solutions Division were responsible for selling both basic collocation services and more complex managed hosting services, as well as being primarily responsible for supporting the core sales teams in their territories. (*Id.* ¶ 36.) At the time of the RIF, Verizon Business planned to change the BSC position in the IT Hosting Solutions Division going forward.[2] (*Id.* ¶ 37.) First, the BSCs would be responsible for taking a more active role in the sales process. (*Id.*) Second, the BSCs would no longer be responsible-or receive commissions or credit-for selling basic collocation services. (*Id.*) Instead, BSCs would be responsible for selling more complex managed hosting solutions. (*Id.*)

[2] Plaintiff denies this statement, but fails to satisfy the requirements under Local Rule 56.1 as to Defendant's Statement of Fact ¶ 37 because his denial does not "fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir.2000).

### F. Martino's Discharge from Verizon Business

**\*4** In June 2006, Franklin and Fran Snyder, the Business Manager of IT Services, asked Rumstein to create and submit a list for the RIF consisting of individuals who would contribute least to Verizon Business going forward. (*Id.* ¶¶ 38, 39.) Rumstein considered a number of factors in determining which BSCs to place on the list, including geographic coverage, the BSC's ability to sell Verizon Business' complete product portfolio, the BSC's credibility with the core sales organization, the BSC's past ability to sell across multiple services, and the BSC's actual sales performance. (*Id.* ¶ 40.) At his deposition, Rumstein explained that despite Martino's

high sales numbers from the BP Amoco deal, he put Martino on the RIF list because Martino had not demonstrated past success in selling managed services. (*Id.* ¶ 41, Ex. D, Rumstein Dep, at 74-75.) Specifically, Rumstein testified that Martino was not performing "based on the expectations we had at IT solutions to sell multiple services." (*Id.,* Ex. D, Rumstein Dep ., at 77.)

After Rumstein created the short list, he submitted it to Snyder on June 15, 2006. (*Id.* ¶ 43.) Ultimately, Franklin reviewed the RIF short list and decided to terminate Martino's employment. (*Id.* ¶ 44.) Specifically, Franklin averred that although Martino's qualified sales numbers were very good, the majority of his sales were due to the BP Amoco deal and that Martino did not participate in the BP Amoco deal in a meaningful way. (*Id.,* Ex. M, Franklin Dec. ¶ 7.) Franklin also averred that Martino's track record as a BSC suggested that he had a limited ability to sell managed services and that the majority of his qualified sales consisted of basic collocation services. (*Id.*)

Verizon Business discharged Martino effective on July 14, 2006. (*Id.* ¶ 46.) On February 2, 2007, Martino filed an EEOC Charge of unlawful discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (*Id* . ¶ 47.) The EEOC issued a right-to-sue letter to Martino on April 27, 2007. (*Id.*) On May 9, 2007, Martino filed his original complaint in the district court. (R. 1-1.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* --- U.S. ----, ----, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly

2008 WL 2157170

supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby,* 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

## I. ADEA Claim

**\*5** In Count I of his Amended Complaint, Martino alleges that Verizon Business discriminated against him based on his age, which was two days short of 56 at the time of his discharge. "The ADEA seeks to protect those over the age of forty from age discrimination in the workplace." *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 517 F.3d 470, 473 (7th Cir.2008). Under the ADEA, Martino may prove intentional discrimination by using either the direct or indirect method of proof as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Tubergen,* 517 F.3d at 473; *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 695 (7th Cir.2006). Martino maintains that he can establish unlawful age discrimination under both methods of proof.

## A. Direct Method

Under the direct method of proving intentional discrimination, a plaintiff is required to set forth "direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Tubergen,* 517 F.3d at 473 (citation omitted). More specifically, "[d]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption" and "[c]ircumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Nichols v. Southern Ill. Univ.-Edwardsville,* 510 F.3d 772, 781 (7th Cir.2007) (citation omitted). "[C]ircumstantial evidence must point directly to a discriminatory reason for the termination decision." *Ptasznik,* 464 F.3d at 695; *see also Atanus v. Perry,* 520 F.3d 662, 2008 WL 696908 (7th Cir. Mar.17, 2008).

Because there is no direct evidence in the record that Verizon Business made an admission that it discharged Martino based on his age, the Court turns to whether Martino has provided sufficient circumstantial evidence that demonstrates a genuine issue of material fact for trial. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir.2007).

## 1. Remarks About Martino's Age

Martino contends that his supervisor, Gross, called him an "oldtimer" during his employment with Verizon Business. Martino also asserts that Brian Higley, who was the Sales Director of the Chicago Suburban Branch of Corporate Accounts, told him that he was "too senior" and "too old" for available sales positions on his team.[3]

[3]     Martino also maintains that Higley and unnamed co-workers "routinely made ageist remarks" showing that "Defendant fostered a pervasive age bias[ed] environment." (R. 49-1, Pl.'s Resp. Brief, at 5.) Martino, however, makes no further arguments supporting a hostile work environment claim. *See Roe-Midgett v. CC Servs., Inc.,* 512 F.3d 865, 876 (7th Cir.2008) (undeveloped argument constitutes waiver). In fact, Martino did not bring a hostile work environment claim in his EEOC Charge or in the Amended Complaint.

Isolated or stray remarks are normally insufficient to establish that an employer was motivated by unlawful discrimination under the direct method of proof. *Id.; see also Sun v. Board of Trs. of Univ. of Ill.,* 473 F.3d 799, 813 (7th Cir.2007). "[A] particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth,* 476 F.3d at 491. Moreover, "statements of a person who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision." *Sun,* 473 F.3d at 813.

## a. Gross' Remarks

**\*6** First, Martino argues that Gross, his direct supervisor, referred to him as an "oldtimer." It is undisputed that Gross did not decide to terminate Martino's employment. Moreover, viewing the facts in Martino's favor, he does not present evidence that Gross called him an "oldtimer" around the time that Rumstein put Martino on the RIF short list or Martino's subsequent discharge. *See Hemsworth,* 476 F.3d at 491. Also, there is no evidence in the record that Gross' remarks were made in reference to Martino's discharge. *See id.*

Martino nevertheless argues that because Gross conferred with Rumstein about the BP Amoco deal and Martino's

performance evaluation and that Rumstein decided to put Martino on the RIF short list, Gross' alleged statements are imputed to Rumstein. Martino's attempt to link Gross to Rumstein's decision to put Marino on the RIF short list is too attenuated to allow an inference of intentional discrimination by Rumstein or Franklin, the ultimate decision maker. *See Nichols,* 510 F.3d at 781; *see also Ptasznik,* 464 F.3d at 695 (circumstantial evidence must "point directly to a discriminatory reason for the termination decision."). As the Seventh Circuit instructs, "when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Sun,* 473 F.3d at 813 (citation omitted). Here, the RIF involved several layers of review, which included Franklin's review of Rumstein's short list and Franklin's ultimate decision to terminate Martino. Thus, Martino's argument based on Gross' remarks fail because the remarks were not connected to Martino's discharge.

### b. Higley's Remarks

Martino also argues that the Sales Director of the Chicago Suburban Branch of Corporate Accounts, Brian Higley, told him that he was "too senior" and "too old" for positions available on Higley's team. Martino explains that although Higley was not his boss at the time he was terminated, he sought a position on Higley's team as a Sales Manager or Corporate Account Manager position after his termination in July 2006. Verizon Business addresses Martino's arguments about Higley in its response to Martino's Rule 56.1 Statements, which contradicts the Local Rules. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir.2006) (purpose of Rule 56.1 statements is to identify the relevant evidence-not to make legal arguments).

Nonetheless, the Court notes that Martino did not bring a failure to re-hire claim in his Amended Complaint nor did Martino mention any such claim in his EEOC Charge. (R. 27-2, Am.Compl., Ex. 1.) Instead, Martino brought a wrongful termination claim against Verizon Business. (*Id.* ¶¶ 10-18.) Therefore, Martino's failure to re-hire claim fails because it is beyond the scope of his EEOC Charge and was not alleged in his Amended Complaint. *See Ritter v. Hill 'N Dale Farm, Inc.,* 231 F.3d 1039, 1045 (7th Cir.2000); *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 920 (7th Cir.2000). Moreover, there is no evidence in the record that Martino actually applied for openings on Higley's team. *See id.* (failure to hire claim requires plaintiff to apply for position). As such,

the Court evaluates Higley's alleged comments under the standard set forth in *Hemsworth* as they pertain to Martino's termination pursuant to the RIF. *See Hemsworth,* 476 F.3d at 491.

**\*7** As discussed above, Rumstein put Martino on the RIF short list and Franklin ultimately decided to terminated Martino's employment. Higley was not the relevant decision maker under the circumstances. In addition, Higley's statements were made after Martino's termination and there is no indication from the record that Higley's alleged comments were made in reference to Martino's discharge. *See Hemsworth,* 476 F.3d at 491. Accordingly, Martino's argument based on Higley's comments fails to establish direct evidence of age discrimination.

### 2. Suspicious Timing

Next, Martino maintains that the timing of his termination is suspicious because it occurred after Gross asked him to take on additional sales responsibilities and Martino's February 2006 positive performance review. *See Tubergen,* 517 F.3d at 473 ("Circumstantial evidence can come in the form of suspicious timing or behavior"). The evidence in the record reflects that Gross assigned Martino additional duties in July 2005, which was approximately one year before he was terminated. (*See* Pl.'s Stmt. Facts ¶ 9.) The twelve-month time period between Martino's July 2005 increased work duties and his termination, as well as the five-month time period from his performance review, are too attenuated to constitute "suspicious timing" that would raise an inference of discrimination. *Cf. Squibb v. Memorial Med. Ctr.,* 497 F.3d 775, 787 (7th Cir.2007) (eight months between filing lawsuit and termination insufficient circumstantial evidence); *Culver v. Gorman & Co.,* 416 F.3d 540, 546-47 (7th Cir.2005) (employer's **sudden** dissatisfaction with employee's performance may give rise to inference of discrimination). In short, Martino's July 2005 increased work duties and his performance review are too remote in time and context to link Martino's age to his discharge. Furthermore, Martino's written performance review that he received five months before his discharge is not relevant because "what matters in a discriminatory discharge case is not the employee's past performance, but whether he was meeting the company's expectations at the time of her discharge." *Johal v. Little Lady Foods, Inc.,* 434 F.3d 943, 946 (7th Cir.2006) (citation omitted).

Martino also argues that the timing of his discharge was suspicious because he took on additional job responsibilities

Martino v. MCI Communications Services, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 2157170

in June 2006, one month before his discharge. Specifically, in May 2006, Robert Weber transferred from IT Hosting Solutions to Premier Accounts. (Pl.'s Stmt. Facts ¶ 9; R. 63-1, Def.'s Resp. ¶ 9.) After Weber left IT Hosting Solutions, Gross asked Martino to assume responsibility for Weber's accounts. (*Id.*) Although the parties dispute the extent to which Martino "took over" Weber's accounts, the additional job responsibilities do not lead to an inference of unlawful discrimination because this evidence does not " 'point[ ] directly' to a discriminatory reason for the employer's action." *See Atanus v. Perry,* 520 F.3d 662, 2008 WL 696908 (7th Cir. Mar.17, 2008); *Ptasznik,* 464 F.3d at 695. In addition, while "[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, ... it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *See Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir.2006) (quoting *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 981 (7th Cir.2004)). Accordingly, Martino's suspicious timing argument fails.

### 3. Suspicious Behavior

**\*8** Martino also argues that he was qualified to go forward as a BSC after the RIF and that Verizon Business' suspicious behavior of retaining younger, non-performers "screams" age discrimination. *See Tubergen,* 517 F.3d at 473 (circumstantial evidence may include suspicious behavior). After the RIF, Verizon Business retained six BSCs who reported to Gross and who were younger than Martino at the time of his discharge (age 55). When a plaintiff and those allegedly favored over him are above the age of 40, the age difference must be ten years or greater to be presumptively substantial. *See id.* at 475 n. 4; *Bennington v. Caterpillar, Inc.,* 275 F.3d 654, 659 (7th Cir.2001). Accordingly, two of the six remaining BSCs who reported to Gross are not sufficient comparators-Greg Smidt (age 47) and Ray Jaeger (age 49) because they are less than ten years younger than Martino. (*See* Pl.'s Stmt. Facts ¶ 18.) Moreover, of the four remaining BSCs, two of them received higher 2005 performance reviews than Martino-Timothy Damato (age 44) and Jonathan Gagnon (age 37). (*See id.* ¶ 20.) That leaves one individual younger than Martino who received the same 2005 performance review as Martino, but who Martino outperformed based on his percentage of sales from the BP Amoco deal-James Franke (age 38).[4] This evidence does not raise an inference of age discrimination, especially because Martino's sales numbers were skewed due to the BP Amoco deal. Also, Martino's argument does not take into consideration these

individuals' ability to meet other performance-related criteria, such as their ability to sell complex managed services. On a final note, Rumstein's RIF list included six individuals besides Martino, all of whom were younger than Martino. (Def.'s Stmt. Facts. ¶ 43.) Thus, Martino's allegations of "suspicious behavior" do not support an inference of intentional age discrimination. *See Nichols,* 510 F.3d at 781.

4      The 2005 performance appraisal for Nate Fox (age 32 or 33) is unavailable. (Pl.'s Stmt. Facts ¶ 20.)

Because Martino has failed to establish intentional age discrimination under the direct method of proof, the Court turns to the indirect method of proof.

### B. Indirect Method

Martino also argues that he can establish a prima facie case of age discrimination under the indirect method of proof. To establish a prima facie case of age discrimination under the indirect method of proof, Martino must show that (1) he is a member of a protected class, (2) his job performance met Verizon Business' legitimate expectations, (3) Verizon Business subjected him to an adverse employment action, and (4) Verizon Business treated similarly situated younger employees more favorably. *See Duncan v. Fleetwood Motor Homes of Ind., Inc.,* 518 F.3d 486, 491 (7th Cir.2008); *Barricks v. Eli Lilly & Co.,* 481 F.3d 556, 559 (7th Cir.2007). In ADEA claims and claims in the context of RIFs, the Seventh Circuit recognizes variations to the fourth prima facie element, including, the employer "sought someone to perform the same work after he left," *see Duncan,* 518 F.3d at 491, or the plaintiff's "job duties were absorbed by employees who were not members of [his] protected class." *Hemsworth,* 476 F.3d at 492. If Martino fails to establish a prima facie case of age discrimination, summary judgment in Verizon Business' favor is appropriate. *See Henry v. Jones,* 507 F.3d 558, 564 (7th Cir.2007).

**\*9** The Court turns to the second element of Martino's prima facie case, namely, whether Martino's job performance met Verizon Business' legitimate expectations because it is dispositive. The proper inquiry under this element requires the Court to look at Martino's job performance through the eyes of his supervisors at the time of the RIF and his termination. *See Gates v. Caterpillar, Inc.,* 513 F.3d 680, 689 (7th Cir.2008). Here, Rumstein explained that he considered various factors in deciding who to put on the RIF short list, including geographic coverage, the BSC's ability to sell Verizon Business' complete product portfolio,

2008 WL 2157170

the BSC's credibility with the core sales organization, the BSC's past ability to sell across multiple services, and the BSC's actual sales performance. Rumstein further explained that despite Martino's high sales numbers from the BP Amoco deal, he put Martino on the RIF list because Martino had not demonstrated past success in selling complex managed services as opposed to collocation services. Specifically, Rumstein testified that Martino was not performing based on IT solutions' expectations to sell multiple services. Further, there is evidence in the record that going forward, BSCs would be required to sell multiple services and would not receive commissions for selling basic collocation services.

Moreover, Franklin explained that although Martino's qualified sales numbers were very good, the majority of his sales were due to the BP Amoco deal and that Martino did not participate in the BP Amoco deal in a meaningful way. Franklin also stated that Martino's track record as a BSC suggested that he had a limited ability to sell managed services and that the majority of his qualified sales consisted of basic collocation services.

Based on both Rumstein's and Franklin's assessments, Martino was not meeting Verizon Business' legitimate performance expectations at the time of the RIF and Martino's discharge. *See Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1056 (7th Cir.2006)* (employee's opinion that he performed to his employer's legitimate expectations is irrelevant). Furthermore, although Martino presents evidence that his qualified sales numbers were high, meeting Verizon Business' expectations as to one aspect of his job does not establish that he was meeting Verizon Business' performance expectations as to every aspect of his job-especially because Verizon Business took other factors into consideration when choosing employees for the RIF. *See Fane v. Locke Reynolds, LLP, 480 F.3d 534, 540 (7th Cir.2007).*

Because Martino has not presented evidence creating a genuine issue of material fact that he was meeting Verizon Business' legitimate performance expectations, he has failed to set forth a prima facie case of unlawful age discrimination under the ADEA. *See Henry, 507 F.3d at 564.* The Court

thereby grants Verizon Business' summary judgment motion as to Count I of the Amended Complaint.

### II. Martino's State Law Claims

**\*10** Finally, the Court declines to exercise its supplemental jurisdiction over Martino's state law claims as alleged in Counts II through V of the Amended Complaint because the Court is dismissing Martino's claim over which the Court has original jurisdiction, namely, his claim pursuant to the Age Discrimination in Employment Act. *See Ross v. Board of Educ. of Twp. High Sch. Dist., 486 F.3d 279, 285 (7th Cir.2007); 28 U.S.C. § 1367(c)(3).* "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *East-Miller v. Lake County Highway Dep't, 421 F.3d 558, 564-65 (7th Cir.2005)* (quoting *Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir.1999)).* Section 1367(d) tolls the statute of limitations for 30 days after the Court's dismissal of these supplemental claims allowing Martino to timely file these claims in state court. *See Williams Elec. Games, Inc. v. Garrity, 479 F.3d 904, 907 (7th Cir.2007); see also Segal v. Geisha NYC, LLC, 517 F.3d 501, 506 (7th Cir.2008).* Accordingly, the Court dismisses Counts II through V of the Amended Complaint without prejudice.

### CONCLUSION

For these reasons, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's ADEA claim alleged in Count I of the Amended Complaint. The Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims, and thus dismisses Counts II through V of the Amended Complaint without prejudice. Finally, the Court denies Defendant's Motion to Strike as moot.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 2157170

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Bilinsky v. American Airlines, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4181481, 2018 A.D. Cases 317,270

2018 WL 4181481
United States District Court,
N.D. Illinois, Eastern Division.

Kimberly BILINSKY, Plaintiff,

v.

AMERICAN AIRLINES, INC., Defendant.

No. 16 C 4253
|
Signed 08/31/2018

**Attorneys and Law Firms**

Charles A. Valente, Heather Kuhn O'Toole, Kaplan Saunders Valente & Beninati, LLP, Chicago, IL, for Plaintiff.

Paul Ehrich Bateman, LaVanga Vusitha Wijekoon, Littler Mendelson, P.C., Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Hon. Virginia M. Kendall, United States District Judge

*1 Plaintiff Kimberly Bilinsky sued American Airlines, Inc. ("American") alleging violations of her rights under the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12203 ("ADA"), by denying her a reasonable accommodation (Count I) and retaliation for requesting a reasonable accommodation (Count II). Bilinsky also alleges the same conduct violated the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq.* ("IHRA") (Count III). American moves for summary judgment as a matter of law on all three counts. *See* (Dkt. No. 59). For the following reasons the Court grants American's Motion. [59.]

**BACKGROUND**

The following facts from the parties' Local Rule 56.1 Statements are undisputed unless otherwise noted.[1] Bilinsky is a former American employee who suffers from multiple sclerosis ("MS"). *See* (Dkt. No. 61, at ¶¶ 1, 8) (Def.'s SOF). Her MS causes weakness on the right side of her body impacting her gait, strength, and balance, which can be exacerbated by heat and stress. *Id.* ¶ 9. She is also unable able to run or do other physical activities that require balance but can use a computer. *Id.* ¶ 13.

[1]     American challenges many of Bilinsky's responses to its Statement of Facts as improper. *See* (Dkt. No. 76, at 13). Those challenges have been carefully reviewed and the facts take those challenges into account.

**1. Pre-Merger Employment**

Bilinsky started working for American in 1991 where she held various positions, eventually becoming a Senior Specialist, Flight Service Communications ("Communications Specialist") in the Flight Service Department in 2007. *Id.* ¶ 3. The position reported to American's headquarters in Fort Worth, Texas, located near Dallas/Fort Worth International Airport ("DFW"). *Id.* ¶¶ 2, 20. Around the time of her interview for the position, Bilinsky informed hiring manager Laura Tolar ("Tolar") that she would be unable to move to Texas because heat aggravated her medical condition. *Id.* ¶ 21. Consequently, Tolar and Bilinsky reached what they called a "work-from-home arrangement" ("WFHA") where Bilinsky could work primarily from her home in Lake Barrington, Illinois, while traveling to DFW approximately one day per week and with occasional travel to locations other than DFW as well. *Id.* ¶¶ 6, 24. Although there was no written job description for her position, Bilinsky's responsibilities included: researching, writing, editing and publishing numerous articles and communications for the Flight Services Department; managing a Flight Service website and database; providing weekly service updates; attending daily conference calls; and attending a weekly staff meeting in Dallas, Texas. *See* (Dkt. No. 67, at ¶¶ 7-8) (Pl.'s SOAF).

**2. Post-Merger Employment**

In December 2013, American merged with US Airways. *See* (Dkt. No. 61, at ¶ 28). The merger required American to combine its operational processes with US Airways so as to obtain a "single operating certificate," while also instigating an integration process to merge procedures, operations, collaboration tools, and media channels. *Id.* ¶ 29; *see also* (Dkt. No. 62-2, Ex. 7, at 24:9-25:8) (Carlson Dep.). Hector Adler ("Adler"), then Vice President of the Flight Service Department, testified this undertaking was a complicated endeavor requiring coordination between multiple departments. *See* (Dkt. No. 61, at ¶ 30); (Dkt. No.

2018 WL 4181481, 2018 A.D. Cases 317,270

62-2, Ex. 6, at 23:3-17) (Adler Dep.). Specifically, Adler noted:

**\*2** "The flight services department had responsibility to combine the policies and procedures for flight attendants between two legacy carriers into a single operating manual and at the same time work in cooperation with the other operating departments to ensure that we were coordinated at every point. We had to develop the procedures, write the manuals, and communicate changing information to the employees. It was a very extensive and significant task that involved nearly every person in the department."

*Id.* He further described the post-merger environment as one in which the communications team "needed to able to communicate on short notice" and need to "respond to the myriad of problems and deadlines that were coming up every day often without prior notice." *Id.* 36:5-10. With all the tasks requiring participation in meetings and strategy, Adler added, there were not enough people to go around and he felt it "special that all of [the team] be in one place." *Id.* 11-22. Early in 2014, based on the changing environment, Adler transitioned Bilinsky's communications team to one "with a higher degree of in-person engagement" and required all Flight Service Department employees with DFW-based positions work from DFW including those who previously worked from home on a regular basis. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32:15-39:17).[2,3] During this same time only two other Flight Services Department employees worked on some form of WFHA and when American changed its policy after the merger one of them relocated. *See* (Dkt. No. 61, at ¶ 42). The other employee refused to relocate from California and was therefore subject to the same reduction-in-force. *Id.*

[2]    Bilinsky notes that as of July 2017, certain employees from the Department were based in Phoenix, Arizona. *See* (Dkt. No. 67, at ¶ 37). However, this factual dispute is irrelevant for two reasons: first, according to Adler, the Phoenix employees must work from Phoenix because they perform administrative functions for which the operating systems are not integrated into American's system at DFW. *See* (Dkt. No. 67-6, Ex. E, at 14:13-15:18); and second, American claims the Department employees in Phoenix did not have "headquarters positions" in the first place, and thus were not subject to the same requirements as Bilinsky. *See* (Dkt. No. 76, at 16).

[3]    Bilinsky disputes these observations; reiterating that Adler did not personally work with Bilinsky and

neither he nor Rhonda Nicol-Perin ("Nicol-Perin") of Human Resources had adequate understanding of Bilinsky's everyday responsibilities. *See, e.g.,* (Dkt. No. 67, Pl. Resp. at ¶¶ 34-41). Regardless of the merit of these points, they are not responsive to American's observations of the general environment at headquarters and the reason Defendant transitioned the Department.

Fearful that these changes would impact her WFHA and that the Dallas climate would limit her functions, Bilinsky met with her immediate supervisor Cathy Scheu ("Scheu") on May 20, 2014. *See* (Dkt. No. 67, at ¶ 10). Bilinsky informed Scheu that her current WFHA was a necessary accommodation for her to keep doing her job because of her disability. *Id.* at ¶ 11.[4] After internal consultations between Adler, Scheu, Human Resources employee Rhonda Nicol-Perin ("Nicol-Perin"), and American's Area Medical Director Dr. Jeral Ahtone ("Ahtone"), Adler ultimately decided to deny Bilinsky's request to continue with her current WFHA. *See* (Dkt. No. 61, at ¶¶ 50, 60); (Dkt. No. 62-2, Ex. 2, 29:1-10) (Nicol-Perin Dep.); (Dkt. No. 67, at ¶ 13). Adler based denial of Bilinsky's request in part on his decision to have his entire communications team physically housed at DFW. *See* (Dkt. No. 67, ¶ 15).

[4]    It is unclear whether Bilinsky specifically requested an accommodation during this meeting, but this is immaterial based on subsequent events indicating that she requested an accommodation that was received and processed by American. *See* (Dkt. No. 61, at ¶¶ 47-50, 76).

### 3. Accommodation Denial and Termination

**\*3** Scheu and Nicol-Perin informed Bilinsky that her request to continue the WFHA had been denied and asked her what other accommodations American could make at DFW that would permit Bilinsky to work there. *See* (Dkt. No. 61, at ¶¶ 60, 61). But Bilinsky made clear that "unless the company could provide a tube of air conditioning around her body 24 hours a day," there was no possible accommodation available. *Id.* ¶ 61. According Bilinsky it was not the conditions at headquarters specifically; rather it was the location of headquarters *in Texas* that made it impossible for her to relocated. *Id.* ¶¶ 61, 62. Unable to agree on an accommodation for a position at DFW, American allowed Bilinsky to apply for other available positions while Scheu and Nicol-Perin checked to see if there were open positions in Chicago. *Id.* ¶ 64.

2018 WL 4181481, 2018 A.D. Cases 317,270

American informed Bilinsky that her last day as a Communications Specialist would be March 27, 2015, and that she would be placed on administrative leave until April 30 to allow her time to apply for other positions including a position as Specialist Corporate Sales based in Chicago. *Id.* ¶¶ 65, 66. Both Scheu and Nicol-Perin assisted Bilinsky with the search process and in trying to obtain a different, amicable position with American. *Id.* ¶¶ 67, 68, 69. For example, around March 25, 2015, Scheu contacted Bilinsky about a vacant Specialist Corporate Sales position based in Chicago. *Id.* ¶¶ 65, 67, 68. Scheu and Nicol-Perin reached out to colleagues on Bilinsky's behalf, but she was not selected because she lacked the requisite experience. *Id.* ¶¶ 67, 68, 73. Nicol-Perin looked for other positions in the Flight Services Department in Chicago as well, but there were none. *Id.* ¶ 69. There were other support staff positions open in Chicago at the time, but Bilinsky told Nicol-Perin she was uninterested in any of them. *Id.*

Around the same time Belinsky asked to continue with her WFHA, she also applied for an Analyst, Manuals, and Documentation position based out of DFW. *Id.* ¶¶ 76, 77. The employee who previously held that position prior to the merger worked from home and refused to relocate to DFW and so was subject to reduction-in-force. *Id.* ¶ 78. American ultimately hired someone else for the Analyst, Manuals, and Documentation position in part because it required work at DFW "and not from a remote location," although Belinsky believes she was denied the position for the same reasons she was unable to continue her WFHA in her former position. *Id.* ¶¶ 78, 79, 80.

Bilinsky's last day at American was May 1, 2015. *Id.* ¶ 4. She filed her Charge of Discrimination of the Equal Employment Opportunity Commission May 4, 2015 and received her Right to Sue letter on March 8, 2016. *See* (Dkt. No. 1, at ¶ 4; Ex. A). She filed the current Complaint roughly one month later. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). A genuine dispute of material fact exists if, based on the evidence, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of

establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must set forth facts that show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255. Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Fed. R. Civ. P. 56(c)* ). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## DISCUSSION

**\*4** The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). An employer's failure to make a reasonable accommodation for any employee with a known disability constitutes prohibited discrimination under the ADA. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008). The same section further defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... or ... denying employment opportunities to a job application or employee who is an otherwise qualified individual with a disability, if such a denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." *42 U.S.C. § 12112(b)(5)(A)-(B).*

The ADA also "prohibits employers from retaliating against employees who assert their rights under the act to be free from discrimination." *42 U.S.C. § 12203(a)*; *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). This includes retaliation even where the initial claim of discrimination is found to be meritless. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

American seeks summary judgment on Belinsky's ADA claims alleging American failed to accommodate her and

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 18 of 35 PageID #:678

Bilinsky v. American Airlines, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4181481, 2018 A.D. Cases 317,270

for retaliation for not selecting her for the Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 60, at 3, 5-6). American's position is that Bilinsky fails to meet her initial burden of proving she was a qualified individual or – even if she has – that they engaged in an interactive process for a reasonable accommodation. *Id.* at 5-6. As for the retaliation claims, American argues Bilinsky fails to establish a causal connection between her request for an accommodation and American's decision not to hire her for the Corporate Sales position. *Id.* at 3. They further seek judgment as a matter of law on the identical claims filed pursuant to the IHRA. *Id.* at 18-19.

**A. Failure to Accommodate**

The ADA permits two categorical claims for discrimination: disparate treatment and failure to accommodate. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015); *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001). Count I does not allege facts consistent with a disparate treatment claim. *See generally* (Dkt. No. 1) (failing to allege discrimination pursuant to 42 U.S.C. § 12112(a) ). More so, Bilinsky concedes that she "filed an action under the ADA based on her employer's failure to provide her with a reasonable accommodation," *see* (Dkt. No. 71, at 11), and does not challenge American's assertion that Count I solely raises a failure to accommodate claim and not one for disparate treatment. *See* (Dkt. No. 60, at 5); *see generally* (Dkt. No. 71). Bilinsky alleges that American violated the ADA when it denied her request to continue working pursuant to her existing WFHA and did not offer her any alternative accommodation. For its part American argues that Bilinsky was not a qualified individual because she was unable to perform the essential functions of her job after the merger. *See* (Dkt. No. 60, at 6-11).

To succeed on a claim for failure to accommodate, a plaintiff must show that she is a "qualified individual" with a disability and that her employer is aware of her disability. *See Basith*, 241 F.3d at 927; *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013). The term "qualified individual" is defined as:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desire. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants

for the job, this description shall be considered evidence of the essential functions of the job.

**\*5** 42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that she is a qualified individual who could perform the essential functions of her position. *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). Additionally, a failure to accommodate claim fails if the plaintiff cannot first establish that she is a "qualified individual" with a disability. *Basith*, 241 F.3d at 932 ("[w]e need not decide whether Basith was denied reasonable accommodation in light of his failure to show a question of fact existed as to whether he was a qualified individual with a disability") (internal quotations omitted); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (explaining that a failure to accommodate under the ADA requires a *prima facie* showing that the plaintiff is or was a qualified individual with a disability).

In the current litigation American challenges only Bilinsky's status as a qualified individual; they do not dispute that Bilinsky is a person who is disabled or that they were aware of her disability. *See* (Dt. No. 60, at 5-6). To determine whether an individual is "qualified" the Court must look to "whether the individual satisfies the prerequisites for the position and then turn[s] to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018). American doesn't dispute Bilinsky's qualifications, *see* (Dkt. No. 60, at 6 n.4), so the Court focuses solely on her ability to perform the essential functions of the position. Whether a function is essential is a question of fact. *See Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) ("[t]he essential-function inquiry is a factual question, *not* a question of law") (emphasis in original). Essential functions are determined by looking at factors including but not limited to the employer's judgment as to which functions are essential, the consequences of not requiring the employees to perform the function, and past and current work experiences. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2014); *see also* 29 C.F.R. § 1630.2(n)(3). The presumption is that the employer's judgment as to what is essential is correct unless the plaintiff offers sufficient evidence to the contrary. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010); *Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011); *Coleman v. Caterpillar, Inc.*, 2017 WL 3840423, at *6 (C.D. Ill. Sept. 1, 2017) (presumption in favor of employer where plaintiff did not offer evidence to the contrary that employer's

2018 WL 4181481, 2018 A.D. Cases 317,270

understanding that at least occasional physical presence at work was essential to the job of advanced purchasing analyst). But while the employer's judgment is one factor to consider it is not controlling and the Court looks at the employer's actual practices in the workplace as well. *See DePaoli v. Abbott Labs.*, 140 F.3d. 668, 674 (7th Cir. 1998) ("[a]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions ... we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job"); *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011); *Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015).

A "reasonable accommodation" may include things such as making work facilities accessible to individuals with disabilities, or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. *See* 42 U.S.C. § 12111(9)(A)-(B).

**\*6** Turning first to the employer's judgment, it is undisputed that American decided an everyday presence was an essential function of the Communications Specialist position after the merger with US Airways. (In American's view, after the merger the level of intra- and inter-departmental coordination made daily availability at DFW vital for all communications employees.) *See* (Dkt. No. 60, at 7). Hector Adler, American's Vice-President of the Flight Service Department described the merger process as a "very extensive and significant task that involved nearly every person in the [D]epartment." *See* (Dkt. No. 67-6, Ex. E, at 23:8-17); *see also* (Dkt. No. 61, at ¶ 30). After several months of observing Department operations, Adler concluded that the Department was not adequately responding to the unpredictable issues arising on a day-to-day basis. *See* (Dkt. No. 67-6, Ex. E, at 27:20-28:13). As the person responsible for setting the operational direction of the Department, and with the desire to create a productive response team, Adler decided to transition the Department from what he called an "e-mail shop" to a team with a "different level of engagement and involvement from all the team members." *See* (Dkt. No. 67-6, Ex. E, at 21:11-24); *see also* (Dkt. No. 61, at ¶¶ 32-33). Consequently, he set in place the requirement that all Department employees be physically present at DFW five day per week. *See* (Dkt. No. 67-6, Ex. E, at 58:13-19); *see also* (Dkt. No. 61, at ¶ 37). American asserts that because Bilinsky refused to relocate to Texas, she could

not perform this essential function of the positions as newly defined and therefore is not a qualified individual.

American's shift in essential function is corroborated by testimony consistent with the fact that the change was complex and hectic in the post-merger environment and exhibits the problems associated with not having all Department employees available at DFW headquarters. For example, Adler noted the importance of "the ability to interact quickly as situations arose" and stated that "it would have been unfair to other members of the team to constantly be pulled onto assignments simply because they were present and others were not." *See* (Dkt. No. 67-6, Ex. E, at 42:1-13). Bilinsky's former manager, Linda Carlson, expressed the importance of having [communications] teams centrally located after the merger. *See* (Dkt. No. 75, at 3); (Dkt. No. 67-8, Ex. G, at 26:19-22). Another former manager, Cathy Scheu, testified that "as we moved through [the merger process] ... we really did need for people to be at headquarters, particularly the communications group." *See* (Dkt. No. 67-7, Ex. F, at 46:11-22).

Bilinsky does not dispute her inability to be physically present at DFW five days per week. Rather, she asserts that the record shows a genuine dispute of fact as to whether her daily attendance was an essential function. *See* (Dkt. No. 71, at 7). Further, she reminds the Court not to "simply defer" to the employer's judgment about what constitutes an essential function. *Id.* She also points to her history of performing the job remotely and includes testimony from her supervisors stating that even after the merger she performed duties normally assigned to others and was willing to "pick up the slack." *See* (Dkt. No. 67, at ¶ 19); (Dkt. No. 67-8, Ex. G, at 27:7-13). But these facts do not sufficiently outweigh American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute.

First, Bilinsky ignores a key fact: that her job duties changed after the merger; requiring a physical presence in Dallas. American does not dispute that Bilinsky satisfactorily performed her job duties from home prior to the merger, but multiple American employees uniformly agree that is was in America's best interest to require the communications staff have a daily physical presence at DFW headquarters after merging with US Airways. When an employee is facing a "policy change that came from above" and the policy change requires the presence of an employee in a specific location, that becomes an essential job function. *See e.g. Gratzl*, 601 F.3d at 680 ("[Plaintiff] cannot prove that she is qualified

2018 WL 4181481, 2018 A.D. Cases 317,270

for her current job simply by citing that show was qualified for a previous job, with different essential functions, that has been eliminated.") In *Gratzl*, for example, the plaintiff had served as a court reporter who worked exclusively in a control room of the courthouse. This was ideal for plaintiff who suffered from incontinence and could take frequent bathroom breaks. But the State eliminated her job of court reporting specialist and required all court reporters to rotate throughout all the courtrooms in the courthouse. Plaintiff refused to rotate, and the courthouse employer worked to see if other accommodations would work such as placing her in juvenile courtrooms, but all proposals were rejected by plaintiff and as such she was given notice of termination. In finding that the district court correctly granted summary judgment for the employer, the Court found that plaintiff's refusal to "consider any accommodation that required that she do in court reporting strongly suggested that she believed she was incapable of performing this function. Therefore, she is not qualified for the job." *Id.*

**\*7** Similarly, the undisputed facts, such as testimony from Adler, Scheu, Carlson and Nicol-Perin, shows that American had a legitimate reason for altering the job requirements and the actions they took substantiate the need to do so. *See e.g., Walter v. Wal-Mart Stores Inc.*, 2011 WL 4537931, at \*11 (N.D. Ind. Sept. 28, 2011) (citing *Gratzl*, 601 F.3d at 680) ("[a]n employee's job description is permitted to evolve, and an employer is not required to maintain an existing position or structure that, for legitimate reasons, [the employer] no longer believes is appropriate") (internal quotation marks omitted). With two major airlines merging, American's decision to mandate its communications team to work out of DFW is similarly appropriate. Similar to the plaintiff in *Gratzl*, Bilinsky can perform the communications job that she had, but her refusal to perform the functions of that job five days a week in person in the Texas headquarters where her employer has now deemed it essential for purposes of employing a responsive communications team that is not merely emailing responses, demonstrates that she is not qualified for the position. As the Court noted in *Gratzl*:

> Another way to look at the question is whether the only accommodation that Gratzl requested—exclusive assignment to the control room—was a reasonable accommodation. "Because Gratzl bears the burden of establishing that she can perform the essential functions of her job with or without reasonable accommodation," (cite omitted) she has not met this burden if the only accommodation she has ever suggested is not reasonable. *Id.*

Second, the fact that Bilinsky's supervisor found her work ethic and work-product post-merger satisfactory is irrelevant to whether a physical presence at DFW became an essential work function according to American. *See Taylor-Novotny*, 772 F.3d at 493 (the plaintiff bears the burden of proving she is a qualified individual by showing an ability to perform *all* essential functions). The relevant issue is not about how well Bilinsky could do the work; rather it is about the work she could not do at all. *See Gratzl* at 680.For example, while commending Bilinsky's willingness to "pick up the slack" on a project, Carlson (her supervisor) noted that by working from home, "[Bilinsky] just wasn't able to do things that you needed to do to support an event," such as driving to an event, checking out equipment, or directly meeting with flight service subject matter experts. *See* (Dkt. No. 67-6, Ex. G, at 27:7-18). As mentioned above, the evidence suggests that Bilinsky's absence put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally. *Id.*, Ex. E, at 41:21-42:13; *see also Coleman*, 2017 WL 3840423, at \*6 (although the plaintiff's performance was not officially deemed unsatisfactory while working remotely, she still failed to carry her burden of proof establishing that physical presence at work was not an essential function because her absence placed a greater burden on co-workers).

Additionally, it's worth noting that the other two communications employees who previously worked from home were not permitted to continue under their similar WFHA situations. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32:15-39:17). American also states that, currently, no Department employees with "headquarters positions" work from home. *See* (Dkt. No. 61, at ¶¶ 43-44); (Dkt. No. 60, at 7). As such, American offers substantial evidence supporting its determination that a physical presence at DFW was an essential function of the Communications Specialist positions after the merger while Bilinsky offers insufficient evidence to create a dispute of material fact. Deference to American's judgment as the employer is required in the absence of an adequate factual or legal basis to abandon that deference. *See Gratzl*, 601 F.3d at 679; *DePaoli*, 140 F.3d at 674.

Bilinsky relies on *Shell v. Smith*, *Miller v. Illinois Department of Transportation*, and *Bixby v. Morgan Chase Bank*; all three are readily distinguishable.

**\*8** In *Shell v. Smith*, before remanding for a factual dispute, the court held that a change in management did not impact

2018 WL 4181481, 2018 A.D. Cases 317,270

whether a task was an essential function of a job; rather the inquiry should focus on actual employment practices and the plaintiff's prior performance.[5] 789 F.3d at 718-19. In contrast to the plaintiff in *Shell*, the fundamental aspects of Bilinsky's job changed because the Flight Services Department served a considerable communications role during the merger. Where in *Shell* the job description remained the same after the change in management, the actual duties required of Bilinsky by American changed because of the merger with US Airways.

[5]    The employee, who suffered from hearing and vision impairment, was a mechanic's helper and the job description said the position may occasionally involve driving buses. But to drive the buses an employee needed to have a commercial driver's license ("CDL"). Based on the vision and hearing impairments the employee could not obtain a CDL. This was not an issue until the employer came under new management, which terminated the plaintiff for failure to obtain a CDL. *See Shell v. Smith*, 789 F.3d at 716, 721.

She also relies on *Miller v. Ill. Dep't of Transp.*, a case where an employee with a fear of heights was denied an accommodation that he not work "on bridge beams and other extreme places" over a certain height after suffering a panic attack on an overpass construction job. *See Miller*, 643 F.3d at 192-94. In reversing summary judgment for the employer, the court held that the locations where Miller worked were not actually an essential function of his job; rather they were easily modifiable assignments and so he could not request an accommodation based on them. *Id.* at 200. In contrast, Bilinsky's Department duties changed after the merger and those changes directly impacted the employment location. The plaintiff in *Miller* effectively asked his employer to formalize for him what the Court said was already occurring in the normal course of business – to reassign him to tasks or jobs that did not involve danger of heights. *Id.* To the contrary, the merger in this matter altered what was the normal course of business for American and its employees and so *Miller* is inapplicable.

Next Bilinsky relies on *Bixby v. JP Morgan Chase Bank, N.A.* – a case where the district court held that allowing a plaintiff to work from home for a period constitutes a reasonable accommodation because the employer allowed other similarly situated employees to work from home as well. *See* 2012 WL 832889, at *11 (N.D. Ill. Mar. 8, 2012). First, this Court is not bound by decisions of other district court judges. Second, the facts as to the reasonableness of the work-from-home arrangement in *Bixby* suggest that such an accommodation

was reasonable and would not impact job performance. *Id.* at *9-11. In contrast, the evidence here shows that the merger resulted in a change in job responsibilities that could not be readily performed from home. *See* (Dkt. No. 67-2, Ex. F. at 48:5-13). This is supported by the actions of American who did not permit two other employees with WFHAs to continue doing so after the merger. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32:15-39:17).

Bilinsky also argues that American did not adequately engage in the interactive process to provide a reasonable accommodation. *See* (Dkt. No. 71, at 15). However, because she failed to sustain her burden of proving that she was a qualified individual the question of whether American offered her a reasonable accommodation is moot. *See Basith*, 241 F.3d at 932; *see also Stern*, 788 F.3d at 292 ("the employee must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job"). There is no factual dispute about whether Bilinsky was a qualified individual after the Communications Specialist position changed due to the merger; she was not. The change in the position requirements after the merger altered the essential functions to include a physical presence at DFW and Bilinsky refused to relocate. Even if Bilinsky were entitled to a reasonable accommodation there is no dispute that American made every effort to place Bilinsky in other employment positions, worked with her to find another position, and considered her for other positions. As such, American's motion for summary judgment as to the ADA claim for failure to accommodate (Count I) is granted.

## B. Retaliation

**\*9** An employer is equally prohibited from retaliating against any individual who asserts a right pursuant to the ADA. *See* 42 U.S.C. § 12203(a). An aggrieved employee can show retaliation through either direct or indirect methods of proof. *See Dickerson*, 657 F.3d at 601. Bilinsky does not allege or argue facts consistent with the indirect method by, for example, trying to show that similarly situated employees received more favorable treatment. *See Mobley*, 531 F.3d at 548 (enunciating the elements for an indirect method of proof for ADA discrimination including comparison of treatment to similarly situated persons). Under the direct method of proof Bilinsky must demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two. *Rodrigo*, 879 F.3d at 243.

"To show causation under the direct method, an employee must show that her protected activity was a substantial or

2018 WL 4181481, 2018 A.D. Cases 317,270

motivating factor behind the adverse employment action." *Taylor-Novotny*, 772 F.3d at 495 (internal citation and quotations omitted). One way to establish causation is by showing a direct admission of retaliatory motive. *Id.* Another way is to present a "convincing mosaic" of circumstantial evidence supporting an inference of retaliatory animus. *Id.* Categories of circumstantial evidence include: (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn[;]" (2) "evidence ... that similarly situated employees were treated differently[;]" and (3) "evidence that the employer offered a pretextual reason or the adverse employment action." *Id.*

To begin, the record is clear that Bilinsky did not have the requisite qualifications for the Corporate Sales position in Chicago, Illinois. *See* (Dkt. No.61, at ¶¶ 67-68, 73). Based on these undisputed facts, American cannot be said to have retaliated against Bilinsky by not selecting her for the position in Chicago; instead they simply did not hire her because she lacked the experience.

As for the Analyst Manuals position in Texas, Bilinsky does not set forth any evidence of suspicious timing, ambiguous statements, or a discrepancy between similarly situated employees.[6] She argues only that American lacked a legitimate, non-discriminatory basis for denying her the Analyst Manuals position because (1) it was previously held by someone with a similar work-from-home arrangement; (2) her interviewer and would-be supervisor was aware of her current WFHA and still indicated that Bilinsky was her "top choice" for the position; (3) her current supervisor, Adler, knew that she applied for the position; and (4) no evidence suggests that American considered the job duties in determining Bilinsky was unqualified because the position required a physical presence at DFW as an essential function. *See* (Dkt. No. 67, at ¶¶ 26-29); (Dkt. No. 71, at 19). Even if Bilinsky had argued suspicious timing the argument fails because of the length of time between her request for accommodation and the date they informed her of the hiring decision for the Analyst Manuals position. *See* (Dkt. No. 67, at ¶ 26); (Dkt. No. 60, at 17); *Mobley*, 531 F.3d at 549 (suspicious timing is generally limited to days, or at most, weeks of the employee's exercising a protected right). Furthermore, the record is devoid of ambiguous statements or examples of similarly situated employees receiving preferential treatment in hiring after requesting an accommodation.

6     Although Bilinsky references employees who have WFHA agreements as of 2017, they are not comparable because they do not hold "headquarters positions" and so they are not similarly situated.

The parties do not dispute that Bilinsky's request for an accommodation constitutes a protected activity or that American's decision to deny her the position constitutes an adverse action. But even assuming these elements are satisfied, Bilinsky cannot establish a causal connection between her request for an accommodation and American's decision not to offer her the Analyst Manuals position. She offers no direct evidence relating the actions and does not cite any circumstantial evidence which permits a reasonable inference that American retaliated against her. There is no evidence that Laura Risley – the woman who interviewed her and would have been her supervisor – was aware that Bilinsky had a pending request for accommodation with American. Further, although Adler knew of her request for accommodation, Bilinsky states Adler "had no vendetta" against her. *See* (Dkt. No. 61, at ¶ 80). In fact, she admits her belief for not getting the position was because "Adler decided that all individuals in his department needed to be physically present at headquarters." *See* (Dkt. No. 67, at ¶ 79). Bilinsky further states it was her opinion that she was denied the position for "the same reason that American didn't allow her to stay" in her Communications Specialist job. *See* (Dkt. No. 61, at ¶ 80). These assertions essentially undercut her claim of retaliation because Adler's decision that all Department employees had to be present at headquarters is precisely a "legitimate, non-discriminatory basis" for denying her the position.

**\*10** In response to other facts noted by Bilinsky, American also points out that the Analyst Manuals position was open in the first place because the previous employee refused to alter her work-from-home arrangement and was subject to reduction-in-force. *See* (Dkt. No. 61, at ¶ 42). Additionally, even if Bilinsky was Risley's first choice for the position that fact bears little significance in the context of the entire record. Bilinsky even acknowledges that Risley could not unilaterally approve her hiring and that American's motive was operational in nature.

There is no disputed fact requiring a jury to determine whether American retaliated against Bilinsky by not hiring her for positions that either she was not personally qualified for or that required a physical presence at American's DFW headquarters. Therefore, American's motion for summary judgment is granted as to the claim for retaliation (Count II).

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 23 of 35 PageID #:683

Bilinsky v. American Airlines, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4181481, 2018 A.D. Cases 317,270

## C. IHRA Claim

Given that the American is entitled to summary judgment on the ADA claims (Counts I and II), the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claim alleging a violation of the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq*. Of course, where a district court has original jurisdiction over some claims, such as the ADA claims alleged by Bilinsky, it has supplemental jurisdiction over other claims that are so related that they form a part of the same case or controversy. *See Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). But if the district court dismisses all claims over which it has original jurisdiction, the court's supplemental jurisdiction persists with the caveat that the court can elect to decline to exercise supplemental jurisdiction at its discretion. *Id.* at 738. "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Yet there are three exceptions to this general rule, which are: (1) where any applicable statute of limitations has run, precluding the filing of a state court claim; (2) where the court has already committed substantial resources; and (3) when resolution on the pendant claim is "absolutely" clear. *See Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Based on the decision above regarding the ADA claims and the applicable law in Illinois related to IHRA claims, the third exception applies and so the Court addresses Bilinsky's IHRA claim below.

"The IHRA provides a comprehensive scheme of procedures and remedies for redressing human rights violations." *Rabe v. United Air Lines, Inc.*, 971 F.Supp.2d 807, 819 (N.D. Ill. 2013) (Pallmeyer, J.) (citing 775 ILCS 5 § 1-101, *et seq*.). Bilinsky alleges violations of the IHRA against American for denying her request to continue her WFHA as a Communications Specialist, and for taking "adverse actions" in denying her Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 1, ¶¶ 27-29). Both Parties agree that the Illinois Supreme Court has adopted the same standard, or analytical framework, employed in federal employment discrimination cases for IHRA claims. *See Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (1989); *see also Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016); *Compare* (Dkt. No. 60, at 18), *with* (Dkt. No. 71, at 20). Application of this standard leads to the same result. Where the Court holds there is no genuine dispute of a material fact and judgment as a matter of law proper for the ADA claims (Counts I and II), so too is the case for Bilinsky's IHRA claim. No reasonable jury could return a verdict in favor of Bilinsky based on the undisputed facts before the Court and so American's Motion for Summary Judgment on the IHRA claim is also granted.

## CONCLUSION

**\*11** American's Motion for Summary Judgment as a matter of law is granted as to all three counts.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4181481, 2018 A.D. Cases 317,270

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 24 of 35 PageID #:684

Pickett v. Chicago Transit Authority, Not Reported in Fed. Supp. (2018)

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

2018 WL 3456497
United States District Court,
N.D. Illinois, Eastern Division.

Lawrence L. PICKETT, Plaintiff,
v.
CHICAGO TRANSIT
AUTHORITY, Defendant.

16 C 4337
|
Signed 07/18/2018

**Attorneys and Law Firms**

Lawrence L. Pickett, Park Forest, IL, pro se.

Christopher R. Jensen, Kevin R. Gallardo, Christopher William Sheekey, John Robert McGuire, III, Chicago Transit Authority, Chicago, IL, for Defendant.

**MEMORANDUM OPINION**

Charles P. Kocoras, United States District Judge

**\*1** On April 15 2016, Plaintiff Lawrence L. Pickett ("Pickett") filed a *pro se* Complaint of Employment Discrimination ("Complaint") against Defendant Chicago Transit Authority ("CTA"), a municipal corporation in Chicago, Illinois. The Complaint alleges disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), alongside age discrimination in violation of the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").

Discovery has been completed, permitting the Court's consideration of CTA's motion for summary judgment, which seeks judgment in the entirety in CTA's favor. In reply briefing, CTA also moved to strike both of Pickett's responsive summary judgment submissions, which Pickett stylized as, respectively, his "Motion for Summary Judgment" ("Pickett's Motion") and "Plaintiff's Statement of Material Undisputed Facts in Support of Its Motion for Summary Judgment" ("Pickett's Facts"). Pickett, still arguing *pro se* on his own behalf, opposes. For the following reasons, the Court denies CTA's motion to strike Pickett's Motion,

denies CTA's motion to strike Pickett's Facts, and grants CTA's motion for summary judgment.

**BACKGROUND**

The following facts taken from the record are undisputed, except where otherwise noted. Per CTA's motion to strike Pickett's Facts, § I.b., *infra*, contains the Court's discussion of what facts it deemed properly before it and therefore appropriate for consideration on summary judgment.

**a. Parties & Places**

CTA is an Illinois municipal corporation engaged in providing public transportation services to the Chicago metropolitan area. CTA hired Pickett as a part-time bus operator on July 18, 2005, where, except for a relatively brief layoff period, Pickett continued to work until his retirement on April 6, 2017. Pickett was a member of Amalgamated Transit Union Local 241 ("Union") throughout his employment with CTA. He is presently 68 years old.

**b. CTA Procedures Relevant to Disabled Employees & Disability Accommodations**

CTA's Administrative Procedure #1017 covers CTA procedures for employees with "substantial medical restrictions and/or disabilities" who may require reasonable accommodations. Procedure #1017 also establishes the Accommodation Review Committee ("ARC"), through which employees can request medical accommodations in writing. Upon making such a request, Human Resources' Benefit Services team collects medical and employment information. Benefit Services then works with the employee to determine if the request can be met.

CTA's Administrative Procedure #1601 states that all terms and conditions of employment be administered without regard to any legally protected class, including age and disability, provided that the individual with the disability is able to perform with or without accommodations the essential functions of the job that he or she holds or desires to hold.

CTA's Administrative Procedure #1012 details procedures for both reporting injuries sustained on duty as well as the employee's transitional return to work. Procedure #1012 establishes a Transitional Return to Work ("TRTW") program that returns an injured employee to work at less than their full-duty assignment for "a limited period after they have suffered

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

an injury on duty with the objective to return the employee to full duty as soon as possible." To be placed in TRTW, an employee must be unable to resume unrestricted full duty but be otherwise able to work in a modified capacity. The TRTW policy further indicates as follows:

**\*2** Employees with temporary physical or mental limitations sustained as a result of a compensable injury on duty are eligible for TRTW assignments if these temporary physical or mental limitations prevent them from performing their regular duties and there is a TRTW assignment available which the employee is able to perform.

Procedure #1012 also states, "TRTW is temporary in nature and is intended to ease the employee back to regular duty. Employees with restrictions that would permanently prevent them from returning to their full-time jobs will not be provided TRTW work assignments."

### c. Age Discrimination

In deposition testimony, Pickett stated that in or around September 2014, he was playing dominoes at CTA's 74th Street Garage with other employees when his general manager, Randolph Williams ("Williams"), approached him and said, "Mr. Pickett, I'm color-blind, but I can tell that that hat isn't blue," in reference to Pickett's hat and its non-conformance with CTA's uniform policy. Pickett testified that he then had to take his hat off, even though other people playing dominoes "were in different array of not being in mandatory uniforms, and nothing was said to anybody else." Pickett testified that although he never felt that Williams discriminated against him based on his age, he did "start[ ] suspecting that maybe [Williams] was there to help create an environment of discomfort for [Pickett]," since his prior relationship with Williams while working at a different garage was a "different, ... relatively casual and comfortable relationship."

Pickett's Facts state that he "could not find" a CTA provision that required employees to wear hats of a specified color. He cites to an attached exhibit titled "Personnel Bulletin," with a subject line of "Uniform Requirements" and an effective date of March 2, 2014. In its discussion of the acceptable "All-Weather Uniform," the document states that a "cap" is "optional," so long as it is an "[a]uthorized CTA baseball style cap with CTA patch." The document also contemplates the acceptable uniform for "Winter Weather," which covers the period from October 15 through April 30, and so would not have included the likely date of Pickett's interaction with

Williams in September. That section does, however, allow for two types of "hats" to be worn, either of which must be "navy" in color.

After Williams commented on Pickett's hat, another co-worker—not Williams—called Pickett by the name "Pops." Pickett testified that the only name he was ever called that implicated his age was "Pops" and the only CTA employees who utilized the nickname were other "co-workers," not supervisors.

In or about December 2015, Pickett met with a Union representative, Tanno Muhammad ("Muhammad"), to inquire about the status of a grievance that Pickett had filed. During the meeting, Muhammad called an individual at CTA to discuss the grievance. Per Pickett's testimony, Muhammad told Pickett that the individual on the phone inquired, "[S]ince [Pickett] was born in 1948, why doesn't he just retire?" Pickett did not know who Muhammad was talking to nor who made the comment, and he did not ask Muhammad who was on the other end of the line.

Pickett also testified that he was sent "two mailings" regarding benefits that he would receive if he retired. Pickett does not recall who sent him the letters, but he interpreted them as encouraging him to retire. Pickett felt that this was discriminatory because, per his testimony, "I didn't feel that it was anybody's decision to make but mine when I was going to retire." Pickett also testified that nobody from CTA ever asked him about his age. However, according to Grievance No. 09-0626, filed by Pickett in June 2009, CTA transportation manager Charles Morris ("Morris") told Pickett that he would be charged with a violation. In the same meeting, the grievance states that Morris told Pickett, "Yeah you are old enough to be my father."

### d. Disability Discrimination

**\*3** On or about April 6, 2011, Pickett was working as a bus operator when he was physically attacked by a passenger. As a result of the attack, Pickett was diagnosed with Post-Traumatic Stress Disorder ("PTSD").

In 2013, Pickett approached his general manager/ transportation manager, Keeby McMillon ("McMillon"), to seek assistance. Pickett testified that "she humiliated" him, and he asked her if they could speak in private. Pickett testified that McMillon refused to close the door because she did not want to be alone in the room with him, apparently "because she didn't feel safe." McMillon did not reference

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

Pickett's PTSD during the meeting, but Pickett assumed that she knew about his condition. Pickett felt that McMillon's refusal to close the door during their meeting was an act of disability discrimination.

Pickett also testified that he believed that CTA discriminated against him based on his PTSD when CTA did not permit him to return to work on light duty/TRTW status on three occasions. Pickett could not remember when each of these incidents occurred.

On or about July 22, 2015, while Pickett was working as a bus operator, he was allegedly verbally assaulted by a passenger who refused to pay his fare and threatened Pickett by telling him "if you don't take me downtown, you're going to die." The police eventually arrived, removed the passenger from the bus, and told Pickett to resume service. Pickett continued working his shift and, as a result of the incident, developed a severe headache and numbness in his right arm. At the end of his shift, Pickett took himself to the hospital as he thought he was having a stroke. After being hospitalized for one day, Pickett was diagnosed with having a transient ischemic attack. Pickett testified that the July 22 incident aggravated his PTSD. After the incident, Pickett was off work from July 22, 2015, until December 2015.

Prior to December 2015, Pickett contacted CTA to try to return to work. He was required to get clearance from Concentra, CTA's third party medical services provider, but, per Pickett's testimony, "on a couple of occasions," he "was denied because [his] blood pressure was high." Pickett also testified that when he tried to return to light duty, an unidentified transportation manager told him that there were not any light duty positions available at his work location.

On December 16, 2015, Pickett, on his own accord, returned to work, having been released by Concentra to return to work that same day. Prior to returning to work on December 16, Pickett did not contact CTA's Leave Management Department to inquire about the availability of a vacant budgeted position or receive clearance to return to work. He worked until December 19, 2015, when an unknown CTA employee informed him via telephone that he could not return without first following proper procedure.

Pickett was placed in Temporary Medical Disability, also known as Area 605,—a program for eligible union employees who have been found medically unfit to perform the essential functions of their job classification due to an illness or injury

for sixty days or longer—because he had not cleared all of his medical hurdles and did not follow CTA's procedures for returning or requesting an accommodation. Principally, Pickett needed to complete proper medical testing and drug screening to be able to return to work, but had yet to do so as of December 19, 2015. Pickett then received a letter from CTA's Leave Management Department, dated December 15, 2015, informing him that he was to be placed in Area 605. The letter informed Pickett of the return-to-work process and how to go about requesting an accommodation. CTA employees returning to work from an injury suffered on duty do not automatically get assigned to light duty. Rather, they receive light duty only if it is available and they are medically cleared for it. Pickett's assignment into Area 605 was effective retroactively to December 14, 2015.

**\*4** Pickett testified that CTA also failed to accommodate his PTSD by "not seeming to acknowledge it." In particular, Pickett contends that CTA did not offer him, or explain how to take, time off under the Family and Medical Leave Act ("FMLA"). Pickett did note, however, that he received a letter indicating that he was qualified for FMLA leave, and he did not indicate in his deposition that he actually requested to take such leave.

On or about January 6, 2017, Pickett submitted to ARC a request for an accommodation, asking to be placed on light duty. However, before ARC could consider the request, Pickett sent a letter, dated January 19, 2017, retracting the requested accommodation. Pickett testified that he thought he was eligible to work light duty because he had been allowed to do so after he was attacked on April 6, 2011.

Pickett thought that he should be allowed to return to light duty "[b]ecause [he] had been previously from the incident in 2011 and [he] thought the circumstances were similar." Pickett testified that, in December 2015, CTA employees younger than him were permitted to work light duty at the 74th Street Garage. Pickett did not know these employees' ages or names, but he assumed they were younger than him based on their physical appearance. He also knew nothing about their personal circumstances, nor who their supervisors were. Pickett's exhibit titled "TRTW and Non-Operator Assignment Sheet For: Sunday, December 20, 2015" lists seven individuals, including Pickett. The document does not indicate anything beyond the last name of each individual, for how long they were allowed to work per day, and whether they were slotted in TRTW or the "Drivers License Program." The

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

document is signed by "Thomas Thornton, Transportation Manager."

Pickett testified that he wanted to be placed on light duty indefinitely. Per CTA's Administrative Procedure #1012, the TRTW program is temporary in nature and available only when vacancies arise.

Pickett testified that he does not know if his supervisors actually knew about his PTSD. Rather, he assumed that they did because he submitted his medical records to management. To what managers he provided such records, Pickett did not specify.

Pickett further testified that he attempted to come back to work light duty in 2016, but he did not qualify because of his blood pressure and the medication he was taking. Pickett contended that these were additional instances of CTA's failure to accommodate his disability, but he could not identify when or how.

Pickett returned to work at CTA on April 1, 2017. Six days later, on April 6, 2017, he retired. Pickett filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 15, 2016 ("EEOC Charge"), alleging retaliation and discrimination based on age and disability.

## LEGAL STANDARD[1]

[1] The Court notes that CTA served on Pickett a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a *pro se* litigant opposing summary judgment. Having reviewed the Notice, the Court finds that it was consistent with the dictates of *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992), and sufficient for Pickett to be apprised of his responsibilities.

In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris*

*Trust & Sav. Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir. 1989).

**\*5** Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with the motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.' " *Ammons v. Aramark Unif. Servs.*, Inc., 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3) ). "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 2015 WL 3930351, at \*3 (N.D. Ill. 2015). "The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial." *Id.* The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must support his contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## DISCUSSION

### I. CTA's Motion to Strike Pickett's Motion

In its reply brief, CTA moves the Court to strike Pickett's Motion because it "fail[s] to comply with this Court's ordered deadlines and the Local Rules." We address Pickett's complications with both this Court's deadlines and the Local Rules, in reverse order.

CTA notes that Pickett did not follow the strictures of Local Rule 56.1 by failing to "file a supporting memorandum of law or statement of material facts to which he contends there is no genuine issue of fact." Indeed, strictly speaking, Pickett's Motion is neither what the Local Rules call for nor what the Court requested. Rather than filing a motion directly responsive to CTA's motion for summary judgment, Pickett characterized his submission as his own motion for summary judgment. He did not submit a separate motion and memorandum of law, and his statement of material facts— discussed in greater detail, *infra* § II.—is deeply problematic.

But Pickett is a *pro se* plaintiff, one who submitted to the Court a filing that, while technically unsound and formally improper, demonstrated at least some attempt to respond

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 28 of 35 PageID #:688

Pickett v. Chicago Transit Authority, Not Reported in Fed. Supp. (2018)

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

to CTA's arguments in its opening motion. Federal courts may recharacterize the label a *pro se* litigant attaches to a motion and place it within a different legal category "in order to avoid an unnecessary dismissal, to avoid inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Castro v. U.S.,* 540 U.S. 375, 381—82 (2003) (internal citations omitted). Pickett's noncontroversial unfamiliarity with the dogma of federal litigation should not abort his ability to argue his position before the Court. We decline to strike Pickett's Motion for failure to comply with the Local Rules, and instead recharacterize Pickett's "Motion for Summary Judgment" under the more proper categorization of a response to CTA's motion for summary judgment.

CTA also requests that we strike Pickett's Motion for failure to comply with deadlines. The Court set an original briefing schedule that called for a responsive submission on February 13, 2018; Pickett missed that date. One week later, on February 21, 2018, he requested an extension of time to respond to CTA's motion. We granted Pickett's request and afforded him a new deadline of March 13, 2018—a deadline that Pickett met.

CTA's contention that Pickett's March 13 filing "[came] almost two months after the Court's ordered deadline for the parties to file their summary judgment motions (January 16, 2018)" is a bald-faced untruth. Our minute entry states, "Summary Judgment is due by 1/16/2018. Plaintiff's response is due by 2/13/2018." Unequivocally, this entry reflects that CTA's motion for summary judgment was due on January 16, 2018, and Pickett's response was due on February 13, 2018. Pickett's response, then, was not "almost two months" late when it was uploaded on March 13, 2018. Rather, it was submitted one month after its initial due date, and so submitted with the blessing of this Court's extension of time. To suggest that Pickett so blatantly disregarded this Court's calendar such that a striking of his entire responsive pleading would be warranted is as disingenuous as it is callous. CTA's request is denied, we recharacterize Pickett's Motion as a response to CTA's motion for summary judgment, and proceed accordingly.

## II. CTA's Motion to Strike Pickett's Facts

 **\*6** CTA also asks the Court to strike Pickett's Rule 56.1 factual submission or, in the alternative, deem CTA's statement of facts admitted. CTA identifies the following issues in Pickett's Facts as reason for the Court to strike

his filing: (1) Pickett's repeat qualified admissions that set forth argument, legal conclusions, and irrelevant facts; (2) Pickett's failure to provide a response to the substance of CTA's statement of facts; and (3) Pickett's routine failure to cite to the record to support his alleged facts and arguments. Even a cursory read of Pickett's Facts reveals each of CTA's highlighted problems to be abundant and true.

Rather than respond directly to CTA's factual recitation, Pickett frequently cherry-picks specific facts from CTA's 56.1 filing to use as a springboard into questionably relevant factual disquisitions. His interaction with CTA's facts are commonly argumentative and conclusory, and rarely directly responsive to the substance of whatever fact is in issue. Pickett's penchant for desultory discourse would not be so alarming were it not for his glaring failure to support his responses with citations to the record. This is a fundamental problem, one that directly contravenes Rule 56.1's function, as highlighted by CTA:

> The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the fact. A litigant who denies a material fact *is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion,* for quick reference of the court.

*Curtis v. Costco Wholesale Corp.,* 807 F.3d 215, 219 (7th Cir. 2015) (emphasis added). As CTA also noted, the requirement of citations to the record is especially crucial in a case like this. "Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ.,* 267 F.3d 723, 727 (7th Cir. 2001) (internal citation and quotation marks omitted).

We are confident, then, that even with Pickett's *pro se* status, the striking of his facts would not be beyond the pale. See *F.T.C. v. Bay Area Bus. Council, Inc.,* 423 F.3d 627, 633 ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules"); *see also Abdel-Ghaffar v. Ill. Tool Works, Inc.,* No. 12 C 5812, WL 5025461, at \*6—7 (N.D. Ill. Sept. 30, 2015) (striking a *pro se* plaintiff's Rule 56.1 response for failure to comply with

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

the local rule). To deem CTA's facts admitted at the expense of Pickett's Facts would accomplish virtually the same goal.

Here, however, we decline to pursue either tack in full, where at least some entries in Pickett's Facts are directly responsive to CTA's facts and include proper citations to the record. While we appreciate our reviewing court's blessing to "not scour a record to locate evidence supporting a party's legal argument," *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005), in those few instances where Pickett made the effort to incorporate the record, we went about reviewing the cited portion of the record to determine if his assertion accurately reflects the evidence to which it cites.

The effect of our determination is this. Wherever Pickett wholesale declined to cite to the record to support his assertions, we have disregarded his characterizations and—where the record supports its assertion—accepted CTA's as true, since no foundational opposition exists to CTA's fact. Wherever Pickett cited to a portion of the record that clearly failed to support his assertion, we have similarly disregarded the proposed fact, and accepted CTA's well-founded assertion as true. Where Pickett was non-responsive or offered plainly irrelevant material, we have also disregarded the response. Finally, wherever Pickett properly incorporated the record to push against CTA's 56.1 statement, we have integrated his cited evidence into our own factual recitation.[2] As a result, although we deny CTA's motion to strike Pickett's Facts or, in the alternative, deem CTA's 56.1 facts admitted, a great many of CTA's well-founded facts were ultimately deemed admitted under our piecemeal approach, and they informed the lion's share of the factual record before us.

[2]     In accordance with the methodology detailed above, the following facts from Pickett's Facts have been disregarded by the Court in their entirety: 3, 8, 16, 17, 18, 20, 25, 26, 32—35, 38, 40, 43—58, and 60—68. The following of Pickett's Facts have been disregarded in part and considered in part: 8, 14, 30, and 31. From CTA's 56.1 submission, the Court disregarded in part and considered in part fact 37.

## III. Statute of Limitations

**\*7** "In Illinois, an employee may sue under the ADEA or ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.' " *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). Pickett filed his EEOC charge on January 15, 2016. Therefore, any allegations of

discriminatory misconduct that occurred before March 22, 2015, are barred under the 300-day statute of limitations.

According to CTA, that renders the following incidents time-barred: (1) the April 2011 incident where Pickett was attacked and subsequently diagnosed with PTSD; (2) McMillon's alleged disability discrimination when she refused to close the door during her meeting with Pickett in 2013; and (3) Pickett's incident of alleged age discrimination in September 2014, when Williams, Pickett's supervisor, allegedly chastised Pickett for wearing an unauthorized hat and another co-worker allegedly called Pickett by the name "Pops."

The Court agrees with CTA as to the second and third incidents. Pickett's 2013 interaction with McMillon occurred, at a minimum, three years before the EEOC Charge was filed. The comment from Williams and the co-worker's comment of "Pops" occurred were uttered sixteen months before Pickett filed his charge. Both incidents were discrete confrontations that accrued well before March 22, 2015, and Pickett offers no response to CTA's contention that they should be time-barred. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver"); *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (the plaintiff waived his claim "by failing to press it before the district court"). Pickett's claims that he was discriminated against in 2013 by McMillon and again by Williams and an unknown co-worker in September 2014 are time-barred.

Although neither party presses the allegation with much vigor, the Court also noted an exhibit of Pickett's that detailed a confrontation with transportation manager Morris in 2009. The grievance states that Morris allegedly told Pickett during the incident, "Yeah you are old enough to be my father." Again, the parties hardly address this episode, but it is record evidence. Having taken it under consideration, the Court finds that it is also time-barred, having occurred more than half a decade before March 22, 2015.

The Court rejects CTA's request to bar from consideration Pickett's 2011 assault and subsequent PTSD diagnosis. Certainly, Pickett may question CTA's treatment of him *after* he was diagnosed with PTSD. In his opposition brief, he states, "I was diagnosed with [PTSD] in 2011 after a passenger attacked me and CTA transportation managers failed to provide adequate and professional support." Pickett goes on to detail the issues he had with CTA's treatment of him following this diagnosis. Pickett does not,

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

however, identify the 2011 incident as a discrete example of CTA's discrimination against him. Such a contention, that a passenger's inexplicable attack on Pickett somehow evidences CTA's animus towards its employee, would be preposterous. Pickett rightly refrains from arguing as such. The 2011 incident is before us for a contextual purpose, not a legally actionable one; it is not time-barred.

## IV. Pickett's Discrimination Claims

Courts in the Seventh Circuit analyze employment discrimination claims under two standards. Under either analysis, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). We address Pickett's age discrimination claim first, before turning to the disability discrimination issue.

### a. Age Discrimination

#### i. *McDonnell Douglas* burden-shifting standard

**\*8** One route by which Pickett can establish a case of employment discrimination is via the burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this model, Pickett must demonstrate that: (1) he was a member of a protected class; (2) he was performing to CTA's legitimate expectations; (3) despite his performance, he suffered an adverse employment action; and (4) others, similarly situated but not in the protected class, were treated more favorably. *Id.* If Pickett can establish these elements, the burden shifts to CTA to demonstrate a legitimate, non-discriminatory reason for Pickett's treatment. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241—42 (7th Cir. 1996). If CTA meets this burden, Pickett must demonstrate that the proffered explanation is pretextual. *Id.*

CTA argues that Pickett can demonstrate neither of the last two prima facie elements on his ADEA claim—that he suffered an adverse employment action and that he was treated unfavorably as compared to other, similarly situated but non-protected employees.

Because Pickett's interaction with Williams is time-barred, the only employment actions implicative of Pickett's age that the Court can discern as arguably adverse are: (1) the December 2015 telephone comment from an unknown individual, relayed to Pickett by Muhammad, in which the individual on the phone asked, "[S]ince [Pickett] was born in

1948, why doesn't he just retire?"; and (2) the mailings that Pickett received discussing retirement benefits.

At the outset, we note that Pickett discusses neither incident in his response. Indeed, Pickett hardly discusses his ADEA claim at all. Pickett is acting *pro se*, and the Court has taken painstaking care to afford Pickett's claims careful attention. However, "[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. Cook Cnty.*, 709 F.2d 1122, 1126 (7th Cir. 1983). Arguments not raised before the district court in response to summary judgment are waived. *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not meaningfully developed in any way are waived"). It was Pickett's responsibility to develop a position regarding the viability of his age discrimination claim, a responsibility which he failed to uphold.

Lacking a position of opposition, the Court can find no path steeped in reason to contravene CTA's argument that these incidents do not constitute actionable adversity. "Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer*, 662 F.3d 448, 453—54 (7th Cir. 2011).

Plainly, neither incident implicated Pickett's terms of employment or future career prospects. As to the third general category, a phone call from an unknown CTA employee prodding not the plaintiff himself, but a Union representative, about Pickett's age is hardly an "unbearable change in job conditions." "[N]ot everything that makes an employee unhappy is an actionable adverse action.... Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004) (internal citations and quotation marks omitted). A discussion between employees that Pickett happened to be privy to, wherein but one arguably condescending remark was made, is definitively one such

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 31 of 35 PageID #:691

Pickett v. Chicago Transit Authority, Not Reported in Fed. Supp. (2018)

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

triviality. It was immaterial, and an insufficient basis on which to ground a discrimination claim.

**\*9** The same goes for the pair of mailings that Pickett received. For starters, Pickett presents no evidence that there was anything adverse about the letters beyond his own jaded interpretation of them. Moreover, an objective reading of the letters in the record reveals them to be little more than informational offerings. The only reasonable interpretation of the documents is that they were of a helpful sort, not adverse. In any event, Pickett does not know who sent him the mailings, and he only identified them as discriminatory because he "didn't feel that it was anybody's decision to make but mine when I was going to retire." The letters do not quarrel with Pickett's feelings and never suggested that it was somebody else's decision. Pickett's basis for finding the letters discriminatory is unreasonable. The letters were, at worst, another triviality, and more likely, a useful tool for a veteran employee. They do not constitute an adverse employment action.

Finally, for posterity's sake, we note that, for his age discrimination claim, Pickett did not even attempt to demonstrate that similarly situated CTA employees were treated more favorably than he. On his ADA claim, Pickett at least offered some documentation, albeit flawed, in this vain. *See infra* § IV.b.i. Not so on his ADEA cause of action. Having failed to demonstrate an adverse employment action based on his age, and having failed to show that similarly situated, non-protected individuals received more favorable treatment, Pickett cannot carry his burden under *McDonnell Douglas.*

### ii. *Ortiz* reasonable factfinder standard

Under *Ortiz,* we ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's ... proscribed factor ... caused the discharge or other adverse employment action." 834 F.3d at 765; *see Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 899 (7th Cir. 2016) (internal citations omitted) ("the critical question ... is simply 'whether a reasonable jury could infer prohibited discrimination' "). The evidence before the Court must be considered as a whole, not bit by bit. *Ortiz*, 834 F.3d at 760.

As discussed above, the Court is hard-pressed to discern a single occasion of actionable age-based adversity against Pickett. Without a reasonably inferable adverse employment action in the record, no factfinder could conclude that age-

based discrimination took place. Additionally, Pickett offers no *Ortiz*-adjacent argument in his response brief, so any relevant putative argument that could be made on his behalf is waived. *Arendt*, 99 F.3d at 237.

Lacking a demonstrable issue of material fact and having failed to show under *McDonnell Douglas* or *Ortiz* that the record contains evidence of actionable discrimination, Pickett cannot succeed on his ADEA claim. The Court awards summary judgment in CTA's favor as to Pickett's age discrimination claim.

### b. Disability Discrimination

### i. *McDonnell Douglas* burden-shifting standard

As with his ADEA claim, CTA again argues that Pickett has failed to establish both of the last two prima facie *McDonnell Douglas* elements—that he suffered an adverse employment action and that he was treated unfavorably as compared to other, similarly situated but non-protected employees. In opposition, Pickett contends that CTA transportation managers "failed to provide adequate and professional support" in the wake of his PTSD diagnosis, primarily in that he "was not allowed to work light duty which similarly situated bus operators were able to." Pickett also contends that his PTSD was "exacerbated by episodes with angry or threatening passengers and hostile managers." Finally, Pickett accuses CTA attorneys of having improperly redacted his deposition transcript and deflected his efforts to depose "Mrs. Monica McMillan-Robinson, members of the Leave Management staff, and Sedgwick Claims Management personnel."

Briefly, as to Pickett's accusations of CTA's impropriety, the Court notes that it has been provided with no evidence of such. No evidence of improper redaction, no evidence of untoward interference with Pickett's evidence-collection efforts, no evidence of anything to suggest either brand of misconduct. Without evidence to support his unfounded allegations of CTA's behavior, the Court emphatically rejects Pickett's attendant arguments.

**\*10** Turning to Pickett's suggested adverse employment actions, we begin with his "hostile managers" contention. The only arguable instance of a CTA manager treating Pickett with hostility because of his PTSD is Pickett's interaction with McMillon, which the Court has already barred from

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 32 of 35 PageID #:692

Pickett v. Chicago Transit Authority, Not Reported in Fed. Supp. (2018)

2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

consideration as untimely under the applicable statute of limitations. The record is otherwise bare regarding supposed disability hostility from Pickett's supervisors; the Court finds no adverse employment action based on manager hostility.

Additionally, Pickett offers no authority for his suggestion that CTA is somehow responsible for the anger and threats of bus passengers, and the Court can find no case law to support such a proposition. Certainly, CTA was required to uphold its ADA requirements in the wake of Pickett's PTSD diagnosis, but it cannot be held responsible for the actions of non-employees who acted out of line while riding public transportation.

Cutting to the quick, Pickett's central issue with CTA is not that its managers or customers might have treated him less than ideally, but rather that CTA itself failed to adequately support his PTSD when it allegedly kept him from working TRTW, despite allowing others, similarly situated, to occupy light duty roles. The first inquiry—whether CTA's declination to place Pickett on light duty amounted to an adverse employment action—is almost certainly no. Pickett himself seems to suggest that his inability to operate a bus required a permanent reassignment to a different position. As discussed below, however, the ADA does not require employers to reassign disabled employees to permanent light duty. Nor does it entitle a disabled employee to whatever accommodation he wants. *See infra* § V.

Moreover, the factual timeline indicates that Pickett's troubles returning to work, light duty or otherwise, were routinely the result of his issues obtaining medical clearance. The record reflects a recurring struggle with high blood pressure, one that kept CTA from allowing Pickett back to work even had it so desired. In 2015, when Pickett finally did receive Concentra's clearance to return to work, he declined to request an accommodation. In 2017, when Pickett ultimately did submit a proper request to be placed on TRTW, CTA was unable to accommodate Pickett because he retracted the request less than two weeks later.

Finally, Pickett's stated inability to receive a TRTW assignment is belied by his own Exhibit B, a TRTW assignment sheet dated December 20, 2015. On it, Pickett is listed next to an entry that reads "TRTW 8 Hours Per Day." It also indicates that Pickett began a TRTW role on December 18, 2015. The only reasonable inference to be drawn from this document is that Pickett's supervisor placed him on temporary light duty when he briefly returned to work for a few days

in 2015, from December 16 until December 19. Pickett was then taken off light duty when CTA discovered that he was working again without its approval. Pickett was placed in Area 605, from which he could return to light duty if he requested the accommodation and had it approved. His failure to request a TRTW role, despite being instructed on how to do so in a letter sent to him by CTA, kept Pickett from the program until he finally submitted a proper recommendation in January 2017, which itself proved fruitless because of his retraction.

The legal upshot of this is that Pickett was not discriminated against because of his disability, but rather that he was accommodated for a time, and then given an opportunity to re-seek said accommodation through the Temporary Medical Disability program. We discern no adverse employment action from such a circumstance.

**\*11** Even had adversity colored Pickett's interactions with the TRTW program, his own exhibits fail to satisfy the last prima facie *McDonnell Douglas* element, that others, non-protected but similarly situated, were treated more favorably. The only evidence that touches this concern is the document from December 20, 2015, which lists other CTA employees at the 74th Street Garage who were on TRTW or non-operator assignment. The document lists five individuals on TRTW status, including Pickett. Rather than show that he was treated unfavorably, though, the document shows that Pickett was accommodated in the same fashion as others at his workplace. Moreover, assuming *arguendo* that the document did illuminate some disparate treatment, it offers no identifying characteristics about the individuals enlisted. Ages, genders, ethnicities, and any other relevant traits necessary for a similarly-situated analysis are absent. Regardless, the document firmly supports CTA's position. Pickett was treated just like his co-workers, a far cry from disfavor.

Finally, as was the case with his age discrimination claim, we note that Pickett himself offered almost nothing in the way of affirmative argument supporting his ADA claim. The vast majority of the Court's consideration was informed by its own research and record-scouring. While the Court conjured many an argument for him, we continue to recognize that arguments not raised in response to summary judgment are waived. *Arendt*, 99 F.3d at 237. Having failed to demonstrate an adverse employment action based on his disability, and having failed to show that similarly situated, non-protected

Case: 3:19-cv-50226 Document #: 57-1 Filed: 08/23/21 Page 33 of 35 PageID #:693

Pickett v. Chicago Transit Authority, Not Reported in Fed. Supp. (2018)
2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

individuals received more favorable treatment, Pickett has failed to carry his *McDonnell Douglas* burden.

### ii. *Ortiz* reasonable factfinder standard

Once more, and for the reasons just articulated, the Court is unable to find a material fact suggestive of disability discrimination. No record evidence suggests that he was mistreated by co-workers because of his PTSD, and no record evidence indicates that he was withheld from the TRTW program because of his PTSD. Lacking either, we cannot reasonably conclude that any disability discrimination took place. As to the ADA discrimination claim, the Court awards summary judgment in CTA's favor.

### V. Failure to Accommodate Claim

The final issue before us is Pickett's charge that CTA failed to accommodate his disability. To establish such a claim, Pickett "must point to evidence that ... would demonstrate that (1) he is a qualified individual with a disability, (2) his employer was aware of the disability, and (3) his employer failed to reasonably accommodate that disability." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014).

CTA makes a half-hearted attempt to argue that its supervisors may not have been aware of Pickett's PTSD, but it is the third prong that settles this issue. As CTA notes, "[T]he ADA does not entitle a disabled employee to the accommodation of his choice. Rather, the law entitles him to a *reasonable* accommodation in view of his limitations and his employer's needs." *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015). This axiom mutes Pickett's sworn testimony, where he stated that he should have been allowed to return to light duty "[b]ecause [he] had been previously from the incident in 2011 and [he] thought the circumstances were similar." The law expressly condemns this brand of expectancy. That Pickett thought he should be placed on TRTW does not make it so.

Moreover, Pickett testified that rather than work as a bus operator, he wanted to be placed on light duty permanently, this despite TRTW's stated purpose as a program for temporary placement. The Seventh Circuit has rejected this line of thinking full-stop. "An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee. Nor is there any duty to reassign an employee to a permanent light duty position." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) (internal citations and quotation marks omitted).

**\*12** CTA had no duty to immediately assign Pickett to light duty when it discovered he had begun working again, and it certainly was not required to offer him such status on a permanent basis. That Pickett declined to follow procedure for returning to work, and then failed to request his desired accommodation once he was placed in Area 605, is not CTA's fault, but his own. "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). The only accommodation request we have evidence of was the one that Pickett himself stymied when he retracted his January 6 request less than two weeks later, on January 19, 2017. CTA cannot be held liable for failing to accommodate an employee who never, in fact, requested the accommodation at issue. On the ADA failure to accommodate issue, we award summary judgment in CTA's favor.

### CONCLUSION

For the aforementioned reasons, the Court denies CTA's motion to strike Pickett's Motion, denies CTA's motion to strike Pickett's Facts, and grants CTA's motion for summary judgment. It is so ordered.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3456497, 2018 Fair Empl.Prac.Cas. (BNA) 254,489, 2018 A.D. Cases 254,489

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 449016
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.

Jennifer L. KEANEY

v.

Camcar TEXTRON

No. 99 C 50327.
|
March 22, 2002.

MEMORANDUM OPINION AND ORDER

REINHARD.

**\*1** Plaintiff, Jennifer L. Keaney, filed a two-count complaint alleging claims of sexual harassment (Count I) and retaliation (Count II) against her former employer, Camcar Textron. Jurisdiction and venue are proper under 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. §§ 1331, 1343(a)(4), 1391(b). Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

In Count I, plaintiff complains of alleged sexual harassment by coemployees Roger Swanson, Cesario Delgado, and Jim Sanders.

Swanson's last day of employment with defendant was January 27, 1997. Plaintiff filed the EEOC charge in this case on December 22, 1997, more than 30 days after the expiration of the 300-day limitation period for any conduct of Swanson's during his employment with defendant. See 42 U.S.C. § 2000e-5(e). Plaintiff claims that his conduct was part of a continuing violation. A plaintiff may not base her suit on conduct occurring outside of the limitations period unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as where the conduct could constitute or be recognized as actionable harassment only in light of later events occurring within the limitations period. See Hall v. Bodine Electric Company, 276 F.3d 345, 353 (7th Cir.2002). In her Response to Defendant's Motion for Summary Judgment plaintiff states as additional facts: "Almost immediately after being hired, Swanson asked her (plaintiff) out. Upon learning that she was dating an older man, he began making offensive comments about their age difference.... He later made it clear to Keaney that he did

not like working with women and referred to her and other women in the plant as stupid or "stupid bitches." ... Swanson also repeatedly stated that Keaney had "too big of an ass" and that he could not date her for that reason; that her boyfriend would be too old to satisfy her sexually; he said that he could satisfy her and teach her new things sexually; and told "just about anybody who would listen" that her boyfriend had a "shriveled and old" penis.... Along with Sanders, Swanson made and circulated a cartoon comparing women's breasts on third shift to different fruits. They frequently talked about Keaney's body so that she could overhear them, even debating the size of her breasts and buttocks....Swanson's harassment took place daily, whether through gender-based insults, staring, sexual remarks or inappropriate touching." On the basis of these alleged facts, plaintiff could reasonably be expected to have known that she was being sexually harassed by Swanson and to have brought suit on that sexual harassment within the limitations period. Therefore, the continuing violation doctrine does not operate to make Swanson's conduct actionable, and defendant is entitled to summary judgment on Count I insofar as it alleges sexual harassment by Swanson.

Delgado was a temporary employee without supervisory authority who began working for defendant in January of 1997. Plaintiff complained about Delgado's staring at her. Tom Talkington, plaintiff's lead person, investigated, tried to see if he could catch Delgado staring at plaintiff, and talked to Delgado about plaintiff's claims. Al Kershner (the supervisor who hired plaintiff) also spoke with Delgado about plaintiff's complaints and told Delgado to try to avoid looking at her. On the day plaintiff suspected Delgado may have been waiting for her in the parking lot, Manufacturing Manager Buchman learned of plaintiff's complaints and, upon learning that plaintiff believed Delgado had waited for plaintiff in the parking lot, terminated Delgado. It cannot be said that defendant was negligent in either discovering or remedying the alleged harassment by Delgado, and defendant accordingly cannot be held liable for that alleged harassment. See 276 F.3d at 356.

**\*2** Plaintiff did report to Talkington that Sanders shined a flashlight on her crotch and buttocks. When plaintiff was asked what she wanted done about it, she said she would accept an apology from Sanders. Plaintiff reported to Talkington that Sanders made a comment about plaintiff's menstrual period. When asked what she wanted Talkington to do; she told him to speak with Sanders because she did not want Sanders fired; and Talkington did so. Subsequently,

Sanders became the lead person. As a lead person Sanders was without the authority to hire, fire, promote, transfer, or discipline other employees, and so was not a supervisor for purposes of imputing liability to defendant. See *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1034 (7th Cir.1998); *Bullman v. Penske Truck Leasing Co., L.P.,* 2000 WL 943877, *7 (N.D.Ind.).* According to plaintiff, Sanders continued to harass her, but there is no indication that plaintiff informed defendant of this either by informing a supervisory employee or calling the telephone number for reporting sexual harassment in defendant's Sexual Harassment Policy statement she received when she started working for defendant in November of 1996. Talkington responded reasonably to the conduct reported to him and the conduct after Sanders became lead person was not reported to defendant, which therefore did not have notice of it. See 276 F.3d at 356. Defendant is entitled to summary judgment on the claim that plaintiff was sexually harassed by Sanders.

In Count II, plaintiff alleges that she was terminated in retaliation for complaining of harassment. In her affidavit, defendant's Human Resources Manager SuzAnne Buchanan states that she knew nothing of plaintiff's sexual harassment complaints at the time of plaintiff's termination, and first learned of these complaints when plaintiff filed her December 1997 EEOC charge. The reason Buchanan terminated plaintiff was for plaintiff's failure to report her absence within the three days specified in the company's policy. When Buchanan made the decision it was her honest belief plaintiff had not called

in as required. The evidence that Buchanan did not know about plaintiff's sexual harassment complaints at the time she terminated plaintiff is unrebutted. Therefore, whatever the reason for plaintiff's termination, it could not have been in retaliation for her sexual harassment complaints. Defendant is accordingly entitled to summary judgment on Count II of the complaint.

Therefore, defendant's motion for summary judgment will be granted and this action will be dismissed with prejudice.

JUDGMENT IN A CIVIL CASE

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

• Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendant's motion for summary judgment is granted and this case is hereby dismissed in its entirety with prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 449016

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.